*Folwell*, 477 So.2d at 1063. Since plaintiff fails to distinguish or contradict this authority, the

Court must conclude that the only proper defendant is the church's corporate incarnation, COP.

COP's motion should be granted.

2.    **COP Accepts Plaintiff's Offer to Dismiss the Church.**

Plaintiff does not dispute COP's assertion that the Church is not needed by plaintiff to

prove liability or collect damages. To the contrary, plaintiff concedes that the Church should be

dismissed—and that he would do it himself—if agents of the Church are deemed agents of COP.

Pl.'s Opp. at 4:22. COP hereby accepts plaintiff's offer. With nothing in dispute, the Court

should dismiss the Church.

Setting aside plaintiff's unreasonable suggestion that COP should enter into a stipulation

"for all cases," the circumstances of which are neither known nor relevant here, COP agrees to

the following for purposes of this case: (1) anyone who would be an agent of the Church if the

Church were a party is an agent of COP; (2) any statement that would be an ER 801 party

admission of the Church if the Church were a party is likewise an admission of COP; and (3) the

Church is not an entity to whom fault can be attributed under RCW 4.22.070. Hence, COP has

provided the assurances plaintiff has requested, and the Court should adopt plaintiff's suggestion

to dismiss the Church from the litigation.

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 50

Dockets.Justia.com

### 3.    Judge Zilly's Ruling is Not Binding

Plaintiff states that Judge Zilly already ruled on this issue. This ruling is not law of the case, a doctrine that applies to prior appellate rulings,[3] and plaintiff does not suggest otherwise. Judge Zilly's remand order is like any other pretrial order that can be modified before judgment.

Substantively, as COP previously discussed, it is a ruling borne of a misconception, and thus should be reexamined in light of the undisputed fact that no "empty chair" results from dismissal of the Church. Plaintiff argues he did not intentionally mislead Judge Zilly. Whether plaintiff's briefing to Judge Zilly was intentionally misleading or not is not the point, and COP did not intend to paint counsel in a negative light. The important thing is that plaintiff's suggestion of the empty chair risk came on reply brief, it was wrong, and Judge Zilly relied on it.

### B.    Judicial Estoppel Does Not Apply.

COP candidly concedes that the Church's attention to corporate formalities has not always been as rigorous and consistent as it has become in the last decade. The Church has participated in litigation in its own name. The question for this Court is thus whether the legally correct ruling should be sacrificed because of an artifact of Church history? Legally and equitably, the answer must be no.

Plaintiff's reliance on judicial estoppel is misplaced. Division I of the Court of Appeals, quoting the United States Supreme Court, has stated that judicial estoppel "prevent[s] 'perversion of the judicial process' by not allowing parties to 'gain an advantage by litigation on one theory, and then seek[ing] an inconsistent advantage by pursuing an incompatible theory.'" *Falkner v. Foshaug*, 108 Wn. App. 113, 124, 29 P. 3d 771 (2001) quoting *New Hampshire v.*

---

[3] "In its most common form, the law of the case doctrine stands for the proposition that once there is an appellate holding enunciating a principle of law, that holding will be followed in subsequent stages of the same litigation." *Roberson v. Perez*, 156 Wn.2d 33, 41 (2005)

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS - 4

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

*Main*, 532 U.S. 742, 750 121 S. Ct. 1808, 149 L. Ed.2d 968 (2001). Judicial estoppel is applied in the discretion of the court. *Id.*

As a threshold matter, judicial estoppel should not apply because the alleged inconsistency relates to a question of law—capacity to sue and be sued—not fact. However, "the heart of the doctrine is the prevention of inconsistent positions as to facts. It does not require counsel to be consistent on points of law." *King v. Clodfelder*, 10 Wn. App. 514, 521 (1974). *Accord, Holst v. Fireside Realty Inc.*, 89 Wn. App. 245, 259, 948 P.2d 858 (1997) (the "doctrine prevents a party from taking a factual position that is inconsistent with his or her factual position in previous litigation.")

Both the United States Supreme Court and the courts of this state have cited factors to guide the Court in exercising its discretion, and "these factors are not exclusive and 'additional considerations may inform the doctrine's application in specific factual contexts.'" *Falkner*, 108 Wn. App. at 124-25, quoting *New Hampshire v. Main*, 532 U.S. at 751. The Court of Appeals in *Falkner* identified the following factors:

> [T]he following have been enumerated as essentials to the establishment of an estoppel under the rule that a position taken in an earlier action estops the one taking such position from assuming an inconsistent position in a later action: (1) the inconsistent position first asserted must have been successfully maintained; (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; (4) the parties and questions must be the same; (5) the party claiming estoppel but have been misled and have changed his position; (6) it must appear unjust to one party to permit the other to change.

*Falkner*, 108 Wn. App. at n.36.[4] These factors are not present here:

---

[4] The *Falkner* court noted that the Supreme Court in *New Hampshire v. Maine* identified a similar set of factors: "(1) clear inconsistency between the party's earlier and later positions; (2) the party's success in convincing the court to

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

- **Not successfully maintained:** There is no evidence that the Church actually *advocated* a contrary position, or that a court adopted it. The alleged inconsistency arises solely by virtue of the Church's silence (in those cases in which it was sued) and by implication (in those few cases in which is brought suit).

- **Not clearly inconsistent:** As discussed above, the Church's position was not inconsistent on a point of fact.

- **Not same parties:** Here, the parties are different.

- **Plaintiff not misled:** Plaintiff does not contend the Church's alleged inconsistency caused him to be misled in any way or to change his position.

- **No injustice:** Dismissing the Church cause no injustice to plaintiff, as it affects neither plaintiff's liability nor damages case. To the contrary, it would be unjust to require the Church to answer in all future suits simply because it did not always adhere strictly to corporate formalities.

In sum, whichever half of the equation one examines—the Church's actions or the effect upon the plaintiff—judicial estoppel is not supported. The Church did not persuade a court in the earlier actions to accept its right to sue or be sued, which in any event is a legal question. And, plaintiff asserts no reliance or prejudice. Plaintiff cites judicial estoppel in an effort to lock the Church into a position which plaintiff impliedly concedes is not supported by law. This is not a just result, it is not supported by the law, and it should not be endorsed by this Court.[5]

accept its position in the earlier litigations; and (3) an unfair detriment to the opposing party from allowing assertion of the inconsistent positions." *Falkner*, 108 Wn. App. at 125.

[5] Plaintiff's judicial estoppel argument focuses particular attention on *Scott v. Corporation of the Presiding Bishop of the Church of Latter Day Saints*, et. al. (D. Ore. Civ. No. 98-366). In that case, the complaint named the Church,

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS - 6

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

1
2
**C.    Compliance with the Beliefs of the Church is Not "Doing Business."**

3
4        In the alternative, COP moved to dismiss because service was improper and no service

5 could be made on a Church agent because the Church is not doing business in Washington.
6
7 Relying on their own interpretation of Church doctrines and religious practices concerning
8
9 tithing/almsgiving and missions (evangelizing), plaintiff asserts there can be "no question" as to
10
11 whether the Church does business.  COP agrees there is no question on this topic, but draws the
12
13 opposite conclusion.
14
15        **1.    The Court Must Accept the Church's Interpretation of Its Own Doctrine and**
16             **Practices.**
17
18        To the extent this issue turns on the characterization of Church doctrine and practices,
19
20 this Court must accept the Church's interpretation over plaintiff's caricatures.[6]  Basic First
21
22 Amendment law holds that churches are the definitive interpreters of their own religious
23
24 doctrines, teachings, polities, and practices.[7]  Absent a sham, no litigant or civil court has the
25
26 right to second-guess a church in the interpretation of its own religion.
27
28
29
30
31
32
33  not COP, as a corporation sole, which the Church denied. The Church then filed a motion "for determination of
34  diversity jurisdiction," advising the court that it had no desire to return to state court but *if* the Court viewed the
     Church as an unincorporated association, and that entity was a defendant, then the traditional rule would defeat
35  diversity. The Church defendants did not concede that the unincorporated Church was a proper defendant with COP
36  — the issue was not addressed at all — and thus there is no inconsistency between COP's position here and in *Scott*.
37
38  [6] Plaintiff's self-serving portrayals betray a fundamental misunderstanding of Church doctrine and practices and
39  highlight the dangers of allowing an adverse litigant to characterize a church's religious practices. The distortions
40  will be more fully examined below.
41
42  [7] Since *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871), the United States Supreme Court has repeatedly held that
43  "'civil courts exercise no jurisdiction'" over "'a matter which concerns theological controversy.'" *Serbian Eastern*
     *Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14 (1976) (quoting *Watson*, 80 U.S. (13 Wall.) at 733-34).
44  Civil courts can never "engage in the forbidden process of interpreting and weighing church doctrine." *Presbyterian*
45  *Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969).

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS – 7

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit____ Page 505

2.    **Tithing and Missionary Work are Religious Practices, Not "Doing Business."**

The religious practices plaintiff calls "business" are actually central to the spiritual life of the Church.[8]  As such, the Church's practices of tithing and evangelizing no more constitute "doing business" in Washington than the Catholic Church's practice of communion.  Second Declaration of Paul Rytting, ¶¶ 4-5.  These core religious practices are simply not "business" under Washington law – they are fundamentally religious, not commercial.  If the Church were operating a grocery store as a mechanism to raise funds, that would be doing business.  The practices cited by plaintiff are not commercial in nature, and thus cannot be characterized as "doing business."

Plaintiff argues that the Church's missionary effort in the State of Washington indicates that it is doing business.  That simply is not the case.  The Church's missionary effort is a core spiritual function.  Rytting Declaration, ¶ 4.  Moreover, the Church is not doing business in the mission.  It does not own any of the property used by the mission or enter contracts in connection with the mission.  *Id.* ¶ 6.  The spiritual work of the mission would not be possible without supporting "business" functions (e.g., checking accounts), but these are controlled and owned by corporate entities.  In fact, the funds used to operate the mission are drawn on accounts owned by COP. *Id.*

---

[8] The ancient religious practices of tithing/almsgiving and evangelizing are expressly enjoined by scriptural texts (*see* Malachi 3:8-12; Mark 16:15-16), which under Church doctrine remain binding on current Church members.

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS - 8

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Pag 566

Similarly, the payment of tithing is a core spiritual function,[9] but the "business" of facilitating the donation is done by COP, not the Church. *Id.* ¶¶ 5, 7-11. While it is true that the funds are collected by local wards and deposited in local banks, those accounts are swept within 24 hours and the funds deposited in a central account owned by COP. *Id.* ¶ 7. The checking account used by the local wards and stakes is funded by COP but owned by a second Church corporation, The Corporation of the Presiding Bishop of The Church of Jesus Christ of Latter-day Saints ("CPB"). *Id.* ¶ 8. The local ward budget is an amount allocated to local units by COP and CPB. Id. ¶ 9. The local units are aided greatly in tracking funds and administering budgets by paid COP and CPB employees. Id.

Plaintiffs incorrectly indicate that tithing is used to provide welfare services to needy members. In reality, another donation known as fast offerings is used for that purpose. *Id.* ¶ 10. Again, those local donations are swept into a central COP account. *Id.* In most instances, the Church does not have to buy food or other commodities provided to the needy, contrary to Plaintiff's contentions, inasmuch as Church-affiliated corporations operate their own farms and other facilities for welfare purposes. *Id.* Those welfare operations are all owned and operated by corporate entities not the Church. *Id.* ¶ 12. Any need to purchase items to provide for the needy, are again, drawn on COP accounts. *Id.* ¶ 11.

---

[9] For example, contrary to plaintiff's assertion, Church members are not "required" to tithe their earnings and there is no "audit" to "ensure compliance with their mandatory tithing requirement." Pl.'s Opp. at 10. This picture of coercion entirely distorts the meaning and place of tithing within the Church's spiritual life. The payment of tithing is considered a privilege of membership with associated blessings. Members do indeed make a personal declaration to their bishop of whether they tithe, but no one's membership is revoked for failing to do so. And while the Church will accept certain in-kind donations, it does so exclusively through a corporate entity like COP – the Church as an unincorporated association does not take title to real property. Plaintiff may have a copy of the Church's ecclesiastical canons, but they have no idea how they actually apply in a Church congregation.

**GORDON MURRAY TILDEN LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Finally, local wards and stakes and, respectively, their bishops and stake presidents, do not do business. They do enter into contracts. *Id.* ¶13. They do not buy the furniture in their buildings. They do not employ the maintenance staff or even pay the light bill. They do not own or maintain the properties. These functions are performed through COP or other corporate entities and their authorized agents.

In sum, Plaintiff's contention that the Church is doing business is grossly inaccurate. This Court should conclude that the Church is not doing business in the State of Washington and, therefore, service cannot be had on any Church agent.

### III.    CONCLUSION

For the reasons stated above and in COP's opening memorandum, COP respectfully requests that this Court dismiss the Church from this suit.

DATED this 5th day of February, 2007.

GORDON MURRAY TILDEN LLP

By
    Charles C. Gordon, WSBA #1773
    Jeffrey I. Tilden, WSBA #12219
    Michael Rosenberger, WSBA #17730
    Attorneys for Defendant
Corporation of the President of the Church
of Jesus Christ of Latter-Day Saints

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS - 10          GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 508

FILED

2007 FEB -7 PM 4:10

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

The Honorable William L. Downing

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| ROB RINDE f/k/a ROBERT LARRY LEROY PITSOR, JR., | NO. 06-2-09825-1 SEA |
| Plaintiff, | CERTIFICATE OF SERVICE |
| v. | |
| THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, and the "MORMON CHURCH" THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, an unincorporated association, | |
| Defendant. | |

The undersigned hereby certifies that on February 7, 2007, copies of the following document:

  1. PRAECIPE TO DEFENDANT'S REPLY BRIEF; and
  2. this CERTIFICATE OF SERVICE

were served at the following addresses via the methods indicated:

Michael T. Pfau
Michelle A. Menely
Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim LLP

CERTIFICATE OF SERVICE - 1

ORIGINAL

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

1   600 University, Suite 2100
2   Seattle, WA 98101-4185
3   Co-Counsel for Plaintiff Rob Rinde
4   () Mail        ( XX ) Hand Delivery          () Via e-mail
5   ( ) Fax        ( ) Federal Express
6
7   Timothy D. Kosnoff
8   Law Offices of Timothy D. Kosnoff
9   One Union Square
10  600 University Street, Suite 2101
11  Seattle, WA 98101
12  Co-Counsel for Plaintiff Rob Rinde
13  () Mail        ( XX ) Hand Delivery          () Via e-mail
14  ( ) Fax        ( ) Federal Express
15
16
17  DATED this 7th day of February, 2007.
18
19
20
21              Jacqueline Lucien
22,
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

CERTIFICATE OF SERVICE - 2

Exhibit___ Page 510

FILED

2007 FEB -7 PM 4: 10

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA.

The Honorable William L. Downing
Hearing Date:  February 9, 2007 at 11:15 a.m.

The Honorable William L. Downing

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

ROB RINDE f/k/a ROBERT LARRY LEROY
PITSOR, JR.,

           Plaintiff,

      v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole; a/k/a the "MORMON CHURCH" THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS, an unincorporated association,

           Defendants.

NO.  06-2-09825-1 SEA

PRAECIPE TO DEFENDANT'S
REPLY BRIEF

     Defendant's Reply Brief in Support of Motion to Dismiss and/or Motion for Summary

Judgment omitted a word, "not," on page 10, line 3.  The corrected sentence should read as

follows: "They do <u>not</u> enter into contracts."

///

///

///

///

- 1

ORIGINAL

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 511

DATED this 7th day of February, 2007.

**GORDON MURRAY TILDEN** LLP

By _____

Charles C. Gordon, WSBA #1773
Jeffrey I. Tilden, WSBA #12219
Michael Rosenberger, WSBA #17730
Attorneys for Defendants
The Corporation of the President of the Church
of Jesus Christ of Latter-Day Saints

- 2

Exhibit ___ Page 512

FILED

07 FEB 09 PM 12:58

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 06-2-09825-1 SEA

## CLERK'S MINUTES

SCOMIS CODE: SMJHRG

Judge:       William L. Downing                          Dept. 43
Bailiff:     None                                    Date: 2/9/2007
Clerk:       Debra Bailey Trail
Reporter:    None                                        Page 1 of 1

---

### KING COUNTY CAUSE NO.: 06-2-09825-1 SEA

**Rob Rinde, f/k/a vs Corp Of Pres. of Latter Day Saints et al**

---

**Appearances:**

Plntf counsel, Timothy Kosnoff, appearing by phone.
Deft Corp appearing by co-counsel, Michael Rosenberger and Jeff Tilden.

### MINUTE ENTRY

Deft Corp motion to dismiss - Granted.

Order to be presented.

Exhibit___ Page 513

FILED

2007 FEB 13  PM 4: 21

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA.

## SUPERIOR COURT, IN AND FOR THE COUNTY OF KING, STATE OF WASHINGTON

| | |
|---|---|
| ROB RINDE F/K/A ROBERT LARRY LEROY PITSOR, JR.<br><br>           Plaintiff/Petitioner<br><br>vs.<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE, AKA THE "MORMON CHURCH" THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, AN UNINCORPORATED ASSOCIATION<br>           Defendant/Respondent | Cause #:  06-2-09825-1<br>         SEA<br><br>Declaration of Service of:<br><br>SUBPOENA DUCES TECUM TO BELLEVUE SCHOOL DISTRICT, 1211 N.E. FIRST STREET, BELLEVUE, WA 98005; $30.00 WITNESS FEE CHECK<br><br><br>Hearing Date:  Mar  5 2007 |

Declaration:

The undersigned hereby declares: That s(he) is now and at all times herein mentioned, a citizen of the United States and a resident of the State of Washington, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the date and time of Feb 12 2007 10:54AM  at the address of 12111 NE FIRST ST BELLEVUE, within the County of KING, State of WASHINGTON, the declarant duly served the above described documents upon BELLEVUE SCHOOL DISTRICT - RECORDS CUSTODIAN  by then and there personally delivering 1 true and correct copy(ies) thereof, by then presenting to and leaving the same with SHARON SWENSON HOWARD, GENERAL COUNSEL .

No information was provided that indicates that the subjects served are members of the U.S. military.

I hereby declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Dated: February 13, 2007 at Seattle, WA

by _____                    Service Fee Total: $ 49.60
        K. VanDyke    0307590

ABC Legal Services, Inc.
206 521-9000
Tracking #: 3384930

**ORIGINAL**
**PROOF OF SERVICE**

Gordon, Murray & Tilden
1001 4th Ave, #4000
Seattle, WA  98154
206 467-6477

Page 1 of 1



The Honorable William L. Downing

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

ROB RINDE f/k/a ROBERT LARRY LEROY
PITSOR, JR.,

                  Plaintiff,

       v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole; and the "MORMON CHURCH" THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS, an unincorporated association,

                  Defendants.

NO.  06-2-09825-1 SEA

ORDER GRANTING
DEFENDANT'S MOTION TO
DISMISS AND/OR FOR SUMMARY
JUDGMENT

       THIS MATTER was brought before the Court upon the motion of defendant Corporation

of the President of the Church of Jesus Christ of Latter-Day Saints ("COP") to dismiss and/or for

summary judgment seeking dismissal of defendant The Church of Jesus Christ of Latter-day

Saints ("the Church").  The Court heard the arguments of counsel on February 9, 2007, and has

considered the following submissions:

       1.      COP's Motion to Dismiss;

ORDER - 1

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

2.    Declaration of Michael Rosenberger and attached exhibits;

3.    Declaration of Paul Rytting;

4.    Plaintiff's Opposition Brief;

5.    COP's Reply Brief;

6.    Plaintiff's Memorandum in Opposition;

7.    Declaration of Michelle A. Menely;

8.    Reply Brief in Support of Motion to Dismiss; and

9.    Second Declaration of Paul Rytting.

Based upon the foregoing, it is hereby:

ORDERED that the motion is GRANTED, subject to the following provisos.

First, to allow plaintiff the opportunity to move to amend the complaint to name Gordon Conger as a party defendant, the case shall not be removed to federal court until after the Motion to Amend is filed and ruled upon; provided, however, the defendant shall have the right to remove if no ruling is issued on or before March 19, 2007. Plaintiff shall file the Motion to Amend no later than 14 days after the date of the hearing, e.g., by no later than February 23, 2007 and plaintiff shall note the motion for hearing, without oral argument, for six (6) court days after filing, and in no event later than March 5, 2007.

Second, in granting the motion, the Court specifically notes and rules as follows:

1.    The Mormon Church, itself, is dismissed as a defendant. However, any person who would otherwise be an agent of the Church is an agent of COP.

2.    The Court will be liberal in considering statements and admission by agents of the Church as statements and admissions against COP;

ORDER - 2

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

3.    Any agent of the Church is an agent of COP for both liability and evidentiary purposes.

4.    The Mormon Church will not be an "empty chair" entity in this case.

DATED this ___13___ day of ___Feb.___, 2007.

_____
The Honorable William L. Downing

Presented By:

GORDON MURRAY TILDEN

By_____
    Michael Rosenberger, WSBA No. 17730
    Attorneys for Defendant

Approved as to form:

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

By_____
    Michael T. Pfau, WSBA No. 24649
    Michelle A. Menely, WSBA No. 28353
    Co-Counsel for Plaintiff

LAW OFFICES OF TIMOTHY D. KOSNOFF

By_____
    Timothy D. Kosnoff, WSBA No. 16586
    Co-Counsel for Plaintiff

ORDER - 3

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

1

2

FILED

2007 FEB 21 AM 10: 00

3

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA

4

5

6

7

## SUPERIOR COURT, IN AND FOR THE COUNTY OF KING, STATE OF WASHINGTON

8

| | |
|---|---|
| ROB RINDE F/K/A ROBERT LARRY LEROY PITSOR, JR. | Cause #:   06-2-09825-1 |
| Plaintiff/Petitioner | SEA |

9

10

Declaration of Service of:

11

VS.
THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE, AKA THE "MORMON CHURCH" THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, AN UNINCORPORATED ASSOCIATION

SUBPOENA DUCES TECUM TO SHORELINE SCHOOL DISTRICT, 18560 FIRST AVENUE N.E., SHORELINE, WA 98155; $30.00 WITNESS FEE CHECK

12

13

Defendant/Respondent

Hearing Date:  Mar  5 2007

14

15

Declaration:

16

The undersigned hereby declares: That s(he) is now and at all times herein mentioned, a citizen of the United States and a resident of the State of Washington, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

17

18

On the date and time of Feb 14 2007  4:07PM  at the address of 18560 FIRST AVE NE  SHORELINE, within the County of KING, State of WASHINGTON, the declarant duly served the above described documents upon SHORELINE SCHOOL DISTRICT - RECORDS CUSTODIAN   by then and there personally delivering 1 true and correct copy(ies) thereof, by then presenting to and leaving the same with CRAIG DEGGINGER, PUBLIC INFORMATION OFFICER 47 W/M 5'6" 160# BROWN HAIR.

19

20

No information was provided that indicates that the subjects served are members of the U.S. military.

21

22

I hereby declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

23

Dated: February 20, 2007 at Seattle, WA

24

25

by _____
T. Peterson

Service Fee Total: $ 55.30

26

27

28

ABC Legal Services, Inc.
206 521-9000
Tracking #: 3384933

**ORIGINAL**
**PROOF OF SERVICE**

Gordon, Murray & Tilden
1001 4th Ave, #4000
Seattle, WA   98154
206 467-6477

Exhibit    Page 518    Page 1 of 1

FILED

2007 FEB 23  PM 4: 07

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA.

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
### FOR THE COUNTY OF KING

| | |
|---|---|
| ROB RINDE f/k/a, ROBERT LARRY LEROY PITSOR, JR., | NO. 06-2-09825-1SEA |
| Plaintiffs, | NOTICE FOR HEARING<br>SEATTLE COURTHOUSE ONLY<br>(Clerk's Action Required ) (NTHG) |
| v. | |
| THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, | |
| Defendant. | |

TO:    THE CLERK OF THE COURT and to all other parties listed on Page 2:
       PLEASE TAKE NOTICE that an issue of law in this case will be heard on the date below and the
       Clerk is directed to note this issue on the calendar checked below.

Calendar Date: March 5, 2007                     Day of Week: Monday

Nature of Motion: <u>Motion to Amend Plaintiff's Amended Complaint</u>

### CASES ASSIGNED TO INDIVIDUAL JUDGES – Seattle
If oral argument on the motion is allowed (LR 7(b)(2)), contact staff of assigned judge to schedule date and time
before filing this notice. **Working Papers:** The *judge's name*, date and time of hearing *must* be noted in the upper
right corner of the Judge's copy. *Deliver Judge's copies to Judges' Mailroom at C203.*

       [XX]  Without oral argument (Mon - Fri)           [ ]  With oral argument Hearing
       Date/Time:_____
       Judge's Name:  Judge William Downing         Trial Date: 9/4/07

### CHIEF CRIMINAL DEPARTMENT - Seattle in E1201
[ ] Bond Forfeiture 3:15 pm, 2nd Thur of each month
[ ] Certificates of Rehabilitation- Weapon Possession **(Convictions from Limited Jurisdiction Courts)**
3:30 First Tues of each month

### CHIEF CIVIL DEPARTMENT – Seattle -- (Please report to E713 for assignment)
*Deliver working copies to Judges' Mailroom, Room C203. In upper right corner of papers write "Chief Civil
Department" or judge's name and date of hearing*

| | |
|---|---|
| [ ]Extraordinary Writs (Show Cause Hearing) (LR 98.40)  1:30 p.m. Tues/Wed -report to Room E713 | |
| [ ]Supplemental Proceedings | **Non-Assigned Cases:** |
| (1:30 pm Tues/Wed)(LR 69) | [ ] Non-Dispositive Motions M-F (without oral argument). |
| [ ]DOL Stays 1:30 pm Tues/Wed | [ ] Dispositive Motions and Revisions (1:30 pm Tues/Wed) |
| [ ]Motions to Consolidate with multiple judges assigned | [ ] Certificates of Rehabilitation (Employment) 1:30 pm |
| (without oral argument) (LR 40(a)(4)) | Tues/Wed LR 40(2)(B)) |

You may list an address that is not your residential address where you agree to accept legal documents.
Sign: Yvonne Mattson 3552        Print/Type Name:  Michelle Menely
WSBA # 28353  (if attorney)                    Attorney for: Plaintiffs
Address: 600 University, Ste. 2100              City, State, Zip  Seattle, WA 98101
Telephone: 206-676-7500                         Date: February 1, 2007

NOTICE FOR HEARING - Seattle Courthouse Only                    Page 1
ICSEA040502
www.metrokc.gov/kcscc/forms.htm

ORIGINAL

| LIST NAMES AND SERVICE ADDRESSES FOR ALL NECESSARY PARTIES REQUIRING NOTICE |
|---|

Name    Charles C. Gordon
Service Address: 1001 Fourth Ave., Ste 4000
City, State, Zip  Seattle, WA 98154
WSBA#   Atty For: Defendants.
Telephone #: 206-467-6477

Name_
Service Address:
City, State, Zip
WSBA#11042
Telephone #: __

Name
Service Address
City, State, Zip
WSBA#_____Atty For
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

## IMPORTANT NOTICE REGARDING CASES

Party requesting hearing must file motion & affidavits separately along with this notice. List names, addresses and telephone numbers of all parties requiring notice (including GAL) on this page. Serve a copy of this notice, with motion documents, on all parties.

The original must be filed at the Clerk's Office not less than six court days prior to requested hearing date, except for Summary Judgment Motions (to be filed with Clerk 28 days in advance).

THIS IS ONLY A PARTIAL SUMMARY OF THE LOCAL RULES AND ALL PARTIES ARE ADVISED TO CONSULT WITH AN ATTORNEY.

The SEATTLE COURTHOUSE is in Seattle, Washington at 516 Third Avenue. The Clerk's Office is on the sixth floor, room E609. The Judges' Mailroom is Room C203.

Exhibit    Page 520

FILED

2007 FEB 23  PM 4:07

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA.

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| ROB RINDE f/k/a ROBERT LARRY LEROY PITSOR, JR., <br><br>            Plaintiff, <br><br>     v. <br><br> THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole. <br><br>            Defendant. | NO. 06-2-09825-1 SEA <br><br> MOTION TO AMEND PLAINTIFF'S AMENDED COMPLAINT <br><br> **NOTED FOR:  MARCH 5, 2007** <br> **WITHOUT ORAL ARGUMENT** <br><br> **THE HONORABLE WILLIAM L. DOWNING** |

COMES NOW Plaintiff Rob Rinde by and through his attorneys of record, and moves this Court to grant this Motion to Amend Plaintiff's Amended Complaint ("Complaint") in order to add an additional liable party and because justice so requires.

## I.  INTRODUCTION

This case involves childhood sexual abuse which was inflicted upon plaintiff Rob Rinde.[1] The claim arises out of the brutal victimization of Rob when he was twelve years old by Paul H. Lewis ("Lewis"), a Mormon Church Scoutmaster and Melchesidek priest.[2] Among

---

[1] *See* Amended Complaint on file herein.
[2] Menely Decl. Exhibit A at 45:5-17.

MOTION TO AMEND COMPLAINT - 1 of 8
06-2-09825-1 SEA
[175712 v14.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit     Page 521

ORIGINAL

other things, Lewis sodomized Rob, beat and chocked him and forced a wire coat hanger up his penis, inflicting permanent injury to his urogential system.[3] When Rob was approximately thirteen years old, he and his mother, Ms. Anne Rinde, disclosed the abuse to civil authorities and to Gordon Conger ("Conger").[4] However instead of helping Rob or his mother, as they requested, Conger pressured plaintiff to recant his complaint against Lewis in order to shield the Mormon Church from scandal and civil liability.[5]  Additionally, Conger failed to take tell anyone or to any action or steps to help or protect Rob.[6]

Plaintiff respectfully moves this Court to grant this Motion to Amend Complaint on the grounds that the amendment is necessary to add an additional liable party and because justice so requires. Specifically, amending the Complaint allows plaintiff to pursue claims against Conger, individually, for intentional infliction of emotional distress, civil conspiracy, fraudulent concealment, and negligence.

## II.   STATEMENT OF RELEVANT FACTS

During the approximate time period of 1981-1982, Lewis held positions of authority within the Mormon Church, including Scoutmaster[7] and Mormon Melchesidek Priest.[8] Prior to the Mormon Church placing Lewis in the positions of Scoutmaster and Priest, Lewis was virtually unknown to the Church, as his military career made him a transient with no ties or

---

[3] See Amended Complaint on file herein.

[4] Id.; Menely Decl. Exhibit A at 56:5-57:11.

[5] See Amended Complaint on file herein.

[6] Menely Decl. Exhibit B at 41:16 – 43:1.

[7] The Mormon Church is closely affiliated with the Boy Scouts of America. The Mormon Church is the oldest and one of the largest sponsoring organizations of boy scouting in the United States. Since 1913, the Mormon Church has used the Scouting program as an integral part of its ministry to boys and young men. Scouting is the exclusive youth activity for males in the Mormon Church. In fact, it is the Mormon Church who designates the scoutmaster. Menely Decl. Exhibit B 17:11-12.

[8] See Amended Complaint on file herein.

MOTION TO AMEND COMPLAINT - 2 of 8
06-2-09825-1 SEA
[175712 v14.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7600 - FACSIMILE (206) 676-7575

history in the community.[9] During that same time period, Lewis groomed, molested, raped, and sadistically tortured Rob Rinde.[10]

In approximately 1984 or 1985, Rob Rinde disclosed the abuse to his mother (Anne Rinde) who, in turn, reported the abuse to the civil authorities and to Gordon Conger, a Mormon Church member with a special relationship to plaintiff and his mother.[11]  Anne Rinde has testified that she turned to Conger because she "trusted him; completely, totally, absolutely trusted him."[12] Conger earned Anne Rinde's trust through his role as her home teacher.[13] In the framework of the Mormon Church, a home teacher is assigned to a family within the Mormon Church to contact the family, at a minimum of once per month,[14] and teach scripture and become a friend and mentor to the family.[15] "As home teachers are called to work directly with families, they are often in a better position to help these family members than are other Church officers or teachers."[16] "As a result, home teaching is one of the most effective ways the Latter-day Saints manifest their commitment to 'bear one another's burdens, that they may be light; … mourn with those that morn; yea, and comfort those that stand in need of comfort, and stand as witnesses of God.'"[17]

---

[9] See Amended Complaint on file herein.

[10] See Amended Complaint on file herein. At all relevant time periods, Mr. Rinde was a member of the Mormon Church, including the Seattle and Bellevue Wards of the Mormon Church.

[11] Menely Decl. Exhibit A at 56:5-57-11;

[12] Menely Decl. Exhibit A at 58:10-13.

[13] Menely Decl. Exhibit A at 34:20-35:25; 84:19-23.

[14] Due to Ms. Rinde's poor health, Conger visited the Rinde home at least twice a week. Menely Decl. at Exhibit A 37:1-2.

[15] Menely Decl. Exhibit A at 34:20-39:12; Menely Decl. Exhibit B at 50:23-24.

[16] Menely Decl. Exhibit C at 136.

[17] Id.

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Through his role as a home teacher, Conger became a close friend and confident to the Rinde family.[18] Conger quickly became aware that Ms. Rinde's poor health affected the family to the extent that the family had "lots of needs."[19] In fact, Anne Rinde has testified that prior to the time she was scheduled for a major surgery that she grew concerned about the welfare of her children and that she discussed those concerns with Conger.[20]  Ms. Rinde further testified that as a result of those concerns Conger personally agreed to take custody of Rob Rinde (and arranged for others to other take custodial care of the other children) in the event that Anne's surgery was not successful.[21]

Due to the close, trusting relationship between Conger and the Rinde family, Conger was the individual from whom Anne Rinde sought assistance during the criminal investigation that ensued following the disclosure of Lewis' rape of Rob.[22] In addition to being her home teacher, Ms. Rinde was aware that Conger was a lawyer.[23] Accordingly, when a meeting was scheduled between a King County Prosecuting Attorney and Rob, Anne immediately called Conger and asked him to handle the meeting.[24]  Conger agreed to accompany Rob to the appointment.[25] When asking Conger to handle this matter, Anne Rinde believed that "he stood *in loco parentis* for Robert, and [she] expected him to behave as such."[26]

---

[18] Menely Decl. Exhibit A at 84:19-23.

[19] Menely Decl. Exhibit B at 48:21-49:25.

[20] Menely Decl. Exhibit A at 38:17-39:18; 39:15-40:21.

[21] *Id.*

[22] Menely Decl. Exhibit A 58:10-13.

[23] Menely Decl. Exhibit A 58:10-13.

[24] *Id.*

[25] Menely Decl. Exhibit A 58:17-18.

[26] Menely Decl. Exhibit A 91:10-12; Menely Decl. Exhibit D 68:20-23.

MOTION TO AMEND COMPLAINT - 4 of 8

06-2-09825-1 SEA
[175712 v14.doc]
LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Plaintiff believes that the evidence in this matter will demonstrate that instead of taking care of the situation (as he agreed to do), Conger did the unimaginable: He instructed Rob not to talk about the abuse to anyone, including his own mother.[27]  Plaintiff believes that the testimony will additionally demonstrate that Conger would not permit the prosecutor to speak with Rob without Conger's presence, telling the prosecutor that he stood in the place of a parent and would stay with him during the questioning.[28]

### III.  ARGUMENT

A.  **Pursuant to CR 15(b), this Court should grant Plaintiff's Motion to Amend Complaint to allow plaintiff to add an additional liable party.**

A motion to amend a complaint may be made upon motion of any party at any time. CR 15(b). Motions to amend pleadings to conform to the proof are addressed to the sound discretion of the trial court. *Dimoff v. Ernie Mayer, Inc.,* 55 Wn.2d 385, 347 P.2d 1056 (1960). The case law interpreting CR 15 provides that the rule should be liberally construed and that amendments should be allowed when the opposing party will be put to no disadvantage by the amendment. *O'Kelly v. Sali,* 67 Wn.2d 296, 298, 407 P.2d 467 (1965); *Lind v. Fick,* 15 Wn. App. 614, 550 P.2d 709 (1976); *Grant v. Morris,* 7 Wn. App. 134, 498 P.2d 336 (1972).

This Court should allow plaintiff's to amend the complaint to add Gordon Conger as a party defendant because the evidence demonstrates that Conger, both as an individual and as an agent of COP, is liable in negligence and for the tort of outrage as a result of his conduct and communiciations (or lack thereof) with and pertaining to Rob Rinde.

---

[27] Menely Decl. Exhibit D 69:18-23.
[28] Menely Decl. Exhibit D 111:2-6.

MOTION TO AMEND COMPLAINT - 5 of 8
06-2-09825-1 SEA
[175712 v14.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 • FACSIMILE (206) 676-7575

Anne Rinde believed, through her close relationship with Conger, that Conger was acting *in loco parentis* in caring for Rob Rinde. Conger agreed to help, but failed to do so. In addition to instructing Rob Rinde not to talk about the rape to anyone, including his own mother, Conger failed to obtain any help for Rob, thereby increasing Rob's damages. In fact, while Conger took no action to protect or assist Rob Rinde (as he was asked to do), Conger affirmatively took action to shield the Mormon Church from scandal and civil liability.

To the extent that Gordon Conger obstructed the reporting of the sexual abuse of minor plaintiff to appropriate authorities, and, moreover, encouraged Rob Rinde to recant the reporting of the sexual abuse to the authorities in order to save the Mormon Church from scandal and embarrassment, plaintiff has a claim for such negligence and conspiracy against Gordon Conger. Hence, granting this Motion to Amend Complaint to add Conger as a party defendant should be granted.

**B.      Pursuant to CR 15(a), this Court should grant Plaintiff's Motion to Amend Complaint because justice so requires.**

CR 15(a) provides that after a responsive pleading has been filed, the plaintiff may amend his complaint only by leave of the court, *which shall be freely given*, when justice so requires, or with the written consent of the adverse party. CR 15 (emphasis added). Pursuant to CR 15(a), this Court should grant plaintiff leave to amend his Complaint, as justice so requires. CR 15(a); *Quackenbush v. State*, 72 Wn.2d 670, 434 P.2d 736 (1967). Motions to amend should be freely granted unless the opposing party would be prejudiced. *Id.* If no prejudice is evident, an amendment may be granted even after substantial delay. *Caruso v. Local Union No. 690, Intern. Broth. of Teamsters*, 100 Wn.2d 343, 670 P.2d 240 (1983).

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Here, justice requires that this Court grant Plaintiff's Motion amend Complaint in order to allow plaintiff the opportunity to plead claims against Gordon Conger. At all relevant time periods, Conger had special relationship with Rob Rinde. Once he undertook to help Mr. Rinde, he had a duty to act as a reasonable person, which duty was breached in the circumstances of this case.

Finally, no party will be prejudiced by the amendment. The trial date is over seven months away, and discovery is in its infancy. Defendants have ample time to prepare a defense to the claim. Alternatively, to the extent either defendant seeks a delay in the trial date, plaintiff would have no objection.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that this Court this Motion to Amend Complaint. Attached to the Menely Declaration at Exhibit E is a Copy of the Proposed Second Amended Complaint.

RESPECTFULLY SUBMITTED this 23ed day of February 2007.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

By _Michelle Menely_
        Michael T. Pfau, WSBA No. 24649
        mpfau@gth-law.com
        Michelle A. Menely, WSBA No. 28353
        mmenely@gth-law.com
        Co-Counsel for Plaintiff

LAW OFFICES OF TIMOTHY D. KOSNOFF

By_____
        Timothy D. Kosnoff, WSBA No. 16586
        timkosnoff@comcast.net
        Co-Counsel for Plaintiff

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit    Page 527

CERTIFICATE OF SERVICE

COMES NOW Fara Fusaro and declares:

1.      I am employed at the law office of Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, LLP.;

2.      On February 23, 2007, I served true and correct copies of the foregoing via ABC Legal Messengers (or other method indicated below) by directing delivery to and addressed to the following:

> ***Counsel for Defendant COP***
> Charles C. Gordon, Esq.
> Michael R. Rosenberger, Esq.
> GORDON MURRAY TILDEN
> 1001 Fourth Avenue, Suite 4000
> Seattle, WA 98154
> Phone: 206.467.6477
> Fax: 206.462.6292

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED this 23rd day of February, 2007 at Seattle, Washington.

Fara Fusaro, Legal Assistant to
Michelle A. Menely

MOTION TO AMEND COMPLAINT - 8 of 8
06-2-09825-1 SEA
[175712 v14.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

FILED

2007 FEB 23 PM 4: 07

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

ROB RINDE f/k/a ROBERT LARRY LEROY
PITSOR, JR.,

            Plaintiff,

    v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole,

            Defendants.

NO. 06-2-09825-1 SEA

DECLARATION OF MICHELLE A.
MENELY IN SUPPORT OF MOTION TO
AMEND PLAINTIFF'S AMENDED
COMPLAINT

**NOTED FOR: MARCH 5, 2007**
**WITHOUT ORAL ARGUMENT**

**THE HONORABLE WILLIAM L. DOWNING**

I, Michelle A. Menely, hereby certify and declare as follows:

1.     I am one of the attorneys for Plaintiff Rob Rinde f/k/a Larry Leroy Pitsor, Jr.,
in this action. I have personal knowledge of and am competent to testify to the facts set forth
below.

2.     Attached as Exhibit A are relevant portions of the transcript of the Videotaped
Perpetuation Deposition of Anne Rinde, taken on July 20, 2006.

3.     Attached as Exhibit B are relevant portions of the deposition transcript of Gordon
Conger, taken on February 15, 2007.

---

MENELY DECL. IN SUPP. OF PLTF MTN TO AMEND COMPL. - 1 of 3
06-2-09825-1 SEA
[175715 v8.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

ORIGINAL

Exhibit   Page 529

1

2        4.     Attached as Exhibit C is the relevant portion of an article on the Mormon Church

3  titled "Home Teaching."

4        5.     Attached as Exhibit D are relevant portions of the Videotaped Deposition of

5  Anne Rinde, taken on July 19, 2006.

6        6.     Attached as Exhibit E is Plaintiff's Proposed Second Amended Complaint.

7        I declare under penalty of perjury under the laws of the State of Washington that the

8  above is true and correct.

9        Dated this _23rd_ day of February, 2007 at Seattle, Washington

10

11                          Michelle A. Menely

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

06-2-09825-1 SEA
[175715 v8.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit___ Page 530

CERTIFICATE OF SERVICE

COMES NOW Fara Fusaro and declares:

1.      I am employed at the law office of Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, LLP.;

2.      On February 23, 2007, I served true and correct copies of the foregoing via ABC Legal Messengers (or other method indicated below) by directing delivery to and addressed to the following:

> **Counsel for Defendant COP**
> Charles C. Gordon, Esq.
> Michael R. Rosenberger, Esq.
> GORDON MURRAY TILDEN
> 1001 Fourth Avenue, Suite 4000
> Seattle, WA 98154
> Phone: 206.467.6477
> Fax: 206.462.6292

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED this 23rd day of February, 2007 at Seattle, Washington.

Fara Fusaro, Legal Assistant to
Michelle A. Menely

MENELY DECL. IN SUPP. OF PLTF MTN TO AMEND COMPL. - 3 of 3
06-2-09825-1 SEA
[175715 v8.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit    Page 531

# EXHIBIT A

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 1

                SUPERIOR COURT OF THE STATE OF WASHINGTON
                          FOR KING COUNTY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ROB RINDE, f/k/a ROBERT
LARRY LEROY PITSOR, JR.,

            Plaintiff,

vs.                                 No. 06-2-09825-1SEA


THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole, aka the "MORMON CHURCH" THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS, an unincorporated association,

            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


              VIDEOTAPED PERPETUATION DEPOSITION

              The following is the videotaped perpetuation

deposition of ANNE RINDE, taken before Jenelle K.

Lundgren, Notary Public, pursuant to Notice of Taking

Deposition, at 500 North Franklin Street, Glenwood,

Minnesota, commencing at 9:00 a.m., Wednesday, July

20, 2006.




                    *    *    *

1336e45f-1c84-465d-89a3-1a03830e0425

Exhibit___Page 533

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 2

1  APPEARANCES:
2
   On Behalf of the Plaintiff:
3
     John Schulz, Esquire
4    MCGRANN, SHEA,
        ANDERSON, CARNIVAL
5    800 Nicollet Mall
     Suite 2600
6    Minneapolis, Minnesota 55402
     Phone: (612) 338-2525
7    e-mail: jrs@mcgrannshea.com
8
   On Behalf of the Defendant:
9
     Charles Gordon, Esquire
10   GORDON MURRAY TILDEN, LLP
     1001 Fourth Avenue
11   Suite 4000
     Seattle, Washington 98154-1007
12   Phone: (206) 467-6477
     e-mail: cgordon@gmtlaw.com
13
14  Also Present:
15  Don Carl, videographer
16
17
18
19
20
21
22
23
24
25

Page 3

1         DEPOSITION REFERENCE INDEX
2
3  EXAMINATION:
4  By Mr. Schulz: 5, 87
5  By Mr. Gordon: 78, 92
6
7  OBJECTIONS:
8  By Mr. Gordon: 39, 41, 49, 55, 65, 74, 76, 77, 87,
9     90, 91
10 By Mr. Schulz: 93
11
12         EXHIBIT REFERENCE INDEX
13 None.
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              P R O C E E D I N G S
2        Whereupon, the videotaped deposition of ANNE
3  RINDE was commenced at 9:20 a.m. as follows:
4
5        THE VIDEOGRAPHER:  This is the video
6  operator speaking, Don Carl of Pat Carl & Associates.
7  Today is Thursday, July 20th in the year 2006.  The
8  time is now approximately 9:30 a.m.  We're at Glenwood
9  Estates, 500 Franklin Street North, Glenwood,
10 Minnesota.  This is the perpetuation of the testimony
11 of Ms. Anne Rinde.  Will counsel please voice identify
12 themselves for the video record?
13       MR. SCHULZ:  This is John Schulz,
14 S C H U L Z, local counsel for Rob Rinde in this
15 matter.
16       MR. GORDON:  My name is Charles Gordon,
17 and my law firm is counsel of record for The Church of
18 Jesus Christ of Latter-Day Saints, the defendants in
19 this matter.
20       THE VIDEOGRAPHER:  Would the court
21 reporter please administrator the oath?
22
23            ANNE RINDE,
24       after having been first duly sworn,
25          deposes and says under oath as follows:

Page 5

1                ***
2
3        THE VIDEOGRAPHER:  You may begin.
4
5             EXAMINATION
6  BY MR. SCHULZ:
7     Q.   Thank you.  Good morning, Mrs. Rinde.
8     A.   Good morning.
9        MR. SCHULZ:  One issue for the record,
10 and this is between counsel and it doesn't involve you
11 at this point, there has been some discussion about
12 whether the deposition testimony you -- that was taken
13 of you yesterday would be used in lieu of
14 cross-examination today at the trial of this matter.
15 There is, at this time, not agreement between counsel
16 in this matter.  I understand Mr. Gordon has made his
17 position or stated his position on this matter, but I
18 simply wish to state that for the record.  That may
19 need to be dealt with between Seattle counsel for Mr.
20 Rinde as well as Mr. Gordon.
21       MR. GORDON:  Well, let me put my
22 statement on the record there.  This deposition was
23 duly noted for two days by each party.  Counsel was
24 here yesterday during my examination.  It's in
25 accordance with the civil rules for the Superior Court

2 (Pages 2 to 5)

Exhibit   Page 534

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 34

1    A.    Right.
2    Q.    Okay.  By the children?
3    A.    Right.
4    Q.    And by Rob?
5    A.    And by Rob.  And Rob worked a lot of
6  weekends for the Relief Society's warehouse.  That's
7  where they kept the groceries and stuff like that.  He
8  would go out there and clean.  If they were canning
9  any particular item that week, he would help with
10  canning.
11    Q.    Okay.
12    A.    I mean, that kid almost never had a
13  weekend to himself.
14    Q.    Okay.
15    A.    He worked all the time.
16    Q.    With the church?
17    A.    (Nodding head).
18    Q.    Is that a yes?
19    A.    Yes, I'm sorry.
20    Q.    That's fine.  In the LDS Church
21  framework, Mrs. Rinde, was the family assigned someone
22  who was known as a home teacher?
23    A.    Yes.
24    Q.    And why don't you describe what that
25  role is.

Page 35

1    A.    It's someone who comes out -- the home
2  teacher is male.  He usually has a partner.  In fact,
3  I've never known them not to have a partner.  Quite
4  often, it is their son, younger or older, makes no
5  difference, as long as they are not children.
6    Q.    Okay.
7    A.    They come out and ask about how things
8  are going, if you're having any financial problems, or
9  any other kind of problems that they can help with,
10  you know, how is your car running, that kind of stuff.
11  Almost the kind of conversations you would have with a
12  husband in that sense.
13    Q.    All right.  And is there regular
14  contact with-
15    A.    Yeah.  I was once -- well, I would say
16  at least -- it's supposed to be once a month, but when
17  you were as dependent as we were towards the end
18  there, when I was so sick on and off, it became more
19  often, more like every other week.
20    Q.    In Bellevue, when you lived there with
21  the family, did you have a home teacher assigned to
22  you?
23    A.    Yes.
24    Q.    And who was that?
25    A.    Gordon Conger.  Not in the beginning.

Page 36

1    Q.    All right.
2    A.    In the beginning, there was someone
3  else who had been assigned to me who didn't like me,
4  but his reason for not liking me was because I
5  reminded him too much of his sister.
6    Q.    Okay.  So --
7    A.    And he didn't fess up to it for a long
8  time.  He would tell people that I was fine when I was
9  in the hospital because he didn't know, and things
10  like that.
11    Q.    All right.  At some point, there was a
12  reassignment, and that individual that you were
13  reassigned to was Gordon Conger?
14    A.    Oh, and he was really, really slapped,
15  and I felt really, really bad about that.  We cannot
16  help who we cannot stand.  There are -- what do you call
17  it -- things in our personalities from other people
18  that just happen that we just don't like them because
19  their eyes are brown or green or whatever.  And I felt
20  -- I always felt so bad, but I knew I couldn't even
21  tell him how sorry I was because that would have
22  offended him even more, so I just learned to keep my
23  mouth shut.
24    Q.    So as a home teacher, Mr. Conger began
25  having contact with the family?

Page 37

1    A.    Oh, yeah.  He was there at least twice
2  a week, I would hazard.
3    Q.    And what type of things did he do or
4  what type of discussions did you have?
5    A.    The same, like I said.  You know, he
6  would ask about how was automobiles, bills that I
7  couldn't handle, how were the kids?  If he didn't
8  think their shoes were up to snuff, he would tell me
9  so and then they'd get an order for me to go to the
10  church store to get them shoes or socks or whatever.
11    Q.    All right.
12    A.    You know.
13    Q.    Aside from Gordon Conger coming --
14    A.    And he had religious duties, too.
15    Q.    Okay.  What was --
16    A.    He had lessons to teach me from
17  whatever was on the hierarchy list at that time.
18  There was no liturgical one, two, three kind of thing
19  to Mormon liturgy because there really isn't Mormon
20  liturgy in that sense.  There's a lot of Mormon
21  liturgy, just not in that sense.
22    Q.    Okay.  So what you're saying is
23  whatever was being taught in the ward at that time
24  would be brought to you in the home as well?
25    A.    Yes.

10 (Pages 34 to 37)

1336e45f-1e84-465d-89a3-1a03830e0425

Exhibit____Page 535

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 38

1    Q.    Is that what you're saying?
2    A.    Yep.
3    Q.    Okay.  Aside from the contact that
4  you've described with Gordon Conger with you, did he
5  have contact with your children, and particularly Rob
6  Rinde?
7    A.    Oh, yeah.  He would take Rob home once
8  in a while and -- because he and Bradley would be
9  going somewhere, and he knew we couldn't afford it.
10  They'd be going to a baseball game or basketball game
11  or something.  I think he took him skiing more than
12  once.
13    Q.    Okay.
14    A.    I can't think much else.  I'm sure
15  there were many other instances, but off the top of my
16  head, that's all I can think of.
17    Q.    Did Mr. Conger have any legal role with
18  Rob and your other children?
19    A.    Oh, yes, he did.  I became very, very
20  ill.  I was to have a surgery, bypass surgery, in
21  1986, I believe.  I'm not sure when exactly.  And I
22  needed to settle the -- the question of the boys'
23  custody, and I talked to Gordon.  I knew he was an
24  attorney.  And I said I need this -- I need to get my
25  will up to snuff.  He asked me about the will.  And I

Page 39

1  said, well, I'm not worried about that.  Whatever I've
2  got anybody can have because I don't got nothing.  But
3  he said I am worried about my children's custody.  And
4  at that time, he volunteered to take Robert.  And then
5  he went -- we were in -- we were in a room at the
6  church, him and I, talking about this after church or
7  something.  It might even have been one of those times
8  when they had a dinner after church and everybody was
9  doing that and Gordon wanted to speak to me for some
10  reason.  Anyway, the bishop came and the bishop said
11  that he and Gordon would find permanent homes for the
12  rest of the boys and that I should not worry.
13    Q.    Should something happen to you?
14    A.    Yes.
15    Q.    So the arrangement was that Gordon
16  would take Rob and the bishop would find homes for the
17  other boys?
18    A.    Right.
19        MR. GORDON:  Objection to the form;
20  leading.
21  BY MR. SCHULZ:
22    Q.    Is that what you're saying?
23    A.    Yes.  I absolutely burst into tears, I
24  remember that.  I was so relieved.
25    Q.    Was that put in written form?

Page 40

1    A.    Yes, it was.
2    Q.    And did you put it in written form?
3    A.    No.
4    Q.    Who did?
5    A.    I believe Jane Glandon did.
6    Q.    Who is Jane Glandon?
7    A.    Gordon's private secretary.
8    Q.    And was she a member of the church?
9    A.    Yes, oddly enough, she was.
10    Q.    Of your ward?
11    A.    Yes.
12    Q.    And that was all signed by you?
13    A.    Yes.
14    Q.    Before you had your surgery?
15    A.    Yes.  Jane brought it, I believe, the
16  next weekend, and she and I adjourned to the same
17  room, and I signed the papers.  She gave me a copy.
18  Do not ask me where they are; house fire.
19    Q.    Okay.
20    A.    And then she took a copy back to the
21  office.
22    Q.    Okay.  After your surgery, you had the
23  surgery and you survived and you moved forward;
24  correct?
25    A.    Yes.

Page 41

1    Q.    All right.  Did Mr. Conger's role as
2  the home teacher of your family continue after that?
3    A.    Oh, yes.
4    Q.    And did his role and his involvement
5  with the family continue in the same way that you've
6  already described?
7    A.    Yes.
8    Q.    All right.  Did it become less or did
9  it stay --
10    A.    No, it continued in the same way.  He
11  -- he always seemed very glad to see us.  He still
12  came and got Rob and did things, you know.
13    Q.    Okay.  All right.
14    A.    I don't know what else.
15    Q.    Okay.  I'm just trying to find out,
16  Mrs. Rinde, to the best of your memory, the role that
17  Mr. Conger as the home teacher had.
18        MR. GORDON:  Objection to the form.
19  Move to strike the preamble.
20  BY MR. SCHULZ:
21    Q.    Mrs. Rinde, let's go on to another
22  area.  Who is Paul Lewis?
23    A.    Paul Lewis, the first time I saw him,
24  was leading the choir in Seattle 1st ward.
25    Q.    Okay.

11 (Pages 38 to 41)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

1336e45f-1e84-465d-89a3-1a03830e0425

Exhibit____Page 536

Page 42

1    A.    Very short, very dark, very
2  persnickety.  He was very fussy.
3    Q.    He was a member of the church in
4  Seattle?
5    A.    Oh, yeah.  I was told later that same
6  day the first time I saw him that he was on duty in
7  some capacity with the Navy down at the -- down by the
8  old car lots, there is a small Naval area down there.
9  It's not a regular Naval base.  I have no idea what it
10 was all about.
11   Q.    Okay.  Did you have contact with him --
12 did the family have contact with him after you first
13 met him?
14   A.    Yeah, because Robert was, by that time,
15 Scout material.
16   Q.    All right.  What was Mr. Lewis's role,
17 as you understood it, with the church or with the
18 Scouts?
19   A.    Well, I thought it was awfully odd that
20 he had so many jobs, but that was none of my business.
21   Q.    Okay.
22   A.    In general, I don't think the boys
23 liked him.
24   Q.    What roles did he have or jobs did he
25 have?

Page 43

1    A.    Well, he was the Scout Master and he
2  decided when was going -- what was going to happen and
3  when.  And he was extremely abrupt, from what Rob
4  said, and sometimes would change his mind in the
5  middle of something, and he just was persnickety.
6    Q.    Was the Scout organization or group
7  that Rob was a member of or participated in --
8    A.    Yeah.
9    Q.    -- connected with the church?
10   A.    Yeah.  Oh, my, yes.
11   Q.    Okay.
12   A.    That's the primary organization for
13 boys in the church of Jesus Christ of Latter-Day
14 Saints.
15   Q.    And was Rob involved in this Scouting
16 organization in both Seattle and in Bellevue?
17   A.    More in Bell -- more in Seattle than in
18 Bellevue.
19   Q.    Okay.
20   A.    After all of this happening that did
21 end up happening, he was -- what do you want to call
22 it -- leery, and he didn't want much more to do with
23 it.
24   Q.    Okay.
25   A.    He would help me with the stuff for the

Page 44

1  little guys, but that was about the sum total.
2    Q.    When you say he would help you with the
3  stuff for the little guys, what do you mean?
4    A.    I got caught doing blue and gold
5  dinner.
6    Q.    Okay.
7    A.    We were supposed to be a whole
8  committee of people to do this and, of course,
9  everybody at the last minute just kind of fades into
10 the woodwork when it comes to that kind of work.  And
11 I didn't realize it was going to be that bad, but it
12 was.  But anyway, that's neither here nor there.  We
13 got through it.  And then he helped me several times
14 at the -- the day camp for the Cub Scouts.
15   Q.    Okay.
16   A.    Although my boys were considered the
17 absolute holy terrors of the day camp.
18   Q.    Your younger boys?
19   A.    Yeah.  And I will admit they were hell
20 on earth.
21   Q.    Okay.
22   A.    They were -- I can't even explain it.
23 If anybody told me I had had kids like that, I would
24 have looked them and told them you're crazy, but they
25 wild, wild men.

Page 45

1    Q.    You had your challenges with them?
2    A.    Yeah.
3    Q.    All right.
4    A.    That I did.
5    Q.    Mrs. Rinde, aside from Paul Lewis being
6  involved in the Scouting program with your children,
7  what was your understanding of other roles he had with
8  the church when you were in Bellevue, if you know?
9    A.    Well, I know he was -- like I said, he
10 was the choir director.
11   Q.    Okay.
12   A.    He was a member of the bishopric,
13 although in what exact capacity, I don't know.
14   Q.    Okay.
15   A.    Let me think.  Just let me think a
16 second here.  And I do believe he taught a mens'
17 Sunday school class, but I'm not sure.
18   Q.    Okay.  All right.
19        MR. GORDON:  Counsel, I don't mean to
20 interrupt, but just to make this clarified, I think
21 the record is a little unclear whether he has those
22 positions in the Bellevue ward versus the Seattle
23 ward.
24        MR. SCHULZ:  The question was Bellevue,
25 -- so --

Pat Carl & Associates  (763) 591-0535 or (800) 591-9PCA  (722)

1336c45f-1e84-465d-89a3-1a03830e0425

Exhibit ___ Page 537

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 50

1  that comment; no question. Go ahead.
2  BY MR. SCHULZ:
3     Q.  Mrs. Rinde, had Rob babysat for the
4  Lewis children before that?
5     A.  Yeah.
6     Q.  Okay.
7     A.  He -- and it seemed to me it was he and
8  somebody else in the ward together.
9     Q.  All right. So the night that you're
10  talking about, he was to go babysit the Lewis
11  children. What happened then?
12    A.  They left my house, and I didn't hear
13  from them until they got back.
14    Q.  Okay.
15    A.  Robert looked like he had been shot.
16    Q.  So what led you to believe something
17  happened?
18    A.  He had no color in his face; none. He
19  was -- whatever had happened had wounded him to the
20  core. It's just like I said, he had been shot; that
21  was the look you got.
22    Q.  Did you talk to him?
23    A.  I tried to talk to him. He would not
24  talk to me. He kept -- like I'm doing here, he kept
25  wiggling and whatever. I'm doing it for one reason,

Page 51

1  he was trying to get away.
2     Q.  Okay.
3     A.  I did not know how much what had
4  happened. I assumed something quite large had
5  happened because of his behavior, and I knew better
6  than to push kids. They'll tell you when they'll tell
7  you as long as they get the feeling that they trust
8  them. And that's what I told him, I trust you to tell
9  me when you can, but please don't wait too long.
10    Q.  At some time later, did you have
11  further conversation with Rob?
12    A.  Oh, yes.
13    Q.  What prompted that, if anything?
14    A.  We had a very long, four-door closet
15  just off the living room in the hall, and I stored an
16  awful lot of stuff in there. I very seldom went in
17  there. It was mostly just storage. And I was looking
18  in there one morning for something or other and I
19  found his white jeans. These white jeans were so
20  soaked with blood that they could have stood on their
21  own. I cried. I'm not going to tell you I didn't.
22  Robert was not home. No one was home, just me. I
23  cried and then I pretty much knew without having to be
24  told much what probably happened.
25    Q.  What did you do next?

Page 52

1     A.  I waited for Rob to get home. The boys
2  got home first and I sent them out, gave them
3  something to eat and sent them out to play. And then
4  when Rob came home, I asked him to come down in the
5  bedroom, because I figured I could close the door if
6  the boys came in. They didn't have to hear everything
7  that was being said. And I asked him, and he waltzed
8  all around this, and I was under the impression right
9  at that moment he didn't remember much of anything,
10  either because he couldn't remember or because he just
11  didn't want to.
12    Q.  Did he give you any details?
13    A.  No, sir.
14    Q.  Okay.
15    A.  No.
16    Q.  What did you do after that, Mrs. Rinde?
17    A.  I was seeing Dr. Ichybana (phonetic) at
18  Group Health. This was when my daughter had been
19  killed. And he used to let me come into his office
20  once a week. He had two offices. He had one ordinary
21  people office, and then he had an office that was
22  pretty bare and basically only had two chairs in it,
23  and I could go in there and he'd close the doors and
24  he'd go away for 15 minutes, and I could scream myself
25  sick. And I needed to do that. I needed to be able

Page 53

1  to blow it off.
2     Q.  Okay.
3     A.  And I did that, but I didn't do it for
4  very long this time because I was too worried. And
5  then he came back in and I told him, and he looked at
6  me. And this was when he made one of his mistakes
7  that he should have never made. He says, well, until
8  he'll talk, he says there's nothing we can do about
9  this. And what -- we should have done something to
10  have forced it, but we didn't.
11    Q.  Did you do anything to follow up with
12  any third parties or people?
13    A.  Just him, Ichybana.
14    Q.  Did you report this after that?
15    A.  Just Ichybana.
16    Q.  Okay. Did you make any reports to the
17  church or to the police or --
18    A.  I didn't know what to report. I had
19  not been told anything. What can I report when I have
20  nothing to say?
21    Q.  Okay.
22    A.  Beyond I had these pants; I had hid
23  them by now for fear that Robert would destroy them.
24  And --
25    Q.  At some time later, did you have

14 (Pages 50 to 53)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

1336e45f-1e84-465d-89a3-1a03830e0425

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

### Page 54

1  additional conversations with Rob about this?
2      A.   Many, long time later as in years.
3      Q.   Okay.
4      A.   And that is after he had put himself in
5  that place in New Orleans, Louisiana for mental help.
6  And then he sent me -- well, he didn't send it to me.
7  He had written all of this stuff down that had
8  happened, and what he -- the white pants came into
9  that. And then I knew more, but I still didn't know
10  it all. I still don't know it all.
11      Q.   Okay. At some time after this happened
12  in Washington, Mrs. Rinde, did you make any reports of
13  this to Child Protective Services, to the church, to
14  any officials in the church?
15      A.   Oh, yeah. Eventually I had done that,
16  yes.
17      Q.   Okay. All right. Let's talk about
18  that.
19      A.   I misunderstood what you said.
20      Q.   Okay.
21      A.   Go ahead.
22      Q.   What did you do to make reports on
23  this --
24      A.   I had to figure out who I talked to
25  first. Just a second here.

### Page 55

1      Q.   Do you need a break?
2      A.   Yeah, I think I do. I don't remember
3  what I said, but it will come to me in a minute.
4           THE VIDEOGRAPHER: Going off the video
5  record. The time is now approximately 10:45 a.m.
6           (A recess was taken.)
7           THE VIDEOGRAPHER: We're back on the
8  video record. The time is now approximately 10:55
9  a.m.
10          MR. SCHULZ: Perhaps it would be best
11  if the court reporter could let Mrs. Rinde know of the
12  last question.
13          (Requested portion of the record
14          was read by the reporter.)
15  BY MR. SCHULZ:
16      Q.   All right. Mrs. Rinde --
17      A.   Is this -- excuse me.
18      Q.   What reporting, if any, did you do to
19  church officers or to public officials?
20          MR. GORDON: That's two questions;
21  object to form.
22  BY MR. SCHULZ:
23      Q.   Let's talk about church officials --
24  well, let's talk about that first, Mrs. Rinde.
25      A.   In regards to?

### Page 56

1      Q.   The abuse of Rob.
2           MR. GORDON: Do you have a time period,
3  counsel, so --
4  BY MR. SCHULZ:
5      Q.   After the abuse occurred, Mrs. Rinde.
6  And if you can, describe as best you can when you had
7  a conversation with church officials about Rob's
8  abuse.
9      A.   I'm extremely tired and so I'm not
10  quite there. I do know that when I found the white
11  pants and I had confronted Rob and nothing was much
12  conforming (sic), some, yes, I did. I called Bishop
13  Nielson Seattle 1st ward, I believe. And then
14  somebody or I said I have to talk to my social worker,
15  so I went to see the social worker in Bellevue, since
16  she was my current social worker. I didn't know what
17  to do. So she told me to bring -- come to her and
18  then they would decide. And okay, I went to her. I
19  don't remember if I brought the pants with me or not.
20  I'm inclined to think I would have, but I wouldn't bet
21  on it. I took -- I went there, she told me I needed
22  to talk to CPS. I said fine, where is CPS? And she
23  told me around the corner, there is CPS. So I went to
24  CPS and explained it to them what was going on. And
25  she told me after the song and dance about her being

### Page 57

1  black and my not remembering her and all that
2  nonsense, she told me I had to go make a report at
3  Issaquah, which was the next thing I did. I went to
4  Iss -- I went to the police department or whatever you
5  want to call it. It is the police department, but
6  there's a place where you report things in Issaquah.
7  We went there and I explained to them. To my
8  knowledge, they may have those pants. Anyway, they
9  said they would get in touch with me shortly and to go
10  home and just not worry until they heard from me --
11  until I had heard from them.
12      Q.   Did you hear back from the --
13      A.   Yes.
14      Q.   -- Issaquah Police Department?
15      A.   I did. And they said that they found a
16  record of Paul Lewis being registered at that motel,
17  and it was quite obvious that Robert had been there
18  from the descriptions that he had given to them
19  because they matched his descriptions and we had never
20  been in that motel any -- ever. Anyway, that he was
21  going to get in touch -- whoever I was talking to was
22  going to get in touch with the county attorney and
23  they would call me.
24      Q.   At some time, did you --- were you
25  contacted by the county attorney?

15 (Pages 54 to 57)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

1336e45f-1e84-465d-89a3-1a03830c0425

Exhibit____ Page__539

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 58

1    A.    Yes, I was. They called and told me
2   that they wanted to meet with Robert and/or my
3   attorney and myself and -- and myself and/or my
4   attorney. I forget the exact wording. It was a
5   little ambiguous on that score. And so I got ahold of
6   Gordon, told him about it.
7    Q.    When you say Gordon, do you mean Gordon
8   Conger?
9    A.    Gordon Conger. And --
10   Q.    Why did you call Gordon?
11   A.    Closest thing I had to a lawyer and a
12  husband, and I trusted him; completely, totally,
13  absolutely trusted him.
14   Q.    And what did you say to Gordon and what
15  did he say to you about this, to the best of your
16  recollection?
17   A.    He said I'll make the appointment and
18  I'll take him, and that's how it went.
19   Q.    Did he take him?
20   A.    (Nodding head). He took him, yes.
21   Q.    Did he take him alone or with others?
22   A.    No, there were two other people there.
23  Only Gordon came in the house that morning.
24   Q.    How did you know there were two other
25  people?

Page 59

1    A.    I could see them.
2    Q.    In the car?
3    A.    Yeah. My apartment was on the ground
4   floor and I had windows, like this, around the corner
5   and I could see. They were parked in front of the
6   side door, and I could see the car. I did -- could
7   not recognize the people in the car, but I recognized
8   that that was his car and there were people in it.
9    Q.    When they came back, did you talk to
10  Gordon, either that same day or --
11   A.    Just for a few minutes, not for very
12  long. And he said it didn't seem like it was going to
13  be a very big deal. Not a big deal isn't the right
14  word. It didn't seem like it was going to be too --
15  just a minute -- too difficult to handle, too painful,
16  that we would be able to manage it, take care of it.
17   Q.    Did he give you any details of what had
18  happened?
19   A.    No.
20   Q.    Did you talk to Rob about what had
21  happened that day?
22   A.    I did, and Rob told me he couldn't tell
23  me, mainly just in case he said something to the wrong
24  person, which threw me for a loop and a half, but I
25  thought --

Page 60

1    Q.    Were those his words?
2    A.    Rob's words, yeah.
3    Q.    At any time did he tell you anything
4   about that meeting during that time frame?
5    A.    Every time I brought it up, he'd ask
6   me, please, don't.
7    Q.    What was Rob's mood or demeanor when he
8   came back?
9    A.    Quiet; extremely, extremely quiet.
10   Q.    Okay. Did that change?
11   A.    No, not for a long time.
12   Q.    Okay.
13   A.    He was pretty -- from that time on,
14  actually since the rape, he was pretty taciturn that
15  whole time.
16   Q.    Okay.
17   A.    He didn't have much to say.
18   Q.    Now, Mrs. Rinde, you talked earlier
19  about your daughter being murdered.
20   A.    Yes.
21   Q.    How did that relate in time to these
22  issues that we've been talking about?
23   A.    My daughter went missing in April, not
24  officially, but that's the last time I heard, so that
25  makes it official to me. It was later discovered that

Page 61

1   it was actually closer to the 1st of May that she was
2   killed. This business with Lewis took place after
3   school vacation had started.
4    Q.    In that same year?
5    A.    Yes.
6    Q.    All right.
7    A.    Also, sometime during that summer --
8   and I don't remember exactly the things, although I
9   could probably find out if I had to -- Robert was
10  diagnosed with possible cancer of the bone in both
11  lower legs. So it was just a little nuts at my house.
12   Q.    And when did you learn of your
13  daughter's death that year?
14   A.    For sure, as in they have a body now?
15   Q.    Well, why don't you --
16   A.    December 20th, 19 -- let me think here.
17  I got to get the right date. Mark was six. Let me
18  think, let me think, let me think. It was December
19  20th. It was the day before Mark's 6th birthday. It
20  would have been '82, '83. '83, I think.
21   Q.    Okay. You believe '82 or '83 --
22   A.    Yeah.
23   Q.    -- to the best of your knowledge?
24   A.    That's to the best of my knowledge. I
25  could find out for sure if I looked it up, but yeah,

16 (Pages 58 to 61)

1336e45f-1e84-465d-89a3-1a03830e0425

Exhibit____ Page 540

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

**Page 74**

1  again.
2      Q.   All right. Did you see Paul Lewis
3  again in the church?
4      A.   No. I don't know what my reaction
5  would have been if I had.
6      Q.   Did Paul Lewis continue to be in the
7  church with the Boy Scouts after this?
8          MR. GORDON: Objection; form and
9  foundation.
10         THE DEPONENT: I had -- no, he
11 disappeared somewhere during the initial stuff coming
12 down.
13 BY MR. SCHULZ:
14     Q.   Okay. When you say the initial stuff
15 coming down --
16     A.   When it was reported to the church, he
17 just disappeared. I'm not saying they had anything
18 with putting him -- him disappearing. I'm just saying
19 during that time frame.
20     Q.   Okay.
21     A.   The kind of Navy thing he was in was a
22 kind that was -- oh, okay. My cousin was sent to
23 guard The Tomb of the Unknown Soldier. That is for a
24 certain length of duty. And I think this thing what
25 Paul was doing was also one of certain length of

**Page 75**

1  duties and you're done, you're on to your duty roster.
2      Q.   And it was same time frame?
3      A.   I think so, yeah.
4      Q.   All right. At any time, did Gordon
5  Conger have any follow-up conversations with you about
6  Paul Lewis?
7      A.   No.
8      Q.   Did any other church official have any
9  follow-up conversations with you about Paul Lewis?
10     A.   To my remembrance at this moment, no.
11     Q.   Okay. Did any church official report
12 to you at any time that they had talked to Paul Lewis
13 about the abuse?
14     A.   The only church official that I have
15 not spoken to have had -- have had written
16 communication with was a bishop in California who
17 wrote to me asking for my help to get Paul Lewis
18 reinstated in the Mormon Church. Would I forgive him
19 and all this other stuff. And I wrote back and said
20 no, and I said if you allow that man to become a
21 Mormon and you put him in control of any children at
22 any given time, I want you to know that I will hold
23 you responsible for any child that is damaged by him.
24 And I said, and I will make sure that whole place
25 where he's at also knows he's responsible.

**Page 76**

1          MR. GORDON: Objection; form.
2          THE DEPONENT: The man was telling me
3  how wonderful it was that he had put five boys through
4  the missions and all of this stuff. And I remember
5  the top of the thing I wrote back, I am so happy that
6  Paul's boys got to go on missions. I'm not angry with
7  them. But I said he put five boys through missions
8  and one boy into hell. And I said, I'm sorry, it
9  doesn't -- they don't balance.
10         MR. GORDON: Objection; form;
11 non-responsive. Move to strike.
12 BY MR. SCHULZ:
13     Q.   Mrs. Rinde, this bishop that you
14 referred to in California --
15     A.   Yeah. Robert would know exactly who he
16 is. I don't know his name.
17     Q.   All right. What was the time frame of
18 this? Do you know?
19     A.   It was just a year or so ago. But I
20 mean he would have to be crazy to let that man into
21 the church.
22         MR. GORDON: Objection; form, no
23 question pending. Move to strike.
24         THE DEPONENT: Ask any mother.
25 BY MR. SCHULZ:

**Page 77**

1      Q.   Mrs. Rinde --
2          MR. GORDON: Same objection.
3  BY MR. SCHULZ:
4      Q.   -- other than the bishop in
5  California -- let's go back to the time frame again
6  that Rob was abused. Were there any follow-up
7  contacts to you by any bishops or church officials
8  regarding Rob that you can recall?
9      A.   Not that I can recall off the top of my
10 head.
11     Q.   Okay.
12     A.   Right at that time, we were going
13 through CAT scans and MRIs and all kinds of treatments
14 for his legs and things, too, and I don't remember
15 everything that was going on.
16     Q.   Okay.
17     A.   I was trying to hang on to his life on
18 top of everything else.
19     Q.   Thank you, Mrs. Rinde.
20         MR. SCHULZ: That's all I have right
21 now.
22         THE DEPONENT: Thank you.
23         MR. GORDON: Mrs. Rinde, I would like
24 to take just 10 minutes. I don't have very much --
25         THE DEPONENT: Okay.

20 (Pages 74 to 77)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

1336e45f-1e84-465d-89a3-1a03830e0425

Exhibit      Page 54

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

**Page 82**

1  Q.   Okay.  She was Relief Society
2  president, to the best of your recollection?
3     A.   To the best of my recollection --
4     Q.   (Inaudible).
5     A.   -- before Bonnie Stowell.  And the
6  bishop's wife, whose name I completely forget, he was
7  bishop before Bishop Williams, she had been Relief
8  Society president before Jane.
9     Q.   You mentioned that she was a secretary
10 for Mr. Conger.  She was a legal secretary?
11    A.   She was a private secretary to Mr.
12 Conger.
13    Q.   Is it your testimony she worked at his
14 law office?
15    A.   Yep, the one up in the building,
16 Columbia Tower, 55th floor.
17    Q.   Okay.  Fourth question, again different
18 subject.  You mentioned that your three sons, while
19 they were younger, were wild, wild men.  What do you
20 mean by that?
21    A.   Mischief, considerable mischief.  They
22 were always getting into some kind of foolishness.
23 I'm trying to think right off the top of the head.
24 They'd instigate stuff.  One boy would say something
25 funny and then my boys would just, you know, roll it

**Page 83**

1  up and just keep it going and keep it going and keep
2  it going until they would have the entire class or
3  whatever group they were in absolutely rolling on the
4  ground.
5     Q.   Okay.  Other question, different
6  subject.  Mr. Lewis's position in the Bellevue, was it
7  1st ward --
8           (Parties started talking over each other.)
9     Q.   Seattle 1st ward?
10    A.   Seattle 1st ward, excuse me, you're
11 correct.
12    Q.   You mentioned a bishopric.  And if you
13 defined the bishopric as a bishop at the ward and the
14 first and second counselors at that ward and no one
15 else, are you saying he was either of those position
16 or you don't know?
17    A.   No.  When I say bishopric, I'm talking
18 about there is those three and they make most of the
19 decisions for the ward.  But there are other men in
20 high calling also that make other decisions, that help
21 make the decisions for the ward.
22    Q.   All I'm saying is, if you define the
23 bishopric at the ward level, a bishop --
24    A.   Right.
25    Q.   -- and first and second counselor,

**Page 84**

1  you're not saying that Lewis was in any of those
2  positions?
3     A.   No.  He was in a separate position
4  altogether that had to do with the purchase of musical
5  instruments -- blank -- musical instruments, getting
6  people to come and play.  We had one little girl,
7  protТgТ pianist in that ward, and she would come and
8  play all the time.  And he made all those kinds of
9  arrangements and he had a -- what do you call it?  A
10 spoon in a lot of pots as far as music and that type
11 of thing went.
12    Q.   Okay.  Different subject.  You
13 mentioned when Gordon Conger was your home teacher and
14 coming to your home on occasion --
15    A.   Hm-hm.
16    Q.   -- that he was the closest thing to a
17 husband.  I just want to make sure that that was a
18 term of endearment --
19    A.   It was a term of endearment.  I
20 absolutely loved Gordon Conger.  He was very, very --
21 I felt -- he was someone I felt I could trust with a
22 personal family thing.  It would never go any farther
23 than Gordon.
24    Q.   Okay.  That's all I wanted to know.
25    A.   There was nothing sexual intended or

**Page 85**

1  any otherwise meant.
2     Q.   In this day and age, you got to be
3  careful on your words.
4     A.   Oh, I know.  And after I said that, I
5  went, oh, what have you done?
6     Q.   No problem.  Another subject.  Your
7  former husband, I think you referred to him as Larry?
8     A.   Yeah.  He's dead.
9     Q.   Was he ever accused of sexually
10 assaulting your daughter Kim?
11    A.   There was talk of it after she was
12 dead, but there was never any evidence.
13    Q.   Was he -- were any charges ever filed
14 against him?
15    A.   He was arrested, but nothing was ever
16 done.  She -- she retracted it all.  She told me it
17 was a lie.  Some other people who were -- supposedly
18 knew about it and whatever, they all said it was a
19 lie.
20    Q.   Is that about the time also that she
21 disappeared?
22    A.   Yeah.
23    Q.   Okay.  Last question.  We talked just
24 very briefly yesterday about Rob babysitting the
25 Johannessen children and -- and bathing them and

22 (Pages 82 to 85)

1336c45f-1e84-465d-89a3-1a03830e0425

Exhibit ___ Page 542

Page 86

1 bathing with them? Do you remember that?
2    A.   Yes, I remember that.
3    Q.   That was just a misunderstanding and
4 nothing ever came of that, I take it?
5    A.   No.
6    Q.   There was no discipline by anybody on
7 that?
8    A.   No.
9    Q.   It was just one of those things that
10 got explained and everyone walked away?
11    A.   Well, they more or less walked their
12 own way. She had been planning -- the daughter with
13 the children -- had been planning on moving to Boise,
14 so she just went to Boise. Nothing had changed.
15 There was no surprise anythings here.
16    Q.   When -- when the incident occurred and
17 there was some alarm, it got all explained and
18 everyone understood and walked away?
19    A.   Yes.
20    Q.   It was a non-event?
21    A.   It was a non-event. No one ever gave
22 me or anyone else any hassle about it.
23    Q.   No police, no church involvement, no
24 nothing?
25    A.   No.

Page 87

1    Q.   You agree with me?
2    A.   Yes.
3    Q.   Okay.
4       MR. GORDON: I have nothing further.
5 Thank you, very much, ma'am.
6       THE DEPONENT: You're welcome.
7       MR. SCHULZ: I have some brief
8 testimony -- brief questions, Mrs. Rinde.
9           EXAMINATION
10 BY MR. SCHULZ:
11    Q.   Mrs. Rinde, you were asked about Mr.
12 Lewis and your understanding of his role with the
13 church.
14    A.   Yes.
15    Q.   And you had been asked some questions
16 about that earlier. Were you aware that he was a
17 member of the high priesthood or some other role --
18    A.   Oh, I know he was a high priest --
19       MR. GORDON: Objection to form --
20       THE DEPONENT: He had to have been.
21       THE COURT REPORTER: Go on.
22       MR. SCHULZ: Did you get down her
23 answer?
24       THE COURT REPORTER: Yeah, I got it on
25 tape, so go.

Page 88

1 BY MR. SCHULZ:
2    Q.   Let's just slow it down a second. I
3 think you started --
4    A.   All right. I apologize.
5    Q.   I think you started before my question
6 ended and Mr. Gordon jumped in and so I think we got
7 kind of confused.
8       MR. GORDON: You had three of us
9 talking there.
10 BY MR. SCHULZ:
11    Q.   So let's do our best. What was your
12 understanding further of Mr. Lewis's role with the
13 church?
14    A.   To participate in the kinds of things
15 he participated for the church. I'm under the
16 impression from everything that I have ever been
17 taught in the church that he would have needed to be a
18 high priest.
19    Q.   What do you mean by that, as you
20 understand it, Mrs. Rinde?
21    A.   All right. When you're 12, you're made
22 an ironic priest. You're -- hands are laid on you and
23 things are said and whatever, and that makes you an
24 ironic priest. At 14, you're made a teacher. And at
25 16, I'm doing a blank.

Page 89

1       MR. GORDON: Melchesidek?
2       THE DEPONENT: No, that's not until 18.
3 16 is the one where they got the one where they can
4 baptize. Oh, it's terrible that I don't remember.
5 BY MR. SCHULZ:
6    Q.   Do you want to skip over that one and
7 go on?
8    A.   Okay. Well, just keep in mind that
9 that gives them the right to baptize.
10    Q.   Okay. Whatever it's called?
11    A.   The next one, you have to -- you go
12 through as you became an elder, usually at 18, and
13 that's when you become a Melchesidek priest. A priest
14 after the matter of Melchesidek is the way it's put.
15    Q.   Okay.
16    A.   If you go higher up in the church to
17 the stake level of the presidency, then you get
18 another level of the priesthood called the high
19 priesthood. And I'm fairly certain -- I would be
20 fairly certain that Paul Lewis was a high priest.
21    Q.   That's your belief and understanding?
22    A.   (Nodding head). Robert was a high
23 priest.
24    Q.   Okay. Mrs. Rinde, you were asked a
25 couple of follow-up questions about Gordon Conger and

23 (Pages 86 to 89)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

1336e45f-1e84-465d-89a3-1a03830e0425

Exhibit___ Page 543

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/20/06

Page 90

```
1   his role with the family --
2       A.   Oh, yes.
3       Q.   -- and to define that role.  You
4   indicated that it was -- he was someone you trusted at
5   that time?
6       A.   I completely -- I totally, absolutely,
7   completely, one hundred percent trusted this man.
8       Q.   Do you feel the same today?
9            MR. GORDON:  Objection to the form
10  (inaudible).
11           THE COURT REPORTER:  Object?
12           MR. GORDON:  Objection to the form.
13  BY MR. SCHULZ:
14      Q.   You can answer.
15      A.   You're going to have to ask me the
16  question again.  Now I'm thrown off by what was said
17  here.
18      Q.   As you sit here today, do you have the
19  same level of trust in Gordon Conger?
20      A.   No, I do not have the same level of
21  trust for Gordon Conger.
22           MR. GORDON:  Same objection.
23           THE DEPONENT:  No.
24           MR. SCHULZ:  Off the record.
25           (Discussion had off the record.)
```

Page 91

```
1   BY MR. SCHULZ:
2       Q.   Why, Mrs. Rinde?
3            MR. GORDON:  Objection to form; asking
4   for opinion.
5            THE DEPONENT:  I don't feel that he has
6   been honest with me.  I don't feel that he has -- I
7   feel that the only person that he has represented in
8   this whole mess has been the church and that's the
9   only thing that he's cared about.  As far as I was
10  concerned and still am concerned, he stood in loco
11  parentis for Robert, and I expected him to behave as
12  such.
13           MR. GORDON:  Objection; move to strike.
14  BY MR. SCHULZ:
15      Q.   Mrs. Rinde, you were asked finally some
16  questions about your memory today.  Did you have
17  difficulty waking up today?
18      A.   I was not awake when you arrived.  They
19  came in, gave me my medicine, which I promptly threw
20  up.
21      Q.   Without going back over that again, did
22  you -- your deposition was taken yesterday; correct?
23      A.   Oh, that deposition?
24      Q.   Your deposition was taken yesterday;
25  correct?
```

Page 92

```
1       A.   Yes.
2       Q.   You gave testimony --
3       A.   Yeah, no problems.
4       Q.   You've given testimony today?
5       A.   Yes.
6       Q.   Correct?
7       A.   Yes.
8       Q.   There were some things you had
9   difficulty remembering today; correct?
10      A.   Oh, yeah, that's one way of putting it.
11  Considerable things I couldn't remember today.
12      Q.   The facts that you testified to
13  today --
14      A.   Yes.
15      Q.   -- the things that you remember today,
16  do you believe those are true and accurate to the best
17  of your ability?
18      A.   To the very best of my ability, yes.
19           MR. SCHULZ:  Thank you.  I have nothing
20  further.
21           MR. GORDON:  Just two follow-ups
22  because I want to get into the definitions.
23           EXAMINATION
24  BY MR. GORDON:
25      Q.   I don't think you inferred that only a
```

Page 93

```
1   stake president is a member of the high priesthood.
2   You didn't mean that, did you?
3       A.   No.
4       Q.   And, in fact, in a given ward, aren't
5   most men over 40 high priests?
6       A.   Usually.
7       Q.   And so a high percentage of the men
8   over 40 years old in a ward are -- hold that position?
9       A.   Yeah.  It would be very unusual for
10  them not to.
11      Q.   And one other question.  And I'm going
12  back and going to change the subjects on you.  When
13  Rob came back from going to the King County
14  prosecutor's office, do you remember that?
15           MR. SCHULZ:  Object; beyond the scope.
16           MR. GORDON:  (Inaudible).
17           THE DEPONENT:  Yeah, I remember when he
18  came home.
19  BY MR. GORDON:
20      Q.   I just want to ask you one question on
21  that.  Did he come into your house, then, alone, or
22  did Gordon come into your house at that time?
23           MR. SCHULZ:  Same objection;
24  continuing, counsel, to this line.
25           THE DEPONENT:  To my knowledge, Robert
```

24  (Pages 90 to 93)

Exhibit ____ Page 544

1336e45f-1e84-465d-89a3-1a03830e0425

# EXHIBIT B

Rinde v. Church of Latter-Day Saints

Deposition of Gordon Conger

February 15, 2007

**Byers & Anderson, Inc.**
**Court Reporters/Video/Videoconferencing**

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101
(206) 340-1316
(800) 649-2034

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax
scheduling@byersanderson.com
www.byersanderson.com

**Serving Washington's Legal Community Since 1980**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

ROB RINDE f/k/a ROBERT LARRY LEROY      )
PITSOR, JR.,                            )
                                        )
                Plaintiff,              )
                                        ) No. 06-2-00825-1 SEA
        vs.                             )
                                        )
THE CORPORATION OF THE PRESIDENT        )
OF THE CHURCH OF JESUS CHRIST OF        )
LATTER-DAY SAINTS, a Utah               )
corporation sole; and the "MORMON       )
CHURCH" THE CHURCH OF JESUS CHRIST      )
OF LATTER-DAY SAINTS, an                )
unincorporated association,            )
                                        )
                Defendants.             )

DEPOSITION OF GORDON G. CONGER

February 15, 2007

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com

Since 1980                         Serving Washington's Legal Community

```
 1                  APPEARANCES

 2
   For the Plaintiffs:
 3
                   Michelle A. Menely
 4                 Gordon, Thomas, Honeywell,
                     Malanca, Peterson & Daheim, LLP
 5                 One Union Square
                   600 University Street, Suite 2100
 6                 Seattle, Washington 98101
                   206-676-7500
 7                 206-676-7575 Fax
                   mmenely@gth-law.com
 8
                   Tim Kosnoff
 9                 Attorney at Law
                   600 University
10                 Suite 2102
                   Seattle, Washington 98101-4161
11                 425.637.3070
                   425.837.9692
12                 timkosnoff@comcast.net

13

14 For the Defendants:

15                 Charles C. Gordon
                   Gordon, Murray, Tilden, LLP
16                 1001 4th Avenue
                   Suite 4000
17                 Seattle, Washington 98154-1007
                   206.467.6477
18                 206.467.6292 Fax
                   cgordon@gmtlaw.com
19

20                 Randy T. Austin
                   Kirton & McConkie
21                 1800 Eagle Gate Tower
                   60 East South Temple
22                 Salt Lake City, Utah 84145-0120
                   801.328.3600
23                 801.321.4893 Fax
                   raustin@kmclaw.com
24

25 Also present: Michael Rosenberger
```

Page 17

```
 1      assistant during that period of time.  I think not    09:54

 2      because it was a fairly small group of boys.           09:54

 3 Q    Okay.  In the 1978 through '84 time frame, are you    09:54

 4      called to the position of a scoutmaster?              09:54

 5 A    Well --                                                09:54

 6 Q    Is one called to position of scoutmaster?             09:54

 7 A    The answer is yes, although it's a dual reporting.    09:54

 8      The scoutmaster reports to the scouting organization, 09:54

 9      and the ward is the sponsoring institution to the     09:55

10      scout troop.                                           09:55

11          And so the scoutmaster is designated by the ward, 09:55

12      but reports to the scout organization.  The scout     09:55

13      organization has a district, and the Bellevue area    09:55

14      was the Cascade District.  And in the scout           09:55

15      organization, I would report to a district            09:55

16      commissioner.                                          09:55

17 Q    I'm sorry.  The Bellevue area was the Cascade         09:55

18      District of the scouts?                                09:55

19 A    Yes.                                                   09:55

20 Q    And did that encompass both the Bellevue sixth ward   09:55

21      and the Bellevue first ward?                           09:55

22 A    Yes.                                                   09:55

23 Q    So were you the scoutmaster for both wards?           09:55

24 A    No.  When we -- when the ward was divided, the scout  09:55

25      troop was divided, and so I was initially scoutmaster 09:55
```

Page 35

```
 1 Q   Did -- I'm sorry.  Were you done?  I do that.  I        10:21
 2     apologize.                                              10:21
 3 A   And I left.                                             10:21
 4 Q   Did you have any conversation with Joyce Pitsor about   10:21
 5     how that meeting with the prosecuting attorney was at   10:22
 6     any point?                                              10:22
 7 A   I'm sure that at some point -- and I don't recall       10:22
 8     whether it was during a regular -- my wife and I or     10:22
 9     my son and I visited the Pitsor family periodically     10:22
10     as their home teacher, another bit of LDS jargon, and   10:22
11     it may have been at our next home teaching visit.       10:22
12 Q   Do you recall what the conversation with you and        10:22
13     Joyce Pitsor was with regard to that?                   10:22
14 A   Well, I just reported that I had not been able to go    10:22
15     in with Rob and that I had done what I was asked to     10:22
16     do in taking him down.                                  10:22
17 Q   I'm sorry.  I should have asked you this way earlier.   10:23
18     Do you remember what year this was that this car trip   10:23
19     down to King County prosecuting attorney's?            10:23
20 A   Yes.  Because about six months later, I was released    10:23
21     as -- from my scout leadership position to take the     10:23
22     position that we've already discussed as a counselor    10:23
23     to the then stake president, and so I knew that it      10:23
24     was early in 1984.                                      10:23
25 Q   I'm sorry?                                              10:23
```