| | | |
|---|---|---|
| 1 | take guitar lessons, but he didn't have a guitar.  So | 10:32 |
| 2 | we bought a guitar, and the next time we went, we | 10:32 |
| 3 | loaned it to him.  It was not Christmastime.  We | 10:32 |
| 4 | couldn't say it was a gift, and I think he brought | 10:33 |
| 5 | that guitar back on that second visit, and we have it | 10:33 |
| 6 | today. | 10:33 |
| 7 Q | (By Ms. Menely)  And there was no discussion about | 10:33 |
| 8 | the abuse or the trip to King County, just a pleasant | 10:33 |
| 9 | conversation? | 10:33 |
| 10 A | No.  Just a pleasant conversation, warm conversation. | 10:33 |
| 11 Q | And then the other two communications you've had with | 10:33 |
| 12 | Rob were the two phone calls? | 10:33 |
| 13 A | Right. | 10:33 |
| 14 | MS. MENELY:  Why don't we go ahead | 10:33 |
| 15 | and take a five-minute break, if it's okay with you | 10:33 |
| 16 | guys? | 10:33 |
| 17 | MR. GORDON:  Sure. | 10:33 |
| 18 | (Recess taken from 10:33 | 10:41 |
| 19 | a.m. to 10:43 a.m.) | 10:41 |
| 20 | | 10:41 |
| 21 | EXAMINATION (Continuing) | 10:41 |
| 22 | BY MS. MENELY: | 10:43 |
| 23 Q | Mr. Conger, I'm trying to get my bearings here.  Do | 10:43 |
| 24 | you know Bishop Lymon Nielsen? | 10:43 |
| 25 A | No. | 10:43 |

Dockets.Justia.com

| | | | |
|---|---|---|---|
| 1 Q | Do you know the name? | | 10:43 |
| 2 A | I do know the name.  Again, because of -- in | | 10:43 |
| 3 | connection with this lawsuit.  I believe that he is | | 10:43 |
| 4 | the bishop of the ward where the abuse took place. | | 10:43 |
| 5 Q | My pen just died.  Excuse me.  So if you -- I take it | | 10:43 |
| 6 | you did not talk to Bishop Nielson at the time of the | | 10:44 |
| 7 | abuse? | | 10:44 |
| 8 A | I did not. | | 10:44 |
| 9 Q | Did you talk to any bishop at the Seattle first ward? | | 10:44 |
| 10 A | No. | | 10:44 |
| 11 Q | Did you talk to any member of the priesthood of the | | 10:44 |
| 12 | Bellevue first ward? | | 10:44 |
| 13 A | Are you talking about -- | | 10:44 |
| 14 Q | I mean the Seattle first ward. | | 10:44 |
| 15 A | -- the time frame? | | 10:44 |
| 16 Q | At about the time you first learned that Rob had been | | 10:44 |
| 17 | a victim of sexual abuse, did you discuss the abuse | | 10:44 |
| 18 | with anyone at the Seattle first ward? | | 10:44 |
| 19 A | None, no. | | 10:44 |
| 20 Q | Did you discuss the abuse with anyone at the Bellevue | | 10:44 |
| 21 | sixth ward? | | 10:44 |
| 22 A | Other than Bishop Johennesen, no. | | 10:44 |
| 23 Q | Did you discuss the abuse allegations with anyone, | | 10:45 |
| 24 | other than Bishop Johennesen and Joyce Pitsor and Rob | | 10:45 |
| 25 | Pitsor? | | 10:45 |

1                    MR. GORDON:  At the time we're      10:45

2  talking about?      10:45

3                  MS. MENELY:  At the time.      10:45

4 A  Myrna.  She was present while it was discussed with      10:45

5  Joyce, I'm sure.      10:45

6 Q  (By Ms. Menely)  You say you're sure.  Do you not      10:45

7  have a specific recall of that?      10:45

8 A  Well, she was my usual companion in visiting the      10:45

9  Pitsor family, and so she was privy to all of the      10:45

10  sadness, of which there was way, way, way too much in      10:45

11  the Pitsor household.      10:45

12 Q  I agree with you on that.      10:46

13      Do you have any recall as to why you didn't talk      10:46

14  to anybody else about the allegations of abuse?      10:46

15 A  The Pitsors were being traumatized by press      10:46

16  references to Joyce's daughter Kimi and her      10:46

17  disappearance at that time.  She was a disappeared      10:46

18  person suspected to be a victim of the Green Killer      10:46

19  murderer.      10:46

20      And they were very close.  Private is the way to      10:46

21  say it.  They were very private about those things      10:46

22  and very vulnerable to people knowing about them and      10:46

23  talking about them, so it was a confidential matter.      10:47

24 Q  Do you recall Joyce or Rob asking you to keep it      10:47

25  confidential, the fact that Rob was a victim of      10:47

| | | |
|---|---|---|
| 1 | sexual abuse? | 10:47 |
| 2 A | They didn't have to ask me. | 10:47 |
| 3 Q | Do you know a Bishop Rosenburg in Tacoma? | 10:47 |
| 4 A | No. | 10:47 |
| 5 Q | Did you know a Bishop Rosenburg in Tacoma? | 10:47 |
| 6 A | No. | 10:47 |
| 7 Q | I still want to say Rosenberger when I say that. | 10:47 |
| 8 | Okay. | 10:48 |
| 9 | Back to this meeting with the prosecuting | 10:48 |
| 10 | attorney.  I'm just trying to get -- narrow the time | 10:48 |
| 11 | down at all. | 10:48 |
| 12 | You know it was during the school year, correct? | 10:48 |
| 13 A | Yes. | 10:48 |
| 14 Q | Okay.  So that would be sometime between September | 10:48 |
| 15 | and June? | 10:48 |
| 16 A | Well, it was early 1984. | 10:48 |
| 17 Q | So January, February, is that what you consider | 10:48 |
| 18 | early? | 10:48 |
| 19 A | I would say January, first quarter. | 10:48 |
| 20 Q | Is there anything else you can recall about when that | 10:48 |
| 21 | meeting may have occurred? | 10:48 |
| 22 A | It was a weekday, I'm sure.  I -- no, I don't think I | 10:48 |
| 23 | can -- | 10:49 |
| 24 Q | Were you -- you were practicing at the time? | 10:49 |
| 25 A | Oh, yes. | 10:49 |

1 Q   Do you happen to have your 1984 calendar still?          10:49

2 A   I've looked.  No.          10:49

3 Q   And I don't suppose in 1984 you were on computer          10:49

4     calendars yet?          10:49

5 A   No, we were not.  I actually never got onto a          10:49

6     computer calendar.  It's a generational thing.          10:49

7 Q   Was your secretary at the time Jane Glandon?          10:49

8 A   The name Jane Glandon is familiar, but not as a legal          10:49

9     secretary.  We had a neighbor by the name of Jane          10:49

10    Glandon, whose husband -- Bert Glandon and she were          10:49

11    neighbors of ours probably in that time frame.          10:49

12 Q  Do you think that -- if you knew who your secretary          10:50

13    was in 1984, she might have one of your calendars          10:50

14    from 1984?          10:50

15 A  No.  She wouldn't.  My longtime secretary at the time          10:50

16    I retired was Mary Kearney, K-e-a-r-n-e-y.  I don't          10:50

17    believe Mary was my secretary in 1984.  I think          10:50

18    she -- let's see.  That's 23 years ago.  So I          10:50

19    don't -- I can't be sure.          10:50

20 Q  Did you maintain records -- strike that.          10:50

21        What years were you at KIRO?          10:50

22 A  1993 to '95.          10:50

23 Q  That doesn't help me narrow it down any.          10:50

24        Are you aware if Joyce Pitsor has indicated that          10:51

25    a report was made to the Issaquah Police Department          10:51

| | | |
|---|---|---|
| 1 | with regard to the allegation of abuse? | 10:51 |
| 2 A | Yes, I'm aware of that. | 10:51 |
| 3 Q | Are you -- have you or were you in possession of the | 10:51 |
| 4 | police report from the Issaquah Police Department -- | 10:51 |
| 5 A | No. | 10:51 |
| 6 Q | -- at the time? | 10:51 |
| 7 A | No. | 10:51 |
| 8 | MR. GORDON:  Just to clarify too, | 10:51 |
| 9 | his awareness would be through me. | 10:51 |
| 10 | MS. MENELY:  That's why I put it | 10:51 |
| 11 | back to at the time. | 10:51 |
| 12 Q | (By Ms. Menely)  Are you aware that Joyce Pitsor | 10:51 |
| 13 | has -- and this is current -- has indicated that she | 10:51 |
| 14 | received a letter from the King County prosecuting | 10:51 |
| 15 | attorney's office with respect to the meeting where | 10:51 |
| 16 | it was to occur? | 10:51 |
| 17 A | I -- no. | 10:52 |
| 18 Q | Did you ever see a letter from the King County | 10:52 |
| 19 | prosecuting attorney's office or like agency with | 10:52 |
| 20 | regard to the meeting that you took Rob to? | 10:52 |
| 21 A | You mean before the meeting, after the meeting? | 10:52 |
| 22 Q | Yes, anytime. | 10:52 |
| 23 A | Anytime.  I don't believe I saw a letter.  I was -- I | 10:52 |
| 24 | knew where he was supposed to go in the courthouse, | 10:52 |
| 25 | but I don't think I was given a letter. | 10:52 |

Page 46

```
 1 Q   I guess you don't have that letter?              10:52

 2 A   No.                                              10:52

 3 Q   Or any other documentation?                      10:52

 4 A   No.                                              10:52

 5                 MR. GORDON:  Documentation about     10:52

 6     what?                                            10:52

 7                 MS. MENELY:  Letter or any other     10:52

 8     type of document that -- indicating where to go. 10:52

 9                 MR. GORDON:  Okay.                    10:52

10                 MS. MENELY:  I don't want to be       10:52

11     limited to a letter.                             10:52

12                 MR. GORDON:  Okay.  When you say,     10:52

13     does he have any documentation, the way it reads 10:52

14     is -- I'm sure he has documentation somewhere.  Okay. 10:52

15     We're communicating.                             10:53

16        Do you want some coffee?                      10:53

17                 MS. MENELY:  Yes.                     10:53

18 Q   (By Ms. Menely)  You have talked today about your 10:53

19     having been the Pitsor -- the home teacher for the 10:54

20     Pitsor family?                                   10:54

21 A   Yes.                                             10:54

22 Q   And is that how you initially met the Pitsor family? 10:54

23 A   Yes.                                             10:54

24 Q   When did you become the Pitsor family home teacher? 10:54

25 A   Well, that will take a little thinking.  We ended in 10:54
```

| | | |
|---|---|---|
| 1 | August/September of '84, and we did it for about two | 10:54 |
| 2 | years, so I would say somewhere in the last half of | 10:54 |
| 3 | '82.  The reason that I know that we did it for two | 10:54 |
| 4 | years is, we tried to help Joyce with Christmas for | 10:54 |
| 5 | the boys, and we did that twice, two Christmases. | 10:54 |
| 6 Q | What do you mean by, you tried to help Joyce with | 10:55 |
| 7 | Christmas? | 10:55 |
| 8 A | Money, and we bought them gifts from us. | 10:55 |
| 9 Q | The boys? | 10:55 |
| 10 A | Mm-hm.  And I think something for Joyce.  She didn't | 10:55 |
| 11 | get many gifts. | 10:55 |
| 12 Q | How often would you visit the -- did you visit the | 10:55 |
| 13 | Pitsor home during your home teaching? | 10:55 |
| 14 A | Approximately monthly. | 10:55 |
| 15 Q | And how long did the visits last, approximately? | 10:55 |
| 16 A | Oh, half an hour. | 10:55 |
| 17 Q | And I think you testified earlier that it was you and | 10:55 |
| 18 | Myrna most of the time? | 10:55 |
| 19 A | Well, I think most of the time would be right, but | 10:55 |
| 20 | that would mean more than 50 percent, not -- my son | 10:55 |
| 21 | David, who is just a year younger than Rob, was my | 10:56 |
| 22 | companion when he was available for a period of time. | 10:56 |
| 23 Q | Why would -- why would you take Rob -- your son David | 10:56 |
| 24 | with you?  Just to have a second person, or what was | 10:56 |
| 25 | the purpose of that? | 10:56 |

Page 48

| | | |
|---|---|---|
| 1 A | Well, we go by twos, and the home teacher is a church | 10:56 |
| 2 | assignment, and we are asked to have a companion.  He | 10:56 |
| 3 | also was a holder of the priesthood, and so this is a | 10:56 |
| 4 | way for young men to learn how to serve. | 10:56 |
| 5 Q | What happens at a home teaching session?  Do you talk | 10:57 |
| 6 | about -- for instance, do you talk about not having | 10:57 |
| 7 | Christmas gifts or do you talk about spiritual | 10:57 |
| 8 | matters? | 10:57 |
| 9 |            MR. GORDON:  Are we talking about | 10:57 |
| 10 | when he was at the Pitsor residence? | 10:57 |
| 11 |            MS. MENELY:  Yes. | 10:57 |
| 12 |            MR. GORDON:  Okay. | 10:57 |
| 13 A | We would spend some time in conversation, which was | 10:57 |
| 14 | to build friendship, build empathy.  We would try to | 10:57 |
| 15 | leave a short spiritual message and then always | 10:57 |
| 16 | conclude with prayer, a blessing on the home and | 10:57 |
| 17 | family. | 10:57 |
| 18 Q | (By Ms. Menely)  And is this pretty generally how | 10:57 |
| 19 | home teachings work? | 10:58 |
| 20 A | Yes. | 10:58 |
| 21 Q | So there's nothing special about the Pitsor family? | 10:58 |
| 22 A | Well, there were lots of needs there, so we spent | 10:58 |
| 23 | lots of time with the needs. | 10:58 |
| 24 Q | And can you explain that to me?  Do you mean you went | 10:58 |
| 25 | there more often than you would other families where | 10:58 |

Page 49

| | | |
|---|---|---|
| 1 | you were a home teacher, or you spent more time there | 10:58 |
| 2 | on your home visits, or -- | 10:58 |
| 3 A | Well, probably more time on the visits.  Joyce | 10:58 |
| 4 | unfortunately, because of obesity and other health | 10:58 |
| 5 | issues, was very minimally functional.  She could | 10:58 |
| 6 | barely walk around, and so that household needed a | 10:58 |
| 7 | lot of help. | 10:58 |
| 8 | The women's organization in our ward also visited | 10:58 |
| 9 | Joyce each month, two women called visiting teachers, | 10:58 |
| 10 | and they would periodically get a group of ladies | 10:59 |
| 11 | together to clean the place up and to give her a lift | 10:59 |
| 12 | with household needs. | 10:59 |
| 13 | And we helped coordinate that, and that was | 10:59 |
| 14 | conveniently done when Myrna was working, so Myrna | 10:59 |
| 15 | would visit part of the time, and David would visit | 10:59 |
| 16 | with me part of the time.  I never went alone. | 10:59 |
| 17 Q | Do you know who the two women were in the -- you said | 10:59 |
| 18 | two women of the women's organization also visited. | 10:59 |
| 19 | Did you mean that on somewhat of a regular basis? | 10:59 |
| 20 A | Yes.  They would make monthly visits as well.  I | 10:59 |
| 21 | believe Bonnie Stowell was one of her visiting | 10:59 |
| 22 | teachers.  I'm not sure of that, but I believe so.  I | 10:59 |
| 23 | don't -- I don't remember who else that would have | 11:00 |
| 24 | been.  Myrna handled liaison with the visiting | 11:00 |
| 25 | teachers. | 11:00 |

Page 50

| | | |
|---|---|---|
| 1 Q | So you got to know Joyce and the rest of the family | 11:00 |
| 2 | during these visits? | 11:00 |
| 3 A | Excuse me? | 11:00 |
| 4 Q | Did you get to know Joyce and the rest of the family | 11:00 |
| 5 | during these home teaching visits? | 11:00 |
| 6 A | Yes. | 11:00 |
| 7 Q | Did you ever visit the Pitsor family on an unofficial | 11:00 |
| 8 | basis, not as home teacher, just as a friend? | 11:00 |
| 9 A | I used to take the little boys to the park, which is | 11:00 |
| 10 | across the street from the Pitsor home, and sometimes | 11:01 |
| 11 | Rob would be with me, and sometimes he would not. | 11:01 |
| 12 | They had a pretty limited existence because Joyce | 11:01 |
| 13 | wouldn't let them out to play in the play area around | 11:01 |
| 14 | the complex there because she couldn't keep an eye on | 11:01 |
| 15 | them, and so I tried to give them a little | 11:01 |
| 16 | broadening. | 11:01 |
| 17 | I took Rob and the little boys to the government | 11:01 |
| 18 | lots one Saturday for an extended outing.  I took | 11:01 |
| 19 | them to my office one Saturday for an extended | 11:01 |
| 20 | outing.  I wanted Rob to see another kind of life and | 11:01 |
| 21 | to have some broadening. | 11:01 |
| 22 | So I did some of those things, but I did those | 11:02 |
| 23 | really -- I mean, home teacher is supposed to be a | 11:02 |
| 24 | friend, so those were done as -- in both ways. | 11:02 |
| 25 Q | Okay.  Did you -- was this taking the children out to | 11:02 |

Page 61

```
 1 Q   It had to have been from "him," being Bishop         11:27

 2     Johennesen?                                           11:27

 3 A   Mm-hm.                                                11:27

 4 Q   Why do you say it had to be from him?                11:27

 5 A   Well, I don't know of anybody else that knew.        11:27

 6 Q   Did you take any action upon learning that           11:27

 7     information?                                          11:27

 8 A   Again, it was -- I don't remember when it was.  I was 11:27

 9     no longer, I believe, the home teacher and no longer 11:27

10     the scoutmaster, and so there was no action that I   11:27

11     could appropriately take.                            11:27

12 Q   Do you know if anyone within the LDS Church took any 11:27

13     action prior -- and with your knowledge being prior  11:28

14     to the time of this lawsuit with regard to the       11:28

15     accusation that Rob had molested Bishop Johennesen's 11:28

16     grandchildren?                                        11:28

17 A   I don't know.                                         11:28

18 Q   During the break I was looking at some notes and     11:28

19     discovered -- I'm switching gears here a little       11:28

20     bit -- and discovered that the date that Kimi Kai    11:28

21     Pitsor's remains were discovered was in 1983 --      11:28

22     April 17th, 1983, I believe.                          11:28

23         Does that help refresh -- does that date help    11:28

24     refresh your recollection at all as to when the      11:28

25     meeting -- as to your meeting -- as to your -- as to 11:28
```

Page 68

1    Scout event at the LDS Church where various scouting    11:47

2    troops all came together and did an event at the LDS    11:47

3    Church ward in Bellevue -- Burien?    11:47

4 A  In Burien?  No.  That's a different stake and so we    11:47

5    would not have been involved in that.    11:47

6 Q  So did the different Boy Scout troops not get --    11:47

7    within the LDS Church not get together ever?    11:47

8 A  Very occasionally for an encampment.    11:47

9 Q  For an encampment?    11:47

10 A  Yes.    11:48

11 Q  What's an encampment?    11:48

12 A  It's just a formal gathering where people sleep in    11:48

13    tents and have campfires and stuff like that.    11:48

14 Q  Are you aware of whether there are other victims of    11:48

15    Paul Lewis, other than Rob Rinde?    11:48

16 A  I don't know any.    11:48

17 Q  Did you personally -- at the time that you first    11:48

18    learned that Rob Pitsor was a victim of child sexual    11:48

19    abuse, did you ask any church officials to look into    11:48

20    it, to do anything?    11:48

21            MR. GORDON:  That's been asked and    11:48

22    answered.    11:48

23        But go ahead.    11:48

24 A  No, I did not.  I knew that his mother knew it.  I    11:48

25    knew that the police and the prosecutor's office knew    11:48

| | | |
|---|---|---|
| 1 | her periodically.  She became, I think, a close | 11:50 |
| 2 | friend of Myrna's, and we tried to be of friendly | 11:51 |
| 3 | support to her. | 11:51 |
| 4 Q | Do you remain friends with Julie Lank today? | 11:51 |
| 5 A | I haven't heard from Julie for probably two or three | 11:51 |
| 6 | years.  At our last meeting she pretty much | 11:51 |
| 7 | terminated our relationship. | 11:51 |
| 8 Q | And finally, we established at the beginning of this | 11:51 |
| 9 | relationship, that Gordan, Murray, Tilden is acting | 11:51 |
| 10 | as your lawyers for this matter.  Is that for this | 11:51 |
| 11 | deposition?  Are you aware? | 11:51 |
| 12 | MR. GORDON:  We're representing him | 11:51 |
| 13 | in anything related to the litigation. | 11:51 |
| 14 Q | (By Ms. Menely)  Are you personally paying your fees? | 11:52 |
| 15 A | No. | 11:52 |
| 16 | MS. MENELY:  I think that's all I | 11:52 |
| 17 | have. | 11:52 |
| 18 | MR. AUSTIN:  Excuse me.  One more. | 11:52 |
| 19 | MS. MENELY:  Oh, sorry. | 11:52 |
| 20 Q | (By Ms. Menely)  Who is paying your fees? | 11:52 |
| 21 | MR. GORDON:  The church is paying | 11:52 |
| 22 | my fees. | 11:52 |
| 23 | MS. MENELY:  That's it. | 11:52 |
| 24 | MR. GORDON:  I've got some | 11:52 |
| 25 | questions. | 11:52 |

# EXHIBIT C

. In December 1975 the First
ent arrangement under which
inits of the stake high priests
e president of the quorum and
ling under his direction. As of
)0 high priests in the Church.
in holding the holy priesthood
Enoch, Noah, Melchizedek,
ere all ordained high priests
ie of Moses the Melchizedek
m the earth, except among the
der the Aaronic Priesthood.
iest was the chief priest in the
all other priests in their func-
e of the temple. Only a direct
in anointed to be the spiritual
igh priest.
ire apparently no Levites or
le. High priests were the pre-
the Melchizedek Priesthood

iul declares Christ to be the
t of Melchisedec," an order
riesthood and not dependent
-6, 10; 7:3, 11, 14–15; Ps.
it made an eternal sacrifice,
!:11–12), and he continues to
e organization of the Church,
CHURCH).

ie Interpreter's Bible, Vol. 11, pp.

eological Dictionary of the New
rand Rapids, Mich., 1965.
nent, rev. ed. Salt Lake City, 1954.

A. LEGRAND RICHARDS

## HOME TEACHING

Each ward of The Church of Jesus Christ of Latter-day Saints assigns priesthood holders, as home teachers to visit the homes of members every month. They go in pairs; often a youth holding the AARONIC PRIESTHOOD accompanies an adult holding the MELCHIZEDEK PRIEST-HOOD. Home teachers are called by their local priesthood quorum leaders and are typically assigned to visit between three and five families. They report on the needs and welfare of their assigned families in regularly scheduled interviews with their priesthood leaders. The home teaching program is a response to modern revelation commissioning those ordained to the priesthood to

teach, expound, exhort, baptize, and watch over the church . . . and visit the house of each member, and exhort them to pray vocally and in secret and attend to all family duties, . . . to watch over the church always, and be with and strengthen them; and see that there is no iniquity in the church, neither hardness with each other, neither lying, backbiting, nor evil speaking [D&C 20:42–54].

At one time called "acting teachers" (1909), the name was formally changed to "ward teachers" in 1912. However, for years before that time the effort was informally called "block teaching" because of the geographic way in which families were assigned (Hartley, pp. 375–98). In April 1963, the ward teaching program was expanded and renamed "home teaching," with emphasis "on the responsibilities of the entire priesthood to 'watch over the Church' as commanded in the early revelations—to be concerned with the whole family as a group and as individuals" (*IE* 66 [June 1963]:504).

In a Home Teachers Meeting during general conference in 1966, Marion G. Romney, then an apostle, instructed home teachers to live so that they could always enjoy the companionship of the Holy Ghost and act under his inspiration in their home teaching responsibilities and to encourage and inspire every family to make and keep the home a truly Latter-day Saint home.

In 1987 Church President Ezra Taft Benson gave three basic guidelines to be followed by home teachers:

First, Church leaders are to encourage home teachers to know as well as possible the people they are called to teach. Home teachers

BEST AVAILABLE IMAGE POSSIBLE

136  ⬥   HOME TEACHING

need to be aware of individual attitudes, interests, and general welfare, working closely with the head of each family to meet the family's temporal and spiritual needs.

Second, the Church expects home teachers to deliver a short monthly message. When possible, messages are to come from the scriptures, particularly the Book of Mormon. Leaders are to instruct home teachers to prepare intellectually and spiritually, giving prayerful consideration to both the temporal and spiritual needs of each family as they prepare lessons. The companionship of the Holy Ghost is essential for successful home teaching, for "if ye receive not the Spirit ye shall not teach" (D&C 42:14). The Church instructs home teachers, therefore, to pray together before each visit, invoking the blessings of the Lord upon the family, and, where possible, to pray with family members at the conclusion of the visit.

Third, home teachers are to magnify their callings (Jacob 1:19) by rendering devoted service. This includes visiting each family early in the month, by appointment, and making additional visits as needed.

Organizationally, home teaching provides a system for effective Churchwide communication. Through stakes, wards, and home teachers, Church leaders have a direct line to every member and have the potential, if necessary, to communicate quickly with the total Church membership, via the local priesthood leaders.

Effective home teaching makes significant contributions to members' lives. Alert, insightful home teachers find various ways of rendering service, such as providing recognition for achievements; informing families of Church activities; assisting during family emergencies, including illness or death; strengthening and encouraging less active members; and arranging transportation. They serve as resources and share the burden of support that would otherwise be carried by the bishop.

As home teachers are called to work directly with families, they are often in a better position to help these family members than are other Church officers or teachers. As a result, home teaching is one of the most effective ways the Latter-day Saints manifest their commitment to "bear one another's burdens, that they may be light; . . . mourn with those that mourn; yea, and comfort those that stand in need of comfort, and stand as witnesses of God" (Mosiah 18:8–9).

BIBLIOGRAPHY

Benson, Ezra Taft. "To t 1987):48–51.

Cullimore, James A. "Hom 1973):124–26.

Hartley, William. "Orda: 1851–1883." *BYU Studi*

Packer, Boyd K. "The Sain

## HOSANNA SHOU

Among Latter-day Sair is usually reserved for thanksgiving and petit of the Lord with loud "hosannas to him that 36:3; 39:19; 124:101)

When the ordina Kirtland, shouts of ho both private and quot At prayer meetings i used related phrases : God" and "Glory to G

The Hosanna Sh one's strength. The c words "Hosanna, Ho Amen, and Amen," accompanied by the uplifted hands. The e atonement of Jesus C

The Hosanna Sl Heaven, as "when . . It also recalls the I accorded the Messia comed him as he app taught that this shou glory of the Father (c

rests, and general wel-
lily to meet the family's

hers to deliver a short
s are to come from the
Leaders are to instruct
piritually, giving prayer-
spiritual needs of each
nship of the Holy Ghost
r "if ye receive not the
Church instructs home
each visit, invoking the
where possible, to pray
r visit.

ir callings (Jacob 1:19)
isiting each family early
ng additional visits as

s a system for effective
kes, wards, and home
e to every member and
nicate quickly with the
ithood leaders.

at contributions to mem-
ind various ways of ren-
tion for achievements;
ting during family emer-
iening and encouraging
ortation. They serve as
hat would otherwise be

ectly with families, they
mily members than are
home teaching is one of
manifest their commit-
they may be light; . . .
fort those that stand in
d" (Mosiah 18:8–9).

BIBLIOGRAPHY

Benson, Ezra Taft. "To the Home Teachers of the Church." *Ensign* 17 (May 1987):48–51.

Cullimore, James A. "Home Teachers—Watchmen over the Church." *Ensign* 3 (Jan. 1973):124–26.

Hartley, William. "Ordained and Acting Teachers in the Lesser Priesthood, 1851–1883." *BYU Studies* 16 (Spring 1976):375–98.

Packer, Boyd K. "The Saints Securely Dwell." *Ensign* 3 (Jan. 1973):88–90.

R. WAYNE BOSS

## HOSANNA SHOUT

Among Latter-day Saints, the sacred ceremony of the Hosanna Shout is usually reserved for TEMPLE DEDICATIONS. It is given in the spirit of thanksgiving and petition, fulfilling the instruction to bless the name of the Lord with loud voices and "with a sound of rejoicing," with "hosannas to him that sitteth upon the throne forever" (D&C 19:37; 36:3; 39:19; 124:101).

When the ordinance of the washing of feet was introduced at Kirtland, shouts of hosanna were viewed as a sealing benediction on both private and quorum prayer and then on the dedicatory prayer. At prayer meetings in the Kirtland Temple, the Saints sometimes used related phrases such as "Blessed is the name of the Most High God" and "Glory to God in the highest" (*HC* 2:386).

The Hosanna Shout is whole-souled, given to the full limit of one's strength. The congregation stands and in unison shouts the words "Hosanna, Hosanna, Hosanna to God and the Lamb. Amen, Amen, and Amen," repeating them three times. This is usually accompanied by the rhythmic waving of white handkerchiefs with uplifted hands. The epithet "Lamb" relates to the condescension and atonement of Jesus Christ.

The Hosanna Shout memorializes the pre-earthly Council in Heaven, as "when . . . all the sons of God shouted for joy" (Job 38:7). It also recalls the hosannas and the waving of palm branches accorded the Messiah as he entered Jerusalem. And hosannas welcomed him as he appeared to the Nephites. President Lorenzo Snow taught that this shout will herald the Messiah when he comes in the glory of the Father (cf. 1 Thes. 4:16).

# EXHIBIT D

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 1

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROB RINDE, f/k/a ROBERT
LARRY LEROY PITSOR, JR.,

      Plaintiff,

vs.               No. 06-2-09825-1SEA

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole, aka the "MORMON CHURCH" THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS, an unincorporated association,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION

    The following is the videotaped deposition

of ANNE RINDE, taken before Jenelle K. Lundgren,

Notary Public, pursuant to Notice of Taking

Deposition, at 500 North Franklin Street, Glenwood,

Minnesota, commencing at 9:00 a.m., Wednesday, July

19, 2006.

\*    \*    \*

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

---

**Page 2**

```
 1  APPEARANCES:
 2
 3      On Behalf of the Plaintiff:
 4      John Schulz, Esquire
        MCGRANN, SHEA,
            ANDERSON, CARNIVAL
 5      800 Nicollet Mall
        Suite 2600
 6      Minneapolis, Minnesota 55402
        Phone: (612) 338-2525
 7      e-mail: jrs@mcgrannshea.com
 8
        On Behalf of the Defendant:
 9
        Charles Gordon, Esquire
10      GORDON MURRAY TILDEN, LLP
        1001 Fourth Avenue
11      Suite 4000
        Seattle, Washington 98154-1007
12      Phone: (206) 467-6477
        e-mail: cgordon@gmtlaw.com
13
14  Also Present:
15  Don Carl, videographer
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1           DEPOSITION REFERENCE INDEX
 2
 3  EXAMINATION:
 4  By Mr. Gordon: 5
 5
 6  OBJECTIONS:
 7  By Mr. Schulz: 101, 110
 8
 9
10           EXHIBIT REFERENCE INDEX
11  None.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2           P R O C E E D I N G S
 3      Whereupon, the videotaped deposition of ANNE
 4  RINDE was commenced at 9:26 a.m. as follows:
 5
 6           THE VIDEOGRAPHER: This is the video
 7  operator speaking, Don Carl of Pat Carl & Associates.
 8  Today is Wednesday, July 19th in the year 2006. The
 9  time is now approximately 9:26 a.m. We're at Glenwood
10  Estates, 500 Franklin Street North, Glenwood,
11  Minnesota to take the videotaped deposition of Ms.
12  Anne Rinde in the matter of -- now, I got to take --
13  Rob Rinde, f/k/a Robert Larry Leroy Pitsor, Junior,
14  versus The Corporation of the President of the Church
15  of Jesus Christ of Latter-Day Saints. And that's in
16  Superior Court of the State of Washington for King
17  County, No. 06-2-9825-1 SEA. Will counsel please voice
18  identify themselves for the video record?
19           MR. SCHULZ: John Schulz, S C H U L Z,
20  on behalf of the plaintiff, Rob Rinde.
21           MR. GORDON: My name is Charles Gordon,
22  and my firm represents The Church of Jesus Christ of
23  Latter-Day Saints, the defendant in this matter.
24           THE VIDEOGRAPHER: Would the court
25  reporter please administer the oath?
```

**Page 5**

```
 1                 ANNE RINDE,
 2         after having been first duly sworn,
 3         deposes and says under oath as follows:
 4                    ***
 5      THE DEPONENT: I swear.
 6      THE VIDEOGRAPHER: You may begin.
 7           EXAMINATION
 8  BY MR. GORDON:
 9      Q.   Ma'am, could you just tell me your
10  name, please?
11      A.   Anne Mitchell Rinde.
12      Q.   And where do you reside?
13      A.   Here.
14      Q.   And that address is --
15      A.   Apartment 114, Glenwood Estates, 500
16  North Franklin Street, Glenwood, Minnesota 56334.
17      Q.   And can you give me your date of birth,
18  ma'am?
19      A.   03-21-44.
20      Q.   Ms. Rinde, can you tell me how you wish
21  to be referred? I don't want to say anything
22  inappropriate.
23      A.   Anne is fine.
24      Q.   I don't think that would be. Ms.
25  Rinde, Mrs. Rinde?
```

2 (Pages 2 to 5)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Exhibit____ Page 571

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 42

1  Washington?
2     A.    Yes. She was an extremely brilliant
3  woman.
4     Q.    Can you recall any other hospitals that
5  Rob would have been admitted to while you were in
6  Seattle, if any, other than what you've mentioned to
7  me?
8     A.    I can't think of any.
9     Q.    How about any physicians that he saw
10 just for normal, routine health issues? Do you recall
11 any of those?
12    A.    Dr. Jackson.
13    Q.    Anybody else? You have to speak
14 audibly.
15    A.    No, I'm sorry, not to my knowledge.
16    Q.    Did you have, for example, a
17 pediatrician you went to --
18    A.    No. No.
19    Q.    Were you a member of Group Health?
20    A.    Yeah, we were members.
21    Q.    Was that throughout the time that you
22 were at both Seattle and Bellevue?
23    A.    Yes. Man, I hated that group.
24    Q.    During the time that Rob was living
25 with you in Seattle and Bellevue, did you have him

Page 43

1  seek out any counselors of any nature?
2     A.    Yes. I had seen after Kimi's death and
3  whatever, a Dr. Ichibana (phonetic).
4     Q.    Can you spell that?
5     A.    Ichibana; I can't spell it. He worked
6  for Group Health as a psychiatric. He was a nisei
7  second genera -- well, he came -- became a citizen
8  after fighting in World War II. To my knowledge,
9  Robert never said much of anything to him. He was
10 still in too much shock of all this to talk to
11 anybody.
12    Q.    And all of this, what you're referring
13 to, is the publicity with your daughter?
14    A.    Yeah.
15    Q.    Do you recall any other counselor or
16 psychologist, psychiatrist, that Robert would have had
17 contact with during the time that he lived with you in
18 Seattle and Bellevue?
19    A.    Off the top of my head, I would say no.
20    Q.    Do you recall if Robert was ever
21 admitted for any kind of emergency services, medical
22 -- need of medical services on an emergency basis
23 while he lived in either Seattle or Bellevue?
24    A.    Not to my knowledge.
25    Q.    Do you have any contact with Robert's

Page 44

1  former wife? I think he's divorced now?
2     A.    Right, yes. I haven't talked to her in
3  person for a long time. I've spoken to her on the
4  phone.
5     Q.    How frequently?
6     A.    Oh, I haven't -- it's been a year.
7     Q.    Do you -- and you have how many
8  grandchildren?
9     A.    Three.
10    Q.    And do you keep in contact with them?
11    A.    Yeah, when they can call me and so
12 forth. Or if Travis makes a call over there and then
13 I usually end up talking to the kids.
14    Q.    Do you have -- do you have a reasonably
15 good relationship with Bren or --
16    A.    I thought so, yeah.
17    Q.    You say you thought so. What do you
18 mean by that?
19    A.    She's a funny little girl. She -- she
20 is plastic, wears a plastic face.
21    Q.    What do you mean by that?
22    A.    She'll give you what you want when
23 you're talking to her. You're never quite sure
24 whether she's telling you the truth or not. You know,
25 she's not believable.

Page 45

1     Q.    Are you currently active in the LDS
2  Church?
3     A.    No.
4     Q.    When was the last you were active?
5     A.    Years.
6     Q.    I mean --
7     A.    I can't tell you how many; years.
8     Q.    When were you baptized in the LDS
9  Church?
10    A.    '73.
11    Q.    Were you baptized more than once?
12    A.    No.
13    Q.    Were you active in the church at all
14 when you were living in Bellevue and Seattle?
15    A.    Yes.
16    Q.    Tell me about that.
17    A.    In Seattle -- what did I do in Seattle?
18 I worked for Relief Society some. I remember one time
19 I had to tell stories. They wanted someone to teach
20 people, teach women, how to tell stories so their kids
21 in waiting rooms or sitting in cars waiting for things
22 to happen, and if they didn't happen to have a book in
23 a car, to begin a story, at least; maybe one that
24 could be kept going over several trips. And some
25 social stuff in the sense of there was the poet Maya

12 (Pages 42 to 45)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Exhibit ____ Page ____ 572

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

---

**Page 46**

1  Angelou would come once every couple of years to
2  Shoreline Community College to give a -- or a
3  recitation, and we got a bunch of the ladies together
4  and would go. It wasn't expensive. It was very
5  cheap. And it was a very enjoyable experience. I did
6  teach, it seems to me, a few classes, but they were
7  mostly emergencies.
8      Q.   Where you were substituting or
9  something like that?
10     A.   Yeah.
11     Q.   And was that in the Seattle ward or was
12 it the Bellevue ward or both?
13     A.   Both.
14     Q.   What ward in Seattle were you active,
15 as you can --
16     A.   First.
17     Q.   How about Bellevue?
18     A.   I can't remember what the number was.
19 I've been trying, and I can't.
20     Q.   That's fine. When you were living in
21 Bellevue, did the church assist you at all in taking
22 care of the homemaking and chores around the house?
23     A.   No.
24     Q.   They -- they offered no assistance?
25     A.   They may have offered. I don't

---

**Page 47**

1  remember, but I did not receive any. I would have
2  probably been quite reluctant to take help, anyway.
3      Q.   How about Bonnie Stowell? Do you know
4  --
5      A.   Yes, I know her very well. She was a
6  lovely woman.
7      Q.   Was she present in your house
8  frequently?
9      A.   Often.
10     Q.   (Inaudible).
11     A.   She was Relief Society president. I
12 felt that she knew I was ill and that's why she came
13 to see me more.
14     Q.   Did other members of the church
15 accompany Bonnie?
16     A.   Usually, whenever a member of the
17 church came to your place for whatever reason, they
18 always came in pairs, usually.
19     Q.   Did they help with housecleaning
20 chores?
21     A.   Not to my knowledge. Not to my
22 remembrance, no.
23     Q.   Did they help -- ever help with taking
24 care of the -- any of the three children?
25     A.   Oh, my, yes. 1975 and '76, I was

---

**Page 48**

1  extremely ill. And I was in and out of -- I had
2  surgery and many complications. And the boys were
3  farmed out, so to speak, to various members of the
4  church, and they would stay in each place two or three
5  times and then they would move on to somewhere else.
6          THE VIDEOGRAPHER: I need to stop you
7  for just one second. Going off the video record.
8          (Discussion had off the record.)
9          THE VIDEOGRAPHER: We're back on the
10 video record.
11 BY MR. GORDON:
12     Q.   I can't remember if you finished your
13 answer or not.
14     A.   I can't either.
15     Q.   Okay. Let's go on. That surgery
16 occurred in '75 or '76?
17     A.   I did not react well to it. It was
18 what they call a -- just a minute -- where they make
19 your stomach smaller. Stapling; a stomach stapling.
20 And unfortunately, they discovered later that they had
21 clipped a nerve called the vagas nerve, and it caused
22 me to continuously upchuck. I mean, I retched all the
23 time.
24     Q.   What period of time did this go on?
25     A.   You mean how long?

---

**Page 49**

1      Q.   Yeah. You said '75-'76; is that about
2  right?
3      A.   Yeah.
4      Q.   Let's go when you're living --
5      A.   Not '75; '85-'86.
6      Q.   Okay. That's what I was going to ask.
7  I think you perhaps mentioned '75 first. Was it '85
8  or '86?
9      A.   Yeah.
10     Q.   Did -- I'm going back to the church
11 members in Bellevue. Did they assist with taking care
12 of your children at times other than when you were
13 recuperating from the surgery?
14     A.   I don't remember them doing it.
15     Q.   If -- would it be fair to state that
16 Bonnie Stowell would be -- have been in your house at
17 least once a week?
18     A.   Minimum of once a week -- or maximum?
19 Maximum, that's the better word.
20     Q.   Okay.
21     A.   Some weeks, she would be there maybe
22 once or twice, and other times, she wouldn't be there
23 for a couple of days.
24     Q.   And at the time she was visiting with
25 you, was she a representative of the Relief Society?

13 (Pages 46 to 49)

Pat Carl & Associates  (763) 591-0535 or (800) 591-9PCA (722)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Exhibit____ Page 573

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 50

1    A.    Once or twice and other time, I thought
2  she was just there to see me in an unofficial
3  capacity.
4    Q.    And just for the folks watching this,
5  what is the Relief Society?
6    A.    Relief Society is the women's part --
7  the part of the Mormon Church. They -- they look
8  after the day-to-day care of the members to make sure
9  that people are taken care of, that they are not in
10  any tremendous dire straits that could affect their
11  health or whatever.
12    Q.    Did Bonnie Stowell and Relief Society
13  help you with getting food?
14    A.    Yeah, from the church, yes.
15    Q.    How frequently was that?
16    A.    Usually once a month, sometimes oftener
17  (sic) depending -- I was at that point where the boys
18  were getting to that point where they ate 24/7 because
19  they are boys and they do that. And sometimes I
20  needed her help; other times I used ordinary help,
21  non-church help.
22    Q.    You were in Bellevue approximately what
23  duration of time? And I'm not trying to memory --
24    (Parties started talking over each other.)
25    A.    We moved to Spokane in about 1988.

Page 51

1    Q.    And so about five years or so?
2    A.    (Nodding head).
3    Q.    And where did you --
4    THE COURT REPORTER: Is that a yes?
5  BY MR. GORDON:
6    Q.    You have to speak --
7    A.    Yes, I'm sorry.
8    Q.    And did you live at Bellevue at the
9  same place during that period?
10    A.    Oh, yes --
11    Q.    And where was that?
12    A.    -- the entire time. That, I can't tell
13  you. I could show you. I can't even remember the
14  address.
15    Q.    Was it some type of assisted living?
16    A.    No, it was not. It was a -- in the
17  sense of the government had -- it was like a Section 8
18  or a Section 10 or something, rather, where the rents
19  were subsidized.
20    Q.    How large -- is it an apartment?
21    A.    It was a three-bedroom apartment. I
22  really could have used another bedroom, but it was
23  three, and I wasn't arguing.
24    Q.    And you had three -- you had four
25  children at that time?

Page 52

1    A.    Right.
2    Q.    Did Rob have to take any
3  responsibilities for the basic maintenance of the
4  house?
5    A.    Oh, yeah.
6    Q.    Tell me about that.
7    A.    Well, the arthritis got really bad and
8  I had a great deal of trouble driving. I had been,
9  over the last year or so, in the wintertime -- I
10  believe in teaching my boys to drive in the winter
11  because the worst things that can happen when you're
12  driving happen in the wintertime. So he could drive
13  if he had to, and I could send him to the grocery
14  store, which is two blocks away. And he would do the
15  grocery shopping and then come home again.
16    Q.    So Robert would have been 16 at that
17  time?
18    A.    Not quite 16. He was probably closer
19  to 15 than 16.
20    Q.    Was he driving before he was 16?
21    A.    Which was naughty, but I did it anyway.
22  I didn't have any options.
23    Q.    How about in terms of just taking care
24  of the three boys that you adopted? Did Rob have to
25  take a role in that, given your personal --

Page 53

1    A.    Yeah, sometimes he did, yes.
2    Q.    Tell me about that.
3    A.    He would get them up, get them ready
4  for school. He could leave a little later than they
5  did. His classes were running later or something. I
6  can't remember how it worked. When they were gone,
7  then he would go. And he -- I would tell him what to
8  cook or I would get it started during the day, and
9  then he would finish it at night, and that's what they
10  would have for dinner.
11    Q.    Would he clean up the kitchen?
12    A.    Oh, yeah, afterwards, yeah. Robert
13  does not like disorder.
14    Q.    And on weekends, for example, when the
15  kids were at home, would he take them on activities,
16  be responsible --
17    A.    Occasionally. Occasionally, I would
18  ride along with and then we would go down to Lake
19  Sammamish, and they would go swimming, and we would do
20  things, you know.
21    Q.    Why did you move to Spokane in
22  approximately '88?
23    A.    I wanted to get away from Seattle. I
24  still was tired of getting calls from the various
25  newspapers.

14  (Pages 50 to 53)

Pat Carl & Associates  (763) 591-0535 or  (800) 591-9PCA  (722)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 54

1    Q.    And did you get any assistance from the
2  church in getting relocated --
3    A.    Yeah.
4    Q.    -- to Spokane? Tell me about that.
5    A.    They gave me the money. I found a
6  place that was extremely cheap. It was being sold for
7  back mortgage payment. They didn't want anything
8  else. There wasn't much owed. I don't remember how
9  much at the time now. And they helped me buy the
10 house.
11   Q.    When you say "they" --
12   A.    The --
13   Q.    -- whom are you referring?
14   A.    The bishopric. Bishop Williams and
15 whoever else he consulted with.
16   Q.    Did Lynn Stowell help out in that?
17   A.    That sounds familiar.
18   Q.    During the time that you were in
19 Bellevue, and I'm focusing at that time, did Gordon
20 and Myrna Conger come to your home very frequently?
21   A.    Often.
22   Q.    And what were the circumstances of
23 that?
24   A.    He was my home teacher.
25   Q.    And for those watching, what is a home

Page 55

1  teacher?
2    A.    That's the male aspect of this Relief
3  Society. They are the ones who come out with the
4  schedule of what's being taught in the church over the
5  next period of time. They would talk over the
6  scriptures and so forth. I'm trying to think. And he
7  talks about what's going on in your life in
8  general and family needs and so on.
9    Q.    Did his wife, Myrna, come with him
10 frequently?
11   A.    On and off. When the boy -- their boy
12 did not come with him, then she did.
13   Q.    From time to time, did Gordon and Myrna
14 take care of any of your children?
15   A.    Robert. Robert. When I was in the
16 hospital, they took Robert.
17   Q.    Would Gordon take any of your kids, you
18 know, just for an afternoon, that sort of thing?
19   A.    I don't remember him doing that, no.
20   Q.    Did you consider at the time Gordon and
21 Myrna to be close friends?
22   A.    Yes, I did.
23   Q.    Did you have any contact with them
24 after you moved to Spokane?
25   A.    Yeah, I believe I did a couple of

Page 56

1  times.
2    Q.    In what sense?
3    A.    Hello, how are you, that kind of thing.
4    Q.    Did there come a time that there was a
5  memorial service for your daughter in Spokane?
6    A.    Oh, that was way before that, but yeah.
7    Q.    When was that?
8    A.    That was when we were still living in
9  Bellevue. I had come over to Spokane to see my cousin
10 and Gordon offered to do the memorial service.
11   Q.    Do you know when that was?
12   A.    Just a minute. Approximately 1982 or
13 '83, I would say.
14   Q.    It was at the time you were living in
15 Bellevue, though?
16   A.    Yes.
17   Q.    Mrs. Rinde, when is the first time you
18 learned that your son Rob had been sexually abused as
19 a minor?
20   A.    The night he got home in the sense of
21 home from being with Paul Lewis. He came in, I was on
22 my bed -- actually, I was having a really good day.
23 But I was just propped up on the bed reading because
24 it was evening, and he came into the bedroom and
25 backed up against my big dresser. I had a big, long

Page 57

1  dresser, and he leaned up against it, kind of extra
2  casually. Overacting casually, I guess, is the best
3  way to put it. And I put my books down and I looked
4  at him and I said, now, what is the matter? Oh,
5  nothing is matter, nothing, nothing at all. Robert,
6  this is your mother you're talking to. Pee on my leg
7  and tell me it's raining some other time. What is the
8  matter? And he started to leak, dribble, cry a little
9  bit around the edges. And he says I can't now. And I
10 said, well, you will -- promise me that you will tell
11 me. He says, yes, I will tell you, but I can't do it
12 now. I said you're not being threatened or colluded
13 or anything? And he said no, but it just hurts too
14 much now.
15   Q.    Can you place where you were living
16 when this --
17   A.    Where we were living?
18   Q.    Yeah.
19   A.    Bellevue.
20   Q.    You're in Bellevue.
21   A.    This was the same night that the
22 assault occurred. When I think back on it now, I
23 don't know how the hell that little boy, 13 years old,
24 managed to hold himself together.
25   Q.    Have you told me everything you can

15 (Pages 54 to 57)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 58

1  recall about this first discussion with Robert?
2      A.    Yeah, I think so.
3      Q.    I just -- I just -- I know it's been a
4  long time. It's been 20-plus years. But I do want
5  you to tell me as much details as you can, what he
6  said to you and you said to him on this first
7  occasion. Have you done that already?
8      A.    Have I done what already?
9      Q.    Given me as much information as you
10 can --
11     A.    As I recall right off the top of my
12 head, yes.
13     Q.    Okay. When is the next time the
14 subject came up between the two of you?
15     A.    Well, needless to say, I watched him,
16 and I didn't want to push him because I know how much
17 good that does, and -- but I did keep at him a little
18 bit. And it was a very, very long time, I don't even
19 know how long, before he ever talked to me about it
20 again.
21     Q.    And that would have been the second
22 occasion that he discussed it with you?
23     A.    When he did talk to me again?
24     Q.    Yes.
25     A.    Yes.

Page 59

1      Q.    I'm sorry, do you want to break or --
2      A.    No. It's just my nose itches. I want
3  to sneeze and I can't.
4      Q.    Did you -- after the first occasion
5  that you just addressed to me, did you have any
6  suspicion that it was a sexual abuse issue?
7      A.    Yeah, I did.
8      Q.    And based upon what?
9      A.    But if he won't talk to me, what do I
10 do? General behavior.
11     Q.    What do you mean by that?
12     A.    Withdrawal; terrible, terrible
13 withdrawal. I remember that that really worried me.
14 He scared me. And like I said, it scared me more --
15 even more so than before, so I felt less like pushing
16 him. I was afraid if I pushed him too hard, he would
17 go out and do something stupid.
18     Q.    On this first occasion that we've just
19 talked about that you talked with Rob, were there any
20 other people in the room?
21     A.    No, just him and I; brothers were
22 asleep.
23     Q.    And was that your -- the Bellevue
24 location? You have to speak audibly, I'm sorry.
25     A.    Yes, I'm sorry.

Page 60

1      Q.    Okay. And so did I understand it
2  correctly, you had suspicions but you let it go for
3  some period of time?
4      A.    For his sanity's sake.
5      Q.    And how long was it before you had a
6  second discussion about this? Years?
7      A.    No. Oh, no. No. I would never have
8  let it go that long. It was probably two or three
9  weeks when I brought the subject up again, but he
10 would not let me pursue it.
11     Q.    Okay. Tell me everything you can
12 recall about that conversation, the second time it
13 came up.
14     A.    I remember saying to him -- oh, the
15 second -- now, let's go one time before that.
16     Q.    Okay.
17     A.    After he and I had the first
18 conversation, I let it go. About two days later, I
19 went to move some things in the front hall closet, and
20 in that front hall closet, I pulled out a pair of
21 white blue jeans. Robert owned one pair of white blue
22 jeans. Only these weren't white blue jeans. These
23 were blood-red, stiff blue jeans; soaked, hard. And I
24 remember holding them in my hands and looking at them,
25 and I cried because then I knew. I took him -- when

Page 61

1  he came into the house, I asked one of the neighbors
2  or somebody to watch the boys for 10 minutes or so,
3  and I needed to talk to Rob. And I had the pants
4  laying out on my bed and I took Rob into the bedroom,
5  and I said now -- I said I'm not -- I don't want to
6  hurt you and I don't want you to think I'm trying to
7  hurt you, but I need to know the truth about this for
8  you. And he just looked at me. He didn't know what
9  to say. He put his arms around me, I remember that.
10 And he says, I just don't want to tell you. And I
11 said Robert, you have to tell me. So he told me -- I
12 don't even want to say the basics, because it wasn't
13 even that. He skidded around it. He told me that
14 Paul had sexually assaulted him, that he had really
15 hurt him, and the blood and all that was from that.
16 And I said yeah, I figured as much, because I remember
17 you left here in those pants. And I said, you know,
18 Robert, I have to report this to the law. And he
19 says, well, who's that? And he says the police? And
20 I said I'm not sure if that's exactly where I go or if
21 I go to CPS or somewhere else, but I've got to find
22 out and I've got -- we've got to go. And he said --
23 he just kind of -- he was so thin. He was so skinny.
24 He pulled himself up to his whole 5'9" or whatever it
25 was. He was so little. And I said, we'll do this in

16  (Pages 58 to 61)

Pat Carl & Associates  (763) 591-0535 or (800) 591-9PCA (722)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 62

1  the morning, first thing in the morning, because it
2  was after 4:00 then, and so we did it. The next
3  morning, I went down to the welfare department and
4  spoke to my social worker, whose name I couldn't tell
5  you if she was standing on my feet. And she said the
6  person I needed to see was over in CPS, which was the
7  Bellevue building. The welfare building was here, CPS
8  building was here, this was all parking lot, and then
9  there was a driveway here out to a main street.
10     Q.   And CPS was Child Protective Services?
11     A.   Child Protective Services.
12     Q.   Go ahead, tell me everything you can
13  recall. You want to take a break, ma'am?
14     A.   No. Let's get this done. It's hard,
15  but it's -- now -- a couple points in here, it's
16  actually amusing. We went -- first, like I said, I
17  went to my regular worker and explained to her what
18  had -- what was going on, what I needed to do and I
19  didn't know who to talk to. So she told me who to
20  talk to and I was smart enough to write it all down;
21  otherwise, I wouldn't have remembered. And we went up
22  to the CPS office, it was the second floor in that
23  building, and I knocked on the desk because the bell
24  was missing. And this woman, black woman, comes up to
25  the desk and I start to tell her what I want, and she

Page 63

1  starts to tell me who I am. And I'm just kind of
2  standing there with my mouth open a little bit letting
3  her go on and on and on and on and on. And when she
4  finally stopped, and I said, I'm sorry, madam, but I
5  do not know you. I have to my knowledge never met
6  you, and this has nothing to do with any -- with you,
7  the reason I'm here. Well, she got mad. How could I
8  not know her since she had been the only woman in that
9  Department of the Welfare Department, not CPS -- but
10  at that point, I had been going to the Welfare
11  Department in Ballard -- in that whole entire
12  building? And how could I not remember her because
13  she's the only black woman in the whole entire
14  building. And I finally looked at her and I said, my
15  dear, I don't remember people by their color. It is
16  not a habit of mine. And she was actually put off. I
17  thought it was just -- well, bordered on the nuts.
18  Anyway, she went in and talked to a supervisor. I did
19  not meet this person. I don't even know who it was.
20  When she came back out, she told me I had to go file a
21  complaint with the Issaquah Sheriff's Department
22  because this is where the assault occurred. After
23  that, then I needed to come back and tell her that the
24  thing had been filed, and then she would know more or
25  something. I don't know what. Anyway, I went to

Page 64

1  Issaquah. The kid who was assigned to me -- and I do
2  mean kid -- didn't look a day over 12. He's just a
3  child. And I explained to him what, where -- what and
4  where and so forth, and he asked Robert a few
5  questions, and some Rob could answer and some Rob was
6  just absolutely incapable of giving him an answer to.
7  And we did whatever we were supposed to do. He says,
8  I don't know what we can do about this after all this
9  time. And I said, well, surely they keep records at
10  the hotel. He's a person of -- he's in the United
11  States Navy. He's an officer. Surely they keep
12  records about where he's supposed to be at any given
13  time. Somebody must know something. And they all
14  kind of agreed with that, but that seemed to be as far
15  as it went. So we went back to CPS, and she basically
16  told me the same thing, that it was more or less our
17  word against his. And I said to her, I don't care
18  whose word is against what. I want this looked into,
19  and I want this fixed. And she says well, you'll be
20  hearing from us soon. So I went home and I called --
21  I may have called him before this, I don't remember
22  for sure -- called the bishop, not 6th Ward Bellevue
23  bishop, but 1st Ward Seattle bishop. That was Paul
24  Lewis's bishopric. He was a member of the bishopric.
25  He was choir director. I don't know, a couple other

Page 65

1  things. And I remember Bishop Nielson was appalled.
2  And he said to just wait until I had received some
3  sort of letter or something from the police
4  department, which it just seemed to me, everybody was
5  telling me, oh, just wait, just wait, just wait, just
6  wait. I thought God, I wish it was one of your kids
7  and then again, I don't. But wait? Wait? I got a
8  kid falling apart here and you want me to wait? I
9  waited, and I finally got a letter. I'm sorry I've
10  got the itches so bad.
11     Q.   You want to take a break? We've been
12  going now for quite a while.
13     A.   Have we? All right. Let's quit for a
14  few.
15         THE VIDEOGRAPHER: Going off the video
16  record. The time is now approximately 11:21 a.m.
17         (A recess was taken.)
18         THE VIDEOGRAPHER: We're back on the
19  video record. The time is now approximately 11:44
20  a.m.
21  BY MR. GORDON:
22     Q.   Mrs. Rinde, again, if at any time you
23  want to take a break, you let me know, and we'll try
24  to get through this.
25     A.   Right.

17 (Pages 62 to 65)

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 66

1    Q.    I think that when we took a break, you
2  were telling us, as you recall, the events unfolding
3  about waiting for some letter from the county, and I
4  think there's where we were.
5    A.    Yeah.
6    Q.    Is that your recollection --
7  (Parties started talking over each other.)
8    A.    -- call, acknowledgement.
9    Q.    Say again, I'm sorry.
10    A.    A record, a call, an acknowledgement of
11  what they were going to do.
12    Q.    And "they," you mean whom?
13    A.    The police department, the public
14  attorney's office, the district attorney's office, the
15  special prosecutor for children's services.  You name
16  it.  Any of those people or all of them together.
17    Q.    Okay.  What happened, do you recall,
18  next, then?
19    A.    I did finally receive a thing where
20  they wanted to talk to Robert down at the district
21  office, down in the courthouse in Seattle; a woman.
22    Q.    Do you recall the name?
23    A.    No, I do not.
24    Q.    Do you have a copy of the letter?
25    A.    No.

Page 67

1    Q.    All right.  Continue on, then.
2    A.    I have torn up everything I own looking
3  for that letter.  To my recollection, I probably gave
4  it to someone in the church, Gordon Conger or someone
5  else.  I'm not going to say I gave it to Gordon Conger
6  because I don't know that I did, but someone with
7  abilities.
8    Q.    Can you continue on, then?  What
9  happened then?  You got a letter and then what
10  happened then?
11    A.    I didn't quite know what to do.  It
12  was, of course, the middle of the day, so I had to
13  wait until everybody was home from jobs, various jobs.
14  Long about six o'clock, I got ahold of Gordon Conger
15  and he came and got the letter.  If it wasn't -- I'm
16  sure it was Gordon.  I don't know who else it would
17  be, but I might be mistaken.  Robert might know that
18  better than I do.  Anyway, got the letter and took it
19  back, called me later and said that they were going to
20  take Robert to this meeting.
21    Q.    Did the letter ask Robert to come down
22  at a certain time and place?
23    A.    Yes.
24    Q.    Okay.  Continue on.
25    A.    I was totally relieved that he was

Page 68

1  willing to do this.  I was completely out of my depth
2  and I knew it.  I can fight like a tiger when it comes
3  to my children, but I have to know where my feet are
4  standing, and I really didn't know where my foot stood
5  in this, how to go about fighting this, because I
6  didn't seem to be getting any direct answers or
7  answers that made sense to me.  So --
8    Q.    So what happened then?
9    A.    They came --
10    Q.    Who is "they"?
11    A.    Gordon Conger, two other men.  Whose --
12  I'm not sure who they were.  I think one of them was
13  Lynn Stowell; would not swear to that, and that
14  doesn't seem right that it was, but it could have
15  been.  The third party, I don't remember at all.  And
16  they picked him up.  They told me not to worry, that
17  they would take care of it, and they would be back
18  shortly.  And I thought well, they seem confident and
19  everything seems to be all right, so I went okay.
20  Those were all people that I trusted implicitly.  I
21  mean, I -- Gordon Conger stood in loco parentis as far
22  as I was concerned, you know.  I can't imagine him
23  even thinking of doing anything to harm Robert.
24    Q.    Okay.  What happened next, then?
25    A.    What do you mean, next time?

Page 69

1    Q.    Well, they picked Robert up and
2  apparently Robert came back at some point?
3    A.    Yeah, I saw them drop him.
4    Q.    And did you talk to Robert about what
5  had happened?
6    A.    He was very taciturn.
7    Q.    Tell me what he said as best you
8  recall.
9    A.    I don't remember him saying much of
10  anything other than the fact he didn't want to talk
11  about it.
12    Q.    Okay.
13    A.    That they told him they didn't want him
14  to talk about it.
15    Q.    Just tell me what he said to you then.
16    A.    He sat down and he looked a little
17  puzzled and not quite with the program.  And he said,
18  I'm not sure what is going on exactly, but they told
19  me not to talk about it, not to you, not to anybody.
20    Q.    Did he say who "they" was?
21    A.    Yes.
22    Q.    Who is that?
23    A.    Gordon Conger and the other ones.
24    Q.    Okay.  What else do you recall of that?
25    A.    He said that they were going to get him

18 (Pages 66 to 69)

30b27dbb-8864-47e0-a8c8-3bfe49213o04

Exhibit ___ Page 578-

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

---

**Page 70**

1  therapy that he needed. And I remember saying you're
2  going back to Les -- not Les, Ichibana. And he said
3  no, it's somebody else. That somebody else turned out
4  to Les Rawlings.
5      Q.    What else do you recall of this
6  conversation?
7      A.    That was about it.
8      Q.    Okay. What happens next? Did you ever
9  hear from the prosecutor's office or anything like
10 that?
11     A.    No, not another word.
12     Q.    Did you ever pursue it?
13     A.    No, they took care of it.
14     Q.    But did you ever independently phone
15 someone up at --
16     A.    No.
17     Q.    -- Child Protective Services or the
18 prosecutor's office or anybody?
19     A.    Why would I need to? I had one of the
20 best attorneys in Seattle taking care of it.
21     Q.    I'm just asking what you did --
22     A.    No, but that's the way my mind works.
23 If I've got someone on the job who is doing what I
24 thought was the right thing to do, why would I
25 second-guess that person's ability?

**Page 71**

1      Q.    I'm not arguing with you --
2      A.    No, I'm just saying.
3      Q.    So you didn't pursue it any further?
4      A.    No, I didn't, because --
5      Q.    Okay.
6      A.    -- I believed in Gordon Conger.
7      Q.    So you never got any kind of further
8  letter from the prosecutor's office of any decision on
9  this one way or the other?
10     A.    No.
11     Q.    Did Robert --
12     A.    Not true.
13     Q.    Okay.
14     A.    I got something to the effect was they
15 couldn't find any -- what is the word -- direct
16 defendant -- direct -- is that right? Direct evidence
17 in the motel.
18     Q.    So they declined to prosecute?
19     A.    No, they didn't say anything like that.
20 They just said they had not found any direct evidence
21 in the motel. They didn't say anything more other
22 than that.
23     Q.    Was that a letter?
24     A.    Yeah.
25     Q.    Do you have a copy of that letter?

**Page 72**

1      A.    No. When you asked me before -- I want
2  to amend something I said.
3      Q.    Sure.
4      A.    You asked me about psychiatric care for
5  Robert. I thought you meant just for that particular
6  time period and maybe that's all you did mean. But if
7  you meant any psychiatric care after finding out about
8  all of this stuff, he saw Les Rawlings.
9      Q.    Who is Les Rawlings?
10     A.    He was highly recommended. This was
11 one I did check; highly recommended psychiatr --
12     Q.    Psychologist?
13     A.    Psychiatrist/psychologist, both. He
14 had very high credentials, very -- what is the word I
15 want? In his -- in his job standing, he was extremely
16 well thought of by the other professionals in Seattle.
17 I talked to one professional that I knew that I had
18 seen over Kimi at one time, and he was -- worked out
19 of Harborview, and he said I -- he says there's no way
20 I could do any better than Les Rawlings, couldn't
21 happen.
22     Q.    And was Les Rawlings -- was his office
23 in Seattle?
24     A.    Yes, down by -- oh, one of the
25 hospitals down off of -- oh, good grief.

**Page 73**

1      Q.    Let me -- Swedish, Virginia Mason,
2  Harborview? Any of those ring a bell?
3      A.    No. This one started with a P.
4      Q.    Poly Clinic?
5      A.    No.
6      Q.    Was he with a medical group? Do you
7  know?
8      A.    He had -- yeah, there were two or three
9  doctors in his group.
10     Q.    And how -- for what period of time did
11 Robert see Mr. -- Dr. Rawlings?
12     A.    Oh, 24 months or more.
13     Q.    Did you ever talk with Dr. Rawlings?
14     A.    Several times.
15     Q.    And did you ever see any written report
16 from Dr. Rawlings?
17     A.    No. Oh, hell. I got a letter
18 occasionally from Dr. Rawlings. They didn't mean
19 anything to me. It was gibberish.
20     Q.    Did you keep any of that information?
21     A.    No. I gave it over to the church.
22     Q.    Whom?
23     A.    I don't know. Again, probably Relief
24 Society president or Gordon Conger or somebody like
25 that.

19 (Pages 70 to 73)

Pat Carl & Associates  (763) 591-0535 or (800) 591-9PCA (722)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

Exhibit ___ Page __ 579

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 94

```
 1     Q.   Did -- have you told me now everything
 2  you can recall about that conversation?
 3     A.   I believe so.
 4     Q.   And that ends with you being told
 5  you'll receive something in the mail?
 6     A.   Yes.
 7     Q.   Did he tell you what he was going to do
 8  with the information that he had?
 9     A.   Yes. He said that they were going --
10  they had already sent officers to the hotel 6 or 8 or
11  whatever it is. I never could remember the number.
12  And they were doing some sort of investigation there,
13  and that he would have -- they would be doing other
14  things, too, and would get back to me when they were
15  finished.
16     Q.   Did you have an understanding that that
17  officer get would get back to you or some other
18  department would get back to you?
19     A.   No, that officer would get back to me.
20     Q.   Did he ever do so?
21     A.   No.
22     Q.   Do you recall the name of that officer?
23     A.   No. All I know is that he looked about
24  12 years old.
25     Q.   So he was a younger man?
```

Page 95

```
 1     A.   Oh, yeah.
 2     Q.   Did you fill out any paperwork?
 3     A.   Oh, yeah.
 4     Q.   What type of paperwork?
 5     A.   Name, age, address, type of
 6  complaint -- name, age, address, type of complaint --
 7  I'm trying to remember all this stuff -- did I know
 8  the person we were complaining about? Yeah. And then
 9  I had to go on there, do I have an address? Yeah, I
10  had an address for that. We didn't know he had moved.
11  We thought he was still there so we put it down. That
12  was about -- that was about it. It was mostly a form.
13     Q.   Was it multiple pages?
14     A.   Two at the most.
15     Q.   Did they give you a copy of it when you
16  left?
17     A.   No.
18     Q.   Do you have copies of anything you
19  filled out there?
20     A.   No.
21     Q.   Do you have any written records of
22  these events that are occurring within this four or
23  five-month period we're talking about?
24     A.   No. I have none of it now.
25     Q.   Did you at some time?
```

Page 96

```
 1     A.   I may have.
 2     Q.   Do you recall destroying any of these?
 3     A.   No. I had a house fire in 1990 and
 4  lost everything.
 5     Q.   So the next thing that happens, there's
 6  a letter, you receive a letter setting up an
 7  appointment?
 8     A.   From the courthouse, Seattle
 9  courthouse.
10     Q.   Okay. And how -- what period of time
11  went by from the time you saw the officer until you
12  got the letter? Do you recall?
13     A.   Six weeks, maybe a little more.
14     Q.   In that intervening six weeks, had you
15  just kind of waited?
16     A.   Yeah. I figured they were
17  investigating.
18     Q.   Did they talk to you -- did you talk to
19  anybody else about it during those six weeks?
20     A.   Gordon Conger, maybe.
21     Q.   Well, just tell me what you recall. If
22  you don't, don't guess.
23     A.   I don't really recall. But that, to
24  me, would be logical.
25     Q.   Do you recall any -- sitting down and
```

Page 97

```
 1  talking to Gordon in the six weeks before you got the
 2  letter?
 3     A.   Not to my knowledge, no.
 4     Q.   Okay. So then the letter comes?
 5     A.   Yeah.
 6     Q.   And it basically says have Robert come
 7  in to talk with one of the lawyers at King County
 8  Courthouse; right?
 9     A.   Right; one of the assistant D.A.s.
10     Q.   And you don't recall the name?
11     A.   Woman.
12     Q.   It was a woman. Anything else?
13     A.   No.
14     Q.   And we don't have that letter; correct?
15     A.   No. If I kept it, it was lost in the
16  fire.
17     Q.   And did the appointment that was made,
18  was -- was it established in the letter, or did you
19  have to call in to make the appointment? Do you
20  recall?
21     A.   No. We had to call in. I'm sorry. I
22  shouldn't have said no the way I said that. We had to
23  call in and make the appointment.
24     Q.   Who made the appointment?
25     A.   Gordon did, I'm assuming.
```

25 (Pages 94 to 97)

30b27dbb-8864-47e0-a8c8-3bfe49213o04

Exhibit ___ Page 580

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 98

1    Q.    Do you know one way or the other?
2    A.    I'm assuming if Gordon didn't make it,
3    someone in his office made it.
4    Q.    Did you call in?
5    A.    No.
6    Q.    Do you know if Robert called in?
7    A.    No, I'm sure he didn't.
8    Q.    Was that appointment relatively quick
9    after you got the letter?
10   A.    Yeah, I would say 48 hours, maybe a
11   little less.
12   Q.    Okay. Now, the folks that transported
13   Robert there, you talked about it before, and you
14   mentioned Gordon Conger.
15   A.    Yeah.
16   Q.    And, as I recall, you're a little
17   uncertain who the other two gentlemen were or --
18   A.    Possibly Lynn Stowell, for one. The
19   third one, I just remember him having very white hair.
20   Beyond that, I don't remember anything.
21   Q.    And did you ask them to drive Robert
22   down there? How did they get involved with this?
23   A.    They've -- well, Gordon said he'd take
24   him and they just rode together.
25   Q.    That was okay with you?

Page 99

1    A.    Yeah.
2    Q.    Did you insist on going yourself?
3    A.    No.
4    Q.    Okay. And then how long were they
5    gone?
6    A.    Oh, wow. Five, six hours.
7    Q.    Was it during the day, then?
8    A.    Yeah. Earlier in the morning, say --
9    they left my house 8:30, 9:00, and did not get back
10   until late afternoon.
11   Q.    And before they took Robert to the King
12   County prosecutor's office, did you have some
13   discussions with any or all of the gentlemen?
14   A.    Gordon.
15   Q.    And tell me as best you recall what you
16   recall being said.
17   A.    I said, what do you want him to wear?
18   I don't -- basically, I think I gave the phone over to
19   Robert as to what he wanted Robert to do.
20   Q.    When you say "phone over to Robert,"
21   what do you mean by that?
22   A.    I would be talking on the phone and
23   Robert would be across the room doing something else
24   and halfway during the conversation, I would say,
25   Gordon, wouldn't this be easier if you just talked to

Page 100

1    Robert? And he said, yeah, it would, and I would give
2    Robert the phone.
3    Q.    How many phones did you have in your
4    Bellevue residence?
5    A.    Two. And no, I didn't, what do you
6    call it, listen in on my children's phones.
7          MR. SCHULZ: Do you need to take a
8    break, Anne?
9          MR. GORDON: Do you want to take a
10   break?
11         THE DEPONENT: I got an itch, that's
12   all.
13         MR. GORDON: Do you want to take a
14   break or --
15         THE DEPONENT: No, that's fine, just
16   keep going.
17         (Parties started talking over each other.)
18   BY MR. GORDON:
19   Q.    Excuse me. When the gentlemen came to
20   pick up Robert, do you recall any discussions with
21   those folks at that time?
22   A.    I asked him how long they thought it
23   was going to take, and he said it shouldn't be too
24   long. He said if it's going to be a long time, it
25   will still only be four or five hours.

Page 101

1    Q.    Anything else you can recall?
2    A.    No.
3    Q.    Did you talk with Gordon about -- or
4    any of those three gentlemen about any specifics of
5    the abuse?
6    A.    No.
7    Q.    Then the next thing that happens,
8    Robert comes back in the late afternoon?
9    A.    Yes.
10   Q.    Did any of the three gentlemen come
11   into the house with Robert?
12   A.    No.
13   Q.    So when Robert gets back, you have a
14   discussion?
15   A.    Yeah, sort of.
16   Q.    Well, again, I know it's been a long
17   time --
18   A.    We talked, but he did not get really
19   specific about a lot of things.
20   Q.    Okay. Just -- if you could just relate
21   to me, as best you can recall, what he told you and
22   what you told him during that conversation?
23         MR. SCHULZ: Objection; repetitious.
24   Counsel, we've covered this ground already.
25         (Parties started talking over each other.)

26 (Pages 98 to 101)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

30b27dbb-8864-47e0-a8c8-3bf0e49213e04

Rob Rinde, et al. vs The Corporation Of The President Of The Church Of Jesus Christ Of Latter-Day Saints, et al. 7/19/06

Page 110

1 then we'll --
2      A.   That's all right.
3      Q.   -- leave you alone.  And I don't want
4 to plow through this again, but we talked at some
5 length about your conversation with Rob when he
6 returned from the prosecutor's office.  You remember
7 that?
8      A.   Yes.
9           MR. SCHULZ:  Object; repetition.
10          MR. GORDON:  Counsel, I know that, but
11 let me ask the question fist.
12          MR. SCHULZ:  Okay.
13 BY MR. GORDON:
14     Q.   And gone the better part of an entire
15 business day?
16     A.   Yeah.
17     Q.   Did he indicate to you, and you may not
18 recall this, whether he talked to the prosecutor
19 alone?
20     A.   No.
21     Q.   He didn't indicate one way or the
22 other?
23     A.   Yes, he did indicate.  No, he did not
24 talk to the prosecutor alone.
25     Q.   Okay.  And do you recall anything more

Page 111

1 on that subject?
2      A.   Only that Robert told me that Gordon
3 said that he would not allow Robert to be talked to
4 alone, that he stood in the place of a parent.
5 There's a word for it I don't remember.  And that he
6 would stay with him while he was being questioned.
7      Q.   And that's what Rob told you back in --
8 when this happened?
9      A.   That was what had happened at the
10 prosecutor's office.
11     Q.   And he told you that when he returned
12 home?
13     A.   When he returned home, yes.
14     Q.   Now, do you recall -- and I just -- I
15 don't want to leave until you've told me everything
16 you can recall about that conversation.  Is there
17 anything else that you can recall that you haven't
18 told me?
19     A.   No, I can't think of anything more.
20     Q.   And the same is true with the
21 conversation you had with Gordon before he transported
22 Robert to the prosecuting attorney's office, we've
23 talked about that.  Do you recall anything more about
24 that conversation than what you've told me?
25     A.   No.

Page 112

1      Q.   Did you ever talk with Gordon about
2 that subject, what happened at the prosecutor's office
3 after Rob returned?
4      A.   I probably did.  I don't remember.
5      Q.   Okay.  Have you talked with Mr. Schulz
6 at all about what questions he's going to ask you
7 tomorrow?
8      A.   No.
9      Q.   Have you had any discussions with him
10 about tomorrow's deposition at all?
11     A.   No.  Well, we've had conversations, but
12 nothing, this is what I'm going to do and this is what
13 you're going to do kind of things, no.
14     Q.   So it would be fair to state that, in
15 terms of tomorrow's questioning by Mr. Schulz, you
16 don't know what he's going to ask you?
17     A    No.
18     Q.   You agree with me?
19     A.   Yeah, I agree with you.  I don't know
20 what he's going to ask me.
21     Q.   Okay.
22          MR. GORDON:  I have nothing further.
23 Thank you very much for your time, ma'am.
24          THE DEPONENT:  You're welcome.
25          THE VIDEOGRAPHER:  Done?  Going off the

Page 113

1 video record.  The time is now approximately 1:04 p.m.
2      (Whereupon, the videotaped deposition of
3 ANNE RINDE was concluded at 1:04 p.m.)

29 (Pages 110 to 113)

Pat Carl & Associates  (763) 591-0535 or (800) 591-9PCA (722)

30b27dbb-8864-47e0-a8c8-3bfe49213e04

# EXHIBIT E

1
2
3
4
5
6
7

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

8

9   ROB RINDE f/k/a ROBERT LARRY LEROY
    PITSOR, JR.                                           NO. 06-2-09825-1 SEA

10
                    Plaintiff,                            SECOND AMENDED COMPLAINT
11
    vs.                                                   **[PROPOSED]**
12
13  THE CORPORATION OF THE PRESIDENT               THE HONORABLE WILLIAM L. DOWNING
    OF THE CHURCH OF JESUS CHRIST OF
14  LATTER-DAY SAINTS, a Utah corporation
    sole; and GORDON CONGER, as individual
15  and as agent of THE CORPORATION OF THE
    PRESIDENT OF THE CHURCH OF JESUS
16  CHRIST OF LATTER-DAY SAINTS.
17
                    Defendants.
18
19
                          **I.     GENERAL ALLEGATIONS**
20
            This case alleges child sexual abuse, intentional infliction of emotional distress (aka
21
    the Tort of "Outrage"), civil conspiracy, fraudulent concealment and negligence.  It arises out
22
    of the brutal victimization of plaintiff when he was twelve years old by Paul H. Lewis, a
23
    Mormon Church Scoutmaster and Melchesidek priest.  Lewis sodomized plaintiff, beat and
24
    choked him and forced a wire coat hangar up his penis inflicting injury to his urogenital
25
    system that resulted in excruciating physical and emotional pain that persists to this day.
26

SECOND AMENDED COMPLAINT - 1 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

When he was approximately fourteen years old Plaintiff disclosed the abuse to civil authorities. Despite knowing that the plaintiff's allegations were true, Mormon Church officials including GORDON CONGER (who was a Seattle attorney and a Bellevue ward bishop), Bishop Rolf Johannsen (another local church leader), and a third, unknown, person, pressured plaintiff into not cooperating with the law enforcement officials who were investigating Lewis. These church officials acted as part of a coordinated effort to shield fellow priest Lewis from the law and to protect the Mormon Church from scandal and civil liability.

## II.    PARTIES

2.1    Plaintiff ROB RINDE, (known as Larry Pitsor at relevant times), is an adult and at all times relevant hereto was a boy residing with his mother and siblings first in Seattle, and then in Bellevue, Washington. Plaintiff was born December 8, 1969. ROB RINDE, his mother and his four siblings were recruited into the Church of Jesus Christ of Latter-day Saints (hereinafter the "Mormon Church").

2.2    Defendant THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST LATTER-DAY SAINTS, a Utah corporation sole, is a corporation duly organized and operating pursuant to the laws of Utah. This defendant also operates as the "MORMON CHURCH" THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, which is an unincorporated association. This defendant will hereinafter be referred to as COP. COP operates churches within the State of Washington.

2.3    Defendant GORDON CONGER, at relevant times, was a Stake or Area President or other hierarchal official in the Mormon Church. GORDON CONGER is the Mormon Seattle Temple President and the designated spokesperson for the Mormon Church. GORDON CONGER is an attorney licensed to practice law in the State of Washington. GORDON CONGER was plaintiffs' home teacher. As such, he was subject to the

SECOND AMENDED COMPLAINT - 2 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

supervision, direction, and control of the Church and he was, at all relevant times, its agent. By virtue of his status within the Mormon Church and by virtue of his voluntarily undertaking roles to assist ROB RINDE (and his family), CONGER entered into a special protective relationship with ROB RINDE giving rise to duties and obligations.

## III.    JURISDICTION AND VENUE

3.1    Jurisdiction and venue are proper in this Court because the acts giving rise to this claim occurred in Bellevue, King County, Washington.

## IV.    FACTS

4.1    "COP" is a corporation governed by a single individual, the President of the Mormon Church, Gordon B. Hinckley. The President wields ultimate and absolute authority within the Mormon Church. Mr. Hinckley, is the "Divine Prophet, Seer and Revelator" of the Church and has the authority to appoint and remove anyone in the Mormon Church, including all members of wards and stakes, at will. The President of the Mormon Church controls everything in the Mormon Church and all of its wards and stakes. As such, the President of the Church has authority to dictate changes in Church policy, discipline, ecclesiastical doctrine or anything else he so chooses. The acts of the President, in his capacity as head of the Mormon Church, are the acts of COP. COP is registered to do business within, and conducts continuous and systematic activities within, the State of Washington. At all relevant times, plaintiff was a member of and attended a Seattle and/or a Bellevue ward of the Mormon Church.

4.2    Adult male members of the Church are eligible to be ordained as "Priests." There are various levels of priesthood, including elevation to the rank of "Elder," "Melchesidek Priest," "High Priest." Elders, Melchesidek Priests and High Priests are held out by the Mormon Church as men that are "morally worthy" and deserving of the trust of its members.

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

Exhibit___ Page 586

4.3    At all relevant times, COP and the Mormon Church assumed special responsibilities toward its members including a disciplinary and red-flagging system meant to identify and track sexual predators and other dangerous individuals within the membership in order to protect innocent members from harm they might inflict.

4.4    The Mormon Church itself is closely affiliated with the Boy Scouts of America. The Mormon Church is the oldest and one of the largest sponsoring organizations of boy scouting in the United States. Since 1913 the Mormon Church has used the Scouting program as an integral part of its ministry to boys and young men. Scouting is the exclusive youth activity for males in the Mormon Church.

4.5    During the relevant time period, COP and the Mormon Church adopted guidelines for handling victims of child sexual abuse and sex offenders. They failed to follow their guidelines with respect to Lewis.

4.6    During the approximate time period of 1981-1983, when RINDE was around twelve years old, Lewis was RINDE's ward scoutmaster. At that time, Lewis was in the United States Navy and was a transient with no ties or history to the area prior to the church placing Lewis in the position of Scoutmaster of a Seattle ward to which RINDE was a member.

4.7    Using his position of authority as Scoutmaster and Mormon Priest, Lewis was able to gain access to RINDE and use that access to groom and then molest, rape and sadistically torture him.

4.8    Lewis sexually molested RINDE at various locations in the Seattle area including at an apartment to which Lewis had unrestricted access, in the swimming pool, locker room/shower and steam bath at Sand Point Naval Air Station, and in a motel room in Issaquah.

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

4.9     The most appalling acts of abuse occurred in a room at Motel 6 in Issaquah in approximately 1983. Lewis used physical violence against RINDE, sodomizing him and forcing RINDE to orally copulate Lewis. Lewis then took a wire coat hangar and forced it into RINDE's urethra causing him to hemorrhage and causing chronic and irreparable injury to his penis and urogenital system. These were acts of childhood sexual abuse, which acts were also violations of chapter 9A.44 RCW or RCW 9.68A.040 or prior laws of similar effect at the time the acts were committed.

4.10    In approximately 1984 or 1985, RINDE disclosed the abuse and his mother reported it to the civil and church authorities. A criminal investigation of Lewis ensued. Church officials described herein above, including GORDON CONGER (acting both in his individual capacity and in his capacity as agent for the Mormon Church) shielded Lewis from the law. The same church officials urged RINDE, then age fourteen (14), to not cooperate with the law enforcement investigation of Lewis thereby allowing Lewis to evade criminal prosecution and to move to another state where he eventually sexually molested more children. These church officials told him that he would not be believed, that it would be "his word" against Lewis, that his allegations would hurt the image and reputation of the Mormon Church, that RINDE would be ridiculed and derided by church members in addition to other comments calculated to intimidate RINDE from cooperating with the civil authorities investigating Lewis.

4.11    Church leaders, including GORDON CONGER, told RINDE that the church would "take care of things," that they would help him with therapy and that they would help his family financially.

4.12    An abuse victim advocate in the King County Prosecutor's office arranged a meeting with RINDE at her office. Before she could meet privately with RINDE, Mormon Church leaders, including GORDON CONGER, interfered in the investigative process. Three

---

SECOND AMENDED COMPLAINT - 5 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

adult Mormon Church officials, including GORDON CONGER, went to RINDE'S home and told him that they would take him to the meeting at the prosecutor's office downtown. On the ride downtown in the car the three adult Mormon church officials pressured RINDE not to cooperate with law enforcement officials.

4.13    At the meeting, GORDON CONGER told the victim's advocate that he was RINDE'S attorney which was untrue. The church official/lawyer told the victim advocate he would not permit her to interview RINDE in private.

4.14    RINDE succumbed to the Church's pressure not to cooperate. As a result, charges against Lewis were not filed. Soon thereafter Lewis moved to another state and joined another ward of the Mormon Church.

## V.    FIRST CAUSE OF ACTION
### (Negligence based on Common Law and breach of Fiduciary Duty – Against COP)

5.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges:

5.2    Defendant COP had a common law duty to plaintiff to protect him from the criminal acts of Lewis.

5.3    Defendant COP breached its duty to protect plaintiff and plaintiff was damaged thereby.

5.4    Defendant COP had a "special relationship" with plaintiff and with Lewis. COP, through its agents, knew or should have known that Lewis was a pedophile that was actively abusing children, COP had a duty to use reasonable care in the hiring, supervision or retention of Lewis as scoutmaster and also had a duty to warn or protect foreseeable victims including plaintiff. Lewis' positions within the defendants' church were causally connected to and served to enable Lewis to gain access to and abuse plaintiff.

5.5    COP's failure to adhere to its previously adopted guidelines for handling victims of child sexual abuse and sex offenders caused harm to the plaintiff. The harm

SECOND AMENDED COMPLAINT - 6 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 • FACSIMILE (206) 676-7575

plaintiff suffered as a result of defendants' negligence was the harm contemplated in COP's Handbook of Instruction to its clergy.

5.6    Notwithstanding its duties, defendant COP failed to train and supervise its hierarchal clergy in the proper implementation of its guidelines, policies and procedures regarding the treatment of victims of child sexual abuse, to monitor and insure compliance with their guidelines, policies and procedures, treatment of child sexual abusers and reporting of child sexual abuse.

5.7    Defendants knew, or in the exercise of reasonable care should have known, that their failure to report Lewis to appropriate law enforcement or social services agencies would result in Lewis sexually abusing children including plaintiff, and in plaintiff failing to obtain adequate treatment.

5.8    As a result of the molestation, breach of trust, and statutory violations, plaintiff has suffered and will continue to suffer physical and emotional pain and dysfunction to his general, non-economic damage in an amount to be determined.  As a further result of the sexual abuse, plaintiff incurred and/or will continue to incur costs for counseling and psychological treatment, and has lost earning capacity to his damage in an amount to be proved at trial.

## VI.    SECOND CAUSE OF ACTION
### (Negligence based on Common Law and breach of Fiduciary Duty – Against COP)

6.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges:

6.2    During relevant times COP placed Lewis, a transient person with no ties to the community and with whom COP had no prior knowledge, into the position of Scoutmaster of Boy Scout Troop of the Seattle 1st Ward.  In doing so, COP breached its own guidelines and duties to screen, monitor and supervise the boy scout leaders it selected.

SECOND AMENDED COMPLAINT - 7 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

6.3    COP, through its bishops, stake presidents and Boy Scout leaders within the State of Washington breached both a duty of reasonable care in hiring, supervising or retaining Lewis as scoutmaster and by failing to warn or protect children and/or by failing to report their knowledge of Lewis's sexual abuse of children to civil authorities.

6.4    But for the breach of duty Lewis would not have been able to abuse plaintiff.

## VII.    THIRD CAUSE OF ACTION
### (Negligence based on Common Law – Against Defendant COP)

7.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges:

7.2    Defendant COP entered into a special protective relationship with ROB RINDE when it agreed to assist ROB RINDE and his family in the aftermath of the abuse. As a result of that special protective relationship, COP had a common law duty to assist ROB RINDE.

7.3    COP knew, or in the exercise of reasonable care should have known, that by coercing plaintiff ROB RINDE into recanting the allegations of abuse at the hands of Lewis, that RINDE would not obtain adequate treatment relating to the abuse and that ROB RINDE would, therefore, suffer additional damages as a result of the abuse.

7.4    As a result of COP's failure to meet its duty of care, ROB RINDE was damaged.

## VIII.    FOURTH CAUSE OF ACTION
### (Negligence based on Breach of Statutory Duty to Report – Against Defendant COP)

8.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges:

8.2    Defendant COP advises its members to bring all worldly and secular problems to the Church Bishops for assistance. In doing so, COP holds its Bishops out as social service counselors.

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

8.3    Bishop Rolf Johannsen was the ward Bishop for the RINDE family at the time of the events giving rise to this action.

8.4    Due to his status as a social service counselor, Bishop Johannsen, and therefore, COP, had a statutory duty, pursuant to RCW 26.44.030 to report known or suspected instances of child abuse.

8.5    Bishop Johannsen breached that duty when he failed to report his knowledge of Lewis' abuse of ROB RINDE.

8.6    COP knew, or should have known, that its Bishop's failure to report the abuse would cause continuing damage to ROB RINDE, and ROB RINDE was damaged by COP's failure to report the abuse.

## IX.    FIFTH CAUSE OF ACTION
### (Negligence based on Common Law – Against Defendant CONGER)

9.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further alleges:

9.2    Defendant CONGER entered into a special protective relationship with ROB RINDE when he agreed to assist ROB RINDE and his family in the aftermath of the abuse. As a result of that special protective relationship, CONGER had a common law duty to assist ROB RINDE.

9.3    After agreeing to assist, CONGER's actions were limited to coercing ROB RINDE into recanting the allegations of abuse. Additionally, CONGER breached his duty to assist ROB RINDE by taking absolutely no affirmative action to assist ROB RINDE by, for example, notifying the authorities, notifying other officials within the Mormon Church of the existence of a pedophile within their organization and/or by failing to obtaining psychiatric, psychological and/or medical help for ROB RINDE.

9.4    CONGER knew, or in the exercise of reasonable care should have known, that by coercing plaintiff ROB RINDE into recanting the allegations of abuse at the hands of

SECOND AMENDED COMPLAINT - 9 of 13

(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

Lewis, and by failing to assist RINDE into obtaining help for his situation that RINDE would not obtain adequate treatment relating to the abuse and that ROB RINDE would, therefore, suffer additional damages as a result of the abuse.

9.5    As a result of CONGER's failure to meet his duty of care, ROB RINDE was damaged.

## X.    SIXTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress – Defendants COP and CONGER)

10.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

10.2    Defendants COP and CONGER knew, or in the exercise of reasonable care should have known, that tampering with a witness was unlawful and that such conduct as pressuring victims not to disclose would be harmful to the best interests and psychological well-being of child victims of sexual abuse, including plaintiff.

10.3    Defendants COP and CONGER knew or should have known that pressuring plaintiff not to cooperate with the civil authorities' investigation of Lewis would greatly exacerbate plaintiff's physical, emotional and psychological injuries and, in fact, the defendants' conduct greatly exacerbated plaintiff's physical, emotional and psychological injuries.

10.4    Defendants knew that plaintiff had been subjected to horrific sexual abuse at the hands of its Scoutmaster and Melchesidek Priest Paul Lewis and knew that plaintiff had and would continue to suffer emotional, psychological and physical injuries and that unless he received appropriate assistance from civil authorities, that his injuries would be greatly exacerbated and much more difficult to treat with the passage of time.

10.5    Defendants, and each of them, being more concerned about shielding the Church from scandal and potential civil liability and intent on protecting the public image of its all-male Mormon priesthood at the expense of aiding a gravely injured child that was

SECOND AMENDED COMPLAINT - 10 of 13

(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

plaintiff, pressured plaintiff into not cooperating with the civil authorities with full knowledge of or with reckless disregard of the emotional and psychological injuries its conduct was certain to inflict.

10.6    Defendants' conduct was an outrageous violation of societal norms and went so far beyond all possible bounds of decency, so as to be regarded as atrocious, and utterly intolerable in a civilized community, and resulted in severe emotional distress.

10.7    As a further result of the defendants' intentional conduct, plaintiff has incurred and/or will continue to incur costs for counseling and psychological treatment, and has lost earning capacity to his damage in an amount to be proved at trial. As a result of the defendants' conduct, plaintiff has suffered and will continue to suffer physical and emotional pain and dysfunction to his general, non-economic damage in an amount to be proved at trial.

## XI.    SEVENTH CAUSE OF ACTION
### (Estoppel and Fraudulent Concealment)

11.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

11.2    COP through its agents (the Mormon Church officials) and Gordon CONGER, individually, engaged in a plan of action to cover up incidents of the sexual abuse of minors by its Melchesidek priests and scout leaders and to prevent disclosure, prosecution and civil litigation including, but not limited to: failure to report incidents of abuse to law enforcement or child protection agencies, denial of abuse it had substantiated, the transfer of abusive Melchesidek priests and scoutmasters, coercion of victims and their families and by failure to seek out and redress the injuries these men had caused. Based on these actions, COP engaged in fraudulent concealment and are estopped from asserting defense of limitations.

SECOND AMENDED COMPLAINT - 11 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

## XII.    EIGHTH CAUSE OF ACTION
### (Civil Conspiracy)

12.1    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count and further allege:

12.2    Defendants COP and CONGER conspired to cover up incidents of sexual abuse of minors by its Mormon priests and scout leaders, including Lewis and to prevent disclosure, prosecution and civil litigation including, but not limited to: failure to report incidents of abuse to law enforcement or child protection agencies, denial of abuse it had substantiated, aiding criminal child molesters in evading detection, arrest and prosecution, allowing them to cross state and international borders for purposes of gaining access to uninformed parents whose innocent children could be sexually abused, failure to warn, and by failure to seek out and redress the injuries its Melchesidek priests and scoutmasters had caused.   Based on these actions, the defendants conspired for the unlawful purpose of concealing and suppressing information on the danger and threat that scoutmaster and priests like Lewis posed to unsuspecting children, including the plaintiff.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a judgment against both defendants, jointly and severally, and in plaintiff's behalf, for the following:

1.    For special damages for medical treatment expenses, lost earnings, and lost earnings capacity, and the expenses of medication and other special expenses, both in the past and continuing into the future, in amounts to be determined at the time of trial;

2.    For all general damages, for physical, mental and emotional injury and disturbance, and other disorders resulting from the acts complained of herein;

3.    For attorney's fees, prejudgment interest, costs and exemplary damages allowed by RCW 9.68A.130 and other law; and

4.    For such other and further relief as this Court determines just in the premises.

SECOND AMENDED COMPLAINT - 12 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

1

Dated this _____ day of February, 2007.

2

3                                        GORDON, THOMAS, HONEYWELL,
                                         MALANCA, PETERSON & DAHEIM LLP

4

5                                        By:_____
                                             Michael T. Pfau, WSBA No. 24649
6                                            mpfau@gth-law.com
                                             Michelle A. Menely, WSBA No. 28353
7                                            mmenely@gth-law.com
                                             Yvonne M. Mattson, WSBA No. 35322
8                                            ymattson@gth-law.com
                                             Co-Counsel for Plaintiff
9

10                                       LAW OFFICES OF TIMOTHY D. KOSNOFF

11

12                                       By:_____
                                             Timothy D. Kosnoff, WSBA No. 16586
13                                           timkosnoff@comcast.net.
                                             Co-Counsel for Plaintiff
14

15

16

17

18

19

20

21

22

23

24

25

26

SECOND AMENDED COMPLAINT - 13 of 13
(06-2-09825-1 SEA)
[175714 v08.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 • FACSIMILE (206) 676-7575



IN THE
SUPERIOR COURT, IN AND FOR THE COUNTY OF KING, STATE OF WASHINGTON

| | |
|---|---|
| ROB RINDE F/K/A ROBERT LARRY LEROY PITSOR, JR.,<br><br>Plaintiff/Petitioner<br><br>vs.<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE, AKA THE "MORMON CHURCH" THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, AN UNINCORPORATED ASSOCIATION,<br><br>Defendant/Respondent | Hearing Date: 03/05/2007<br><br>CAUSE NO: **06-2-09825-1 SEA**<br><br>DECLARATION OF SERVICE OF:<br>**SUBPOENA DUCES TECUM TO SPOKANE SCHOOL DISTRICT 200 NORTH BERNARD, SPOKANE, WA 99201; WITNESS FEE CHECK** |

The undersigned hereby declares: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **14th day of February, 2007, at 8:19 AM**, at the address of **200 N BERNARD, SPOKANE, Spokane** County, **WA 99201**; this declarant served the above described documents upon **SPOKANE SCHOOL DISTRICT, RECORDS CUSTODIAN**, by then and there personally delivering **1** true and correct copy(ies) thereof, by then presenting to and leaving the same with **MEG BOUCHARD, AUTHORIZED TO ACCEPT, A white female approx. 40-45 years of age 5'4"-5'6" in height weighing 100-120 lbs with blonde hair.**

No information was provided or discovered that indicates that the subjects served are members of the U.S. military.

Declarant hereby states under penalty of perjury under the laws of the State of **Washington** that the statement above is true and correct.

DATED this **15th day of February, 2007.**

T BRADLEY, Reg. # 855, SPOKANE, WA

ABC's Client Name
**Gordon, Murray & Tilden**
**1545-02**
Exhibit___ Page 597

ORIGINAL PROOF OF
SERVICE

ABC Tracking #: **3384927**

https://www.abclegal.com/agents/proofs/perlres.asp?ord=3384927&ttl=Declaration+of+Service&svr=T+...    2/15/2007

RECEIVED

2007 MAR -1 AM 11: 48

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA

FILED

2007 MAR -1 PM 12: 57

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE. WA.

The Honorable William L. Downing

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

ROB RINDE f/k/a ROBERT LARRY LEROY
PITSOR, JR.,

Plaintiff,

v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole;

Defendant.

NO. 06-2-09825-1 SEA

OPPOSITION BY CORPORATION OF
THE PRESIDENT OF THE CHURCH
OF JESUS CHRIST OF LATTER-DAY
SAINTS TO PLAINTIFF'S MOTION
TO AMEND COMPLAINT

## I.    INTRODUCTION

Plaintiff's last-ditch effort to avoid removal has led him, for purely tactical reasons, to

seek leave to amend his complaint to add claims against Gordon Conger.  Motions to amend

should be denied where the proposed claims are without merit.  This is such a case.

Plaintiff's claims against Mr. Conger are time-barred, and have been for 16 years.  In an

effort to avoid the statutes of limitations, plaintiff claims that Mr. Conger and COP "fraudulently

concealed" their wrongful conduct.  This version of the "discovery rule" is plainly inapplicable.

Plaintiff's allegation that Mr. Conger pressured him not to cooperate with prosecutors is

inconsistent with "concealment"—this alleged wrong was done *to plaintiff and in his presence.*

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 1
No. 06-2-09825-1 SEA

ORIGINAL

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page  598

In fact, plaintiff is the *only* witness in support of his story. His claims accrued when he experienced and witnessed the alleged wrongdoing. Because he was a minor at the time, the statutes of limitations were tolled until he became 18 and expired when he turned 21. He is now 37, and it is too late to bring these claims.

## II.    STATEMENT OF FACTS

To deny the motion, this Court need not accept the unequivocal denial of plaintiff's allegations by COP and Mr. Conger. Nevertheless, COP believes that additional factual context is appropriate to balance plaintiff's presentation. When one considers plaintiff's psychiatric disorders alongside Mr. Conger's stature and demonstrated concern for plaintiff and his family during the relevant time, skepticism concerning these allegations is appropriate.

**A.    Independent of the Abuse that is the Subject of This Lawsuit, Plaintiff Had a Horrific Childhood.**

COP does not dispute that plaintiff has had a tragic life and is deeply troubled, but disputes that COP is responsible. By his own reports, plaintiff had a childhood that was horrific.

Plaintiff's father was an "alcoholic and sadistic."[1] During therapy in 1996, plaintiff reported that "he kicked the shit out of me."[2] Plaintiff has also reported that his father sexually abused him.[3]

Plaintiff's mother was morbidly obese, dysfunctional and prone to physical abuse. Plaintiff reported to one therapist that "there are many patches on the walls in Frank's house from her slamming him and Kimmie against the wall, hitting their heads."[4] Because of her

---

[1] Declaration of Michael Rosenberger, Ex. 1 at 2. Hereafter, all citations to exhibits are attachments to the Rosenberger declaration.
[2] Ex. 2.
[3] Ex. 3 at 2; Ex. 1 at 2.
[4] Ex. 4.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 2
No. 06-2-09825-1 SEA

**GORDON MURRAY TILDEN LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

obesity and related health problems, plaintiff's mother did not work. In plaintiff's teenage years, his mother relied on plaintiff to do much of the housework, including taking care of younger adopted siblings.

Plaintiff's older sister, Kimmie, was predatory and sexually abused him beginning when plaintiff was five years old.[5] Kimmie ran away from home and became a victim of the Green River killer. Her death in plaintiff's early teenage years was very traumatic for plaintiff and his family.

Despite the trauma inflicted by his parents and sister, plaintiff appears to have been quite functional until approximately 2002. During 1996-1997, he underwent therapy, paid for by the LDS Church, with Jan Nix, Ph.D. Ms. Nix's treatment notes from September 1997 indicate that "symptoms of PTSD are virtually resolved."[6] Plaintiff subsequently resigned from his job with the Washington State Department of Labor and Industries "in order to take two years off to travel to 'celebrate' the success of his psychotherapy and the absence of psychiatric symptoms."[7] He then moved to Minnesota and opened a book store.

In October 2002, plaintiff was raped by a boyfriend.[8] This date rape in 2002 appears to have triggered acute and disabling psychiatric disorders. After the rape, plaintiff stopped working and had several stints of inpatient psychiatric care. Among his most significant symptoms is dissociative identity disorder; that is, multiple personalities exist in him.[9]

---

[5] Ex. 3 at 2; Ex. 5 at 1.
[6] Ex. 6. [RR 337]
[7] Ex. 7 at 2.
[8] Ex. 8 at 1; Ex. 9.
[9] Ex. 1 at 2, 5.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 3
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292