1
2
**B.    Gordon Conger is a Respected Member of the Bar Who Cared Greatly for Plaintiff.**

3
4
    **1.    Mr. Conger's Background.**

5
6
    The proposed defendant, Gordon Conger, graduated from the University of Washington

7
8
Law School in 1962.  With the exception of a two year stint as in-house counsel at KIRO, he

9
10
worked his entire career at Preston Gates & Ellis and its predecessor firms.  Except for some

11
12
inverse condemnation he did as a young lawyer, Mr. Conger spent his entire career as a

13
14
transactional and business lawyer.  He retired in 1999.

15
16
    **2.    Mr. Conger Tried to Help, Not Harm, the Plaintiff.**

17
18
    Mr. Conger is a life-long member of the LDS Church.  Every family in the Church has a

19
20
"home teacher," and Mr. Conger was home teacher to plaintiff's family.  As Mr. Conger

21
22
described the role of home teacher in his deposition:

23
24
    We would spend some time in conversation, which was to build friendship, build
    empathy.  We would try to leave with a short spiritual message and then always
25
    conclude with a prayer, a blessing on the home and family.

26
27
Deposition of Gordon Conger at 48:13-17.

28
29
    Because of the family's needs, Mr. Conger spent more time with them than other families

30
31
for whom he was a home teacher.  "[B]ecause of obesity and other health issues [plaintiff's

32
33
mother] was very minimally functional.  She could barely walk around, and so that household

34
35
needed a lot of help."  *Id.* at 49:5-7.  Mr. Conger took plaintiff and the little boys on outings—"I

36
37
wanted Rob to see another kind of life and to have some broadening."  *Id.* at 50:7-21.

38
39
    Mr. Conger provided plaintiff with not just spiritual guidance, but also material goods he

40
41
otherwise would not have received because the family was on public assistance.

42
43
    When we were his home teacher, we tried to give him a special gift each
44
    Christmas.  We gave him a computer one Christmas because they didn't have
45
    much.  And he expressed a desire, at one of our visits, to take guitar lessons, but

---

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 4
No. 06-2-09825-1 SEA

**GORDON MURRAY TILDEN LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Dockets.Justia.com

he didn't have a guitar. So we bought a guitar, and the next time we went, we loaned it to him. It was not Christmas time. We couldn't say it was a gift, and I think he brought that guitar back on [a later visit], and we have it today.

*Id.* at 39:22-40:6.

In the 1990's, plaintiff introduced his then-wife to Mr. Conger on a few occasions. Mr. Conger recounts that these meetings as "very warm" and that he and plaintiff had "pleasant conversations." *Id.* at 38:20-39:19.

### 3.    Mr. Conger Did not Coerce Plaintiff or Impede the Investigation.

Mr. Conger has been deposed and unequivocally denies the allegations plaintiff now levies against him. *Id.* at 77-81. He not only denies that he pressured plaintiff into not cooperating with the prosecutor's office, he calls it "an outrage." *Id.* at 81:19. He had never met and did not even know the name of the man he supposedly protected. *Id.* at 22:10-17.

Mr. Conger testified that when he took plaintiff to the prosecutor's office, a woman greeted them and told Mr. Conger that she would meet alone with plaintiff and that Mr. Conger would have to wait outside. *Id.* at 30:6-15. He did so, and plaintiff had a reasonably long meeting, alone, with the representative of the prosecutor's office. *Id.* at 32:2-12. Mr. Conger adds that "I certainly didn't advise her that I was his lawyer, because I wasn't." *Id.* at 31:19-20.

### III.    EVIDENCE RELIEF UPON

Declaration of Michael Rosenberger and exhibits thereto.

### IV.    ARGUMENT

### A.    Plaintiff's Claims Against Mr. Conger are without Merit and the Motion to Amend Should Thus be Denied.

"A trial court appropriately denies a motion to amend when a claim is without merit." *Syputa v. Druck, Inc.*, 90 Wn. App. 683, 649, 954 P.2d 279 (1998). Plaintiff's claims fail as a

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 5
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 602

matter of law because, first, they are barred by the statute of limitations and, second, because each claim is defective on the merits.

Additionally, federal courts have recognized that when a plaintiff seeks to defeat federal jurisdiction by adding a non-diverse defendant, the court "should scrutinize that amendment more closely than an ordinary amendment." *Hensgens v. Deere & Co.*, 833 F.2d 1179, 1182 (5th Cir.1987).

> For example, the court should consider the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether plaintiff has been dilatory in asking for amendment, whether plaintiff will be significantly injured if amendment is not allowed, and any other factors bearing on the equities.

*Id.* These considerations cut against permitting the amendment. Plaintiff brings this motion solely to preclude removal. Moreover, there is no prejudice—plaintiff does not need Mr. Conger in this suit, or else he would have added him in his prior amendment to the complaint.

**B.    Plaintiff's Claims are Barred by the Statute of Limitations.**

**1.    The Limitations Period on Plaintiff's Claims Expired 16 Years Ago.**

When a claim is based upon an injury allegedly suffered by a minor, the statute of limitations "is tolled until the injured party reaches the age of 18." *E.R.B. v. Church of God*, 89 Wn. App. 670, 679 (1998), revd. on other grounds, *C.J.C. v. Corporation of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 985 P.2d 262 (1999). Plaintiff was born December 8, 1969.[10] Hence, the statutes of limitations began to run in December 1987.

Plaintiff's Proposed Second Amended Complaint alleges three causes of action for damages against Mr. Conger: negligence, outrage (intentional infliction of emotional distress)

---

[10] Ex. 10 at Interrogatory No. 1.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 6
No. 06-2-09825-1 SEA

**GORDON MURRAY TILDEN LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit ___ Page 603

and civil conspiracy.[11]  The statute of limitations for negligence and conspiracy is three years,

RCW 4.16.080(2),[12] and either two or three years as to outrage.  *Doe v. Finch*, 133 Wn.2d 96,

101, 942 P.2d 359 (1997) (noting without resolving that "there appears to be some disagreement

in this state whether outrage claims are governed by the three-year statute of limitation, or the

two-year statute of limitation.").  Hence, plaintiff's claims were time-barred no later than

December 9, 1990—more than sixteen years ago.

> **2.    The Discovery Rule Does Not Apply Here Because Plaintiff Knew of Mr. Conger's Alleged Misconduct at the Time it Occurred.**

For his "seventh cause of action" in the proposed amended complaint, plaintiff alleges

that COP and Mr. Conger "engaged in fraudulent concealment and are estopped from asserting

the defense of limitations."  Proposed Second Amended Complaint ¶ 11.2.  By this allegation,

plaintiff attempts to invoke the discovery rule.  *Crisman v. Crisman*, 85 Wn. App. 15, 20, 931

P.2d 163 (1997) (noting that discovery rule has been applied to two types of cases: cases of

fraudulent concealment and cases, such as legal malpractice, where plaintiff's injury may make it

extremely difficult to learn the factual elements of the cause of action).  In *Crisman,* the Court of

Appeals stated:

> Traditionally, the rule has been applied in cases where the
> defendant *fraudulently conceals a material fact from the plaintiff*
> *and thereby deprives the plaintiff of the knowledge of accrual of*
> *the cause of action.*  Application of the discovery rule tolls the
> limitation period until such time as the plaintiff knew or, through

---

[11] A fourth theory against Mr. Conger, "estoppel and fraudulent concealment," does not claim damages but alleges COP and Mr. Conger are estopped from asserting statutes of limitations.  Discussed in more detail below, this theory is plainly inapplicable because COP and Mr. Conger could not have "concealed" that which plaintiff witnessed directly.

[12] COP is unaware of any Washington case specially discussing the statute of limitations applicable to a conspiracy claim.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 7
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

the exercise of reasonable diligence, should have known *of the fraud.*

*Id.* (emphasis added).

Plaintiff's concealment theory fails because it is inconsistent with his substantive allegations. Specifically, Mr. Conger could not have "fraudulently concealed a material fact" from the plaintiff because the alleged wrongful acts were done *to plaintiff* or in his presence. Indeed, plaintiff would be the only person testifying that the alleged wrongful acts occurred. He would do so because he was a participant in the events during which the wrongs allegedly occurred, not because of a later discovery.

The proposed complaint clearly alleges torts that accrued at the time of the acts:

- ¶ 4.10: Mr. Conger "urged Rinde, then age 14, to not cooperate with the law enforcement investigation of Lewis."

- ¶ 4.12: "On the ride downtown in the car [Mr. Conger] pressured Rinde not to cooperate with law enforcement officials."

- ¶ 4.13: "Conger told the victim's advocate that he was Rinde's attorney which was untrue [and] he would not permit her to interview Rinde in private."

Plaintiff has identified no witness other than himself to support these allegations.[13]

Since plaintiff was the object of the alleged "pressure" not to cooperate, and was present when Mr. Conger allegedly misrepresented his status and refused to allow the prosecutor to interview plaintiff in private, his causes of action accrued at that time. *In Re Estates of Hibbard,* 118 Wn.2d 737, 752, 826 P.2d 690 (1992) ("a cause of action accrues when a claimant knows, or

---

[13] In his interrogatory responses, plaintiff did not claim that anyone from the Prosecutor's Office—or anyone else— could support his allegations. Ex. 10 at Interrogatory No. 3.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 8
No. 06-2-09825-1 SEA

**GORDON MURRAY TILDEN** LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

in the exercise of due diligence should have known, all the essential elements of the cause of action, specifically duty, breach, causation and damages.")  Plaintiff knew all elements of his various causes of action against Mr. Conger because Plaintiff allegedly experienced or witnessed the facts firsthand.  Although the running of the statute of limitations was tolled until he reached the age of 18, there can be little doubt that his claims accrued on the day of his trip to the prosecutor's office.

### 3.    Plaintiff's Claims Against Mr. Conger Are not Saved by the Special Statute of Limitations Applicable to Sexual Abuse Claims.

A special statute of limitations applies to claims to recover damages suffered "as a result of childhood sexual abuse." RCW 4.16.340.  Plaintiff does *not* allege that Mr. Conger's conduct *caused* sexual abuse to occur.  Hence, the injuries allegedly caused by Mr. Conger are not "the result of childhood sexual abuse."  Rather, they are the result of separate intentional acts that followed the sexual abuse by a year or two.  *See,* Proposed Second Amended Complaint, ¶¶ 4.9, 4.10 (abuse occurred in 1981-83; trip to prosecutor's office in 1984 or 1985).

The special discovery rule for victims of childhood sexual abuse tolls the running of the limitations period until the claimant discovers that the sexual abuse "caused the injury for which the claim was brought." RCW 4.16.340 (1)(c).  However, the claims subject to this statute of limitations are claims based on the sexual abuse itself.  As the statute reads:

> All claims or causes of action based on intentional conduct brought by any person for a recovery of damages for injuries suffered *as a result of childhood sexual abuse* shall be commenced within the later of the following periods: . . .

RCW 4.16.340 (emphasis added).  Plaintiff does not claim that Mr. Conger failed to prevent the sexual abuse that is the focus of his suit.  Rather, plaintiff seeks recovery for damages caused by

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 9
No. 06-2-09825-1 SEA

**GORDON MURRAY TILDEN** LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 606

alleged interference with a criminal investigation. Thus, plaintiff's claims do not seek recovery for injuries "suffered as a result of childhood sexual abuse," and thus fall outside RCW 4.16.340.

Interpreting the statute, the Washington Supreme Court stated that "an action is 'based on intentional conduct' if intentional sexual abuse is the starting point or foundation of the claim." *C.J.C. v. Corporation of the Catholic Bishop of Yakima*, 138 Wn.2d 709, 985 P.2d 262 (1999). The Court stated that "the alleged sexual abuse is essentially an element of plaintiff's negligence claims." *Id.* The court in *C.J.C.* employed this analysis to find that a claim alleging the negligent failure to *prevent* the intentional sexual abuse was covered by the special statute of limitations.

Unlike *C.J.C.*, where the negligence claim required proof that the sexual abuse itself had occurred, the sexual abuse here is merely a background fact to the claims against Mr. Conger. Plaintiff's claims against Mr. Conger do not depend on proof that the sexual abuse happened; in fact, they do not even require proof that plaintiff was reporting a *sexual* assault. The evidence required to prove the outrage claim (i.e., the alleged attempt to pressure plaintiff not to cooperate with prosecutors) would be the same if Rinde had been the victim of some violence other than sexual assault. Hence, the sexual abuse is not "element" of plaintiff's claims, and the damages allegedly caused by Mr. Conger were not the "result of childhood sexual abuse."

## C.    If Not Barred by the Statute of Limitations, the Outrage Claim Fails as a Matter of Law.

If plaintiff attempts to bring the outrage claim within the sexual abuse statute of limitations, thereby arguing his claim against Mr. Conger seeks "recovery of damages for injuries suffered as a result of childhood sexual abuse," his outrage claim fails as a matter of law.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 10
No. 06-2-09825-1 SEA

**GORDON MURRAY TILDEN LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 607

Assuming *arguendo* the emotional distress damages sought by plaintiff's outrage claim were "the *result* of sexual abuse," then they are recoverable on the primary negligence claim—that COP failed to prevent the sexual abuse. The outrage claim would fail because allowing the claim to go to the jury would improperly permit double recovery for the same emotional distress. "Outrage should allow recovery only in the absence of other tort remedies." *Rice v. Janovich*, 109 Wn.2d 48, 62, 742 P.2d 1230 (1987). In *Rice*, the Supreme Court held that the trial court had erred by instructing on both assault and outrage.

**D.    Plaintiff's Negligence Claim Fails as a Matter of Law.**

"A party's characterization of the theory of recovery is not binding on the Court. It is the nature of the claim that controls." *Pepper v. J.J. Welcome Construction Company*, 73 Wn. App. 523, 546-47, 871 P.2d 601 (1994). To the extent plaintiff's negligence cause of action alleges that Mr. Conger coerced plaintiff not to cooperate with the prosecutor and refused to allow the prosecutor to interview plaintiff privately, plaintiff alleges an intentional tort, not negligence. Just as a "negligence claim presented in the garb of nuisance need not be considered apart from negligence claim," *id.*, plaintiff presents an outrage claim in the garb of negligence and it need not be considered independent of the outrage claim.

To the extent plaintiff claims that Mr. Conger had a "duty to assist" plaintiff which he allegedly breached by "failing to obtain psychiatric, psychological and/or medical help" for plaintiff, the theory fails for absence of duty. Neighbors, friends and co-workers do not assume a duty to ensure a person's future medical care merely by befriending him. The notion of such a duty would erode civility and compassion, and violate public policy as expressed in "Good Samaritan" statutes. *See*, RCW 4.24.300 (providing immunity from liability for voluntary providers of medical services at the scene of an emergency).

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 11
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Plaintiff attempts to plead around the absence of duty by alleging a "special relationship" between Mr. Conger and plaintiff. Even if there were a "special relationship"—and there was none—this concept has no relevance here because the special relationship doctrine provides that "a duty may arise to protect others from third party *criminal conduct* if a special relationship exists between the defendant, the third party or the third party's victim." *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 200, 943 P.2d 286 (1997) (emphasis added). The "special relationship" creates an exception from the general rule at common law, which was that "a private person does not have a duty to protect others from the criminal acts of third parties." *Id.* at 199.

In any event, no "special relationship" existed that would give rise to any duty. No case has ever found a "special relationship" merely because of acts of friendship or compassion. Much more has been required. *See, e.g., Nivens* (special relationship exists between business and business invitee); *Niece v. Elmview Group Home*, 131 Wn.2d 39, 929 P.2d 420 (1997) (special relationship exists between a private group home and a developmentally disabled resident of group home).

**E.    The Civil Conspiracy Claim Fails Because COP Cannot Conspire with its Agents.**

Plaintiff alleges a conspiracy between COP and Mr. Conger. Proposed Complaint, ¶ 12.2. However, plaintiff also alleges that Mr. Conger was "at all relevant times, its agent." *Id.* ¶ 2.3. "According to the intracorporate conspiracy doctrine, a corporation cannot conspire with itself through its agents when the acts of the agents are within the scope of their employment." *Larson by Larson v. Miller*, 76 F.3d 1446, 1456 (8th Cir. 1996).

## V.    CONCLUSION

For the reasons stated above, COP respectfully request that this Court deny plaintiff's motion to amend the complaint to add claims against Gordon Conger.

OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
COMPLAINT - 12
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page    609

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

DATED this /sᴛ day of March, 2007.

                           GORDON MURRAY TILDEN LLP

                    By _____
                       Charles C. Gordon, WSBA #1773
                       Jeffrey I. Tilden, WSBA #12219
                       Michael Rosenberger, WSBA #17730
                       Attorneys for Defendants
                    The Corporation of the President of the Church
                    of Jesus Christ of Latter-day Saints

OPPOSITION BY CORPORATION OF THE PRESIDENT OF          GORDON MURRAY TILDEN LLP
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'         1001 Fourth Avenue, Suite 4000
OPPOSITION TO PLAINTIFF'S MOTION TO AMEND                 Seattle, WA  98154-1007
COMPLAINT - 13                                          Phone (206) 467-6477
No. 06-2-09825-1 SEA                                      Fax (206) 467-6292

Exhibit ___ Page 610



FILED

2007 MAR -1  PM 12: 57

COUNTY
COURT CLERK
SEATTLE, WA.



The Honorable William L. Downing

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

ROB RINDE f/k/a ROBERT LARRY LEROY
PITSOR, JR.,

                Plaintiff,

    v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole, and the "MORMON CHURCH" THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS, an unincorporated association,

                Defendant.

NO.  06-2-09825-1 SEA

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 1, 2007, copies of the following

document:

    1.  OPPOSITION BY CORPORATION OF THE PRESIDENT OF THE
        CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TO
        PLAINTIFF'S MOTION TO AMEND COMPLAINT;
    2.  DECLARATION OF MICHAEL ROSENBERGER; and
    3.  this CERTIFICATE OF SERVICE

were served at the following addresses via the methods indicated:

CERTIFICATE OF SERVICE - 1

ORIGINAL

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit___ Page 61

1  Michael T. Pfau
2  Michelle A. Menely
3  Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim LLP
4  600 University, Suite 2100
5  Seattle, WA 98101-4185
6  Co-Counsel for Plaintiff Rob Rinde
7  () Mail       ( XX ) Hand Delivery          () Via e-mail
8  ( ) Fax       ( ) Federal Express
9
10  Timothy D. Kosnoff
11  Law Offices of Timothy D. Kosnoff
12  One Union Square
13  600 University Street, Suite 2101
14  Seattle, WA 98101
15  Co-Counsel for Plaintiff Rob Rinde
16  () Mail       ( XX ) Hand Delivery          () Via e-mail
17  ( ) Fax       ( ) Federal Express
18
19
20  DATED this 1st day of March, 2007.
21
22
23  _Jacqueline Lucien_
24  Jacqueline Lucien
25

CERTIFICATE OF SERVICE - 2

**GORDON MURRAY TILDEN LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

FILED

RECEIVED

The Honorable William L. Downing

2007 MAR -1 PM 12: 57

KING COUNTY SUPERIOR COURT
SUPERIOR COURT CLERK SEATTLE
SEATTLE, WA.

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| ROB RINDE f/k/a ROBERT LARRY LEROY PITSOR, JR., | NO.  06-2-09825-1 SEA |
| Plaintiff, | DECLARATION OF MICHAEL ROSENBERGER IN SUPPORT OF OPPOSITION BY CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TO PLAINTIFF'S MOTION TO AMEND COMPLAINT |
| v. | |
| THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole; and the "MORMON CHURCH" THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, an unincorporated association, | |
| Defendants. | |

Michael Rosenberger, being duly sworn on oath, deposes and says:

1.    I am one of the attorneys representing Defendant COP in this matter.  I make this declaration based upon personal knowledge.

2.    Attached as Exhibit 1 is a true and accurate copy of a Psychological Evaluation dated November 10, 2005, authored by Francis J. Manley, Ph.D., that was produced by plaintiff in this matter.

---

DECLARATION OF MICHAEL ROSENBERGER IN SUPPORT
OF OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
TO PLAINTIFF'S MOTION TO AMEND COMPLAINT - 1
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

ORIGINAL

Exhibit ___ Page 613

3.    Attached as Exhibit 2 is a true and accurate copy of excerpts from the chart notes of Jan Nix, Ph.D., produced by plaintiff in this matter.

4.    Attached as Exhibit 3 is a true and accurate copy of an Initial Psychiatric Consultation dated January 15, 2003, authored by Allison M. Meisner M.D., produced by plaintiff in this matter.

5.    Attached as Exhibit 4 is a true and accurate excerpt of notes from the file of one of plaintiff's treating therapists, Marilyn J. Tisserand, M.A., produced by plaintiff in this matter.

6.    Attached as Exhibit 5 is a true and accurate copy of an Admission Summary from River Oaks Hospital, dated April 14, 2005, produced by plaintiff in this matter.

7.    Attached as Exhibit 6 are true and accurate copies of treatment notes of Jan Nix Ph.D., produced by plaintiff in this matter.

8.    Attached as Exhibit 7 is a true and accurate copy of a Neuropsychological Evaluation dated January 14, 2003 by Maureen J. Winger, Ph.D., produced by plaintiff in this matter.

9.    Attached as Exhibit 8 is a true and accurate copy of an Intake/Diagnostic Assessment, dated March 31, 2003 by Nancy Kiger, Ph.D., produced by plaintiff in this matter.

10.    Attached as Exhibit 9 is a true and accurate copy of an email authored by plaintiff dated June 11, 2003, produced by plaintiff in this matter.

11.    Attached as Exhibit 10 is a true and accurate copy of excerpts from plaintiff's interrogatory responses.

12.    Attached are true and accurate copies of excerpts from the deposition of Gordon Conger, dated February 15, 2007.

---

DECLARATION OF MICHAEL ROSENBERGER IN SUPPORT
OF OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
TO PLAINTIFF'S MOTION TO AMEND COMPLAINT - 2
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit ___ Page 614

1
2
3      I declare under the laws of the State of Washington and of the United States that the
4
5  foregoing is true and correct.
6
7      DATED this 1st day of March, 2007.
8
9
10
11
12                                          Michael Rosenberger
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

DECLARATION OF MICHAEL ROSENBERGER IN SUPPORT
OF OPPOSITION BY CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
TO PLAINTIFF'S MOTION TO AMEND COMPLAINT - 3
No. 06-2-09825-1 SEA

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Phone (206) 467-6477
Fax (206) 467-6292

Exhibit    Page 615

EXHIBIT 1



**PSYCHIATRIC HOSPITAL**
5121 Raytown Road  ·  Kansas City, Missouri 64133  ·  (816) 356-5688

PSYCHOLOGICAL EVALUATION

PATIENT NAME:             RENDE, ROB
MEDICAL RECORD NUMBER:   02-78-66
DATE OF ADMISSION:        11/07/05
ATTENDING PHYSICIAN:     KENNETH A. SPAULDING, M.D.

CONSULTANT:               FRANCIS J. MANLEY, PH.D.
DATE OF EVALUATION:       11/10/05

<u>INSTRUMENTS USED IN THE EVALUATION:</u>  The Millon Clinical Multiaxial Inventory III, The Rorschach Inkblots, the Thematic Apperception Test, the House-Tree-Person, the Kinetic Family Drawing, the Bender-Gestalt, the Shipley-Hartford, the Dissociative Experience Scale, and the Structured Clinical Interview for Dissociative Disorders (SCID-D).

<u>INTERVIEW AND TEST BEHAVIOR:</u>  During the evaluation, Rob seemed somewhat detached and watchful. He had an unamused smile throughout much of the evaluation. However, he seemed to be fairly open and he was very cooperative. His concentration was good and there was no evidence of any psychotic thinking.

<u>BACKGROUND INFORMATION:</u>  Rob has been hospitalized one time before for psychiatric reasons. He has made two suicide attempts in the past. He has frequently had suicidal ideation. Apparently, he was a premature birth, born 4-1/2 months early.

He came into the hospital due to the fact that he was having increasingly unmanaged symptoms of dissociative identity disorder. He was also having difficulty controlling his flashback memories. While he was in therapy, he discovered that there was one part of him that wanted to die and is quite serious about this.

Rob has been married and has three children, a son age 13, a son 11, and a daughter 9. He was married for 8 years and he states that his wife left him for "someone better." He is currently engaged to be married to a woman whom he has known for 7 years. She is a lesbian and has formed quite an attachment to his children. He considers himself gay but feels that getting married would make things easier for the family, given the social climate they are living in.

He gets support from his fiancee, Kate, and also from his therapist. His hobby is genealogy, and he has traced his family back 20 generations. In the past, he worked for the State of Washington in various capacities and he has owned a bookstore in the past.

He denies drug and alcohol problems. He has been seeing his most recent outpatient therapist for about 2 months. He states that he is in the process of developing trust with her.

PSYCHOLOGICAL EVALUATION

FORM #: TR3B

RR 1205



P S Y C H I A T R I C   H O S P I T A L
5121 Raytown Road  •  Kansas City, Missouri 64133  •  (816) 356-5688

RENDE, ROB
Page 2

He was raped by a boyfriend 12 years ago. His father and his sister sexually abused him when he was a child. His father also engaged in verbal abuse and physical abuse. He was also abused by people higher up in the Mormon Church to which he belonged.

He is the third child of three children born to his parents. An older sister of his was murdered and a brother was stillborn. His mother was depressed and has made suicide attempts. She is emotionally needy and is addicted to food. She weighs 600 pounds. His father is a plastics engineer. He is described as alcoholic and sadistic. Much of the sexual abuse was done at his hands.

Rob acknowledges a great deal of amnesia. There are large parts of his childhood that he cannot remember. He has significant problems with short-term memory presently. He has frequent periods of time loss. His memory is so faulty that he is unable to report how long his time loss periods are. He denies psychogenic fugue. He has found things in his possession, such as food and clothes, that he ordinarily would not buy.

He sometimes experiences symptoms of depersonalization, which include watching himself from a distance. He often feels detached from himself. When he looks in the mirror, he sees "many different people." They seem to resemble all of his different personality parts.

He denies derealization. He states that he has difficulty remembering people who would ordinarily be familiar to him.

He feels that there is an intense struggle inside of him to block the negative memories from childhood. He also has conversations with different personality parts. He is quite confused about who he actually is. He sometimes acts like a child when a child part of him is in control of his behavior. Several of his parts are in control of his behavior. He feels that he is coconscious when 2 of these perhaps 14 parts are in charge of his behavior. Much of the time, he is not aware when parts of him take over. Ordinarily, he does not understand the voices that he hears inside of him from the different personality parts. He feels that it is chaotic inside of him and he mainly hears a great deal of noise.

He stated that he was not aware of having mood changes but he stated that he has been told that his mood changes dramatically. He does acknowledge some racing thoughts. He has flashback memories daily. These are intense and extremely disruptive for him. He is struggling to keep these memories at bay. He has nightmares every night.

Based on his responses to the SCID-D, Rob does seem to be suffering from dissociative identity disorder. His score of 47 on the Dissociative Experience Scale is basically consistent with this finding.

PSYCHOLOGICAL EVALUATION

FORM #: TR3B



**P S Y C H I A T R I C   H O S P I T A L**
5121 Raytown Road  ·  Kansas City, Missouri 64133  ·  (816) 356-5688

RENDE, ROB
Page 3

RESULTS OF OBJECTIVE TESTING:  His responses to the Millon Inventory suggest that he is suffering from symptoms of major depression.  However, more often, he is experiencing overwhelming anxiety.  His symptoms of anxiety along with it make it very difficult for him to function.  He has marked symptoms of posttraumatic stress disorder.  When he is not experiencing a major depression, he has symptoms of dysthymia.

PERSONALITY STYLE:  His personality pattern scales suggest that he is very avoidant and he has features of schizoid and dependent personality disorders.  He also has self-defeating personality features.  There is no indication that he is suffering from borderline personality disorder.

His overall profile suggests that he presents as socially awkward, withdrawn, introverted, and self-conscious.  Because people such as Rob are hypersensitive to rejection and fear negative evaluations, they either try to maintain a good social appearance despite their underlying fear or they withdraw from social contacts.  Tension, anxiety, and anger may be present, all stemming from the same issue, a desire for social acceptance and a fear of rejection.  Most often, they maintain a social distance in order to avoid any further experience of being rejected.  They are devastated by perceived signs of disapproval and tend to withdraw, thus reducing the chance to enhance relationships.  This circumstance results in social isolation despite a very strong need for social relatedness.  People like him can put on a pleasant appearance and mask their underlying social anxiety, but they have a pervasive belief that others will be disparaging of them.  Their essential conflict is a strong desire to relate but an equally strong expectation of disapproval and depreciation and rejection.  This conflict results in keeping others at a distance but also in loneliness, isolation, and continued shyness and timidity.  People with this profile are at risk for social phobias.

Rob also shows markedly dependent features.  In all likelihood, he experiences an intense conflict between a fear of independence and a desire to withdraw from interpersonal relationships.  This dependent/autonomy conflict is enhanced by a belief that reliance on others will bring disappointment and possible rejection but independent action will result in failure, shame, and ridicule.  This conflict requires the patient to suppress any anger or resentment that may be felt in order to maintain relationships with those who can satisfy their basic needs.  Patients who score at this level may be described as passive, docile, serene, quiet, compliant, obliging, and submissive.

Rob, at times, may appear apathetic, dull, quiet, colorless, vague, aloof, and introverted.  People such as this may seem lost in their surroundings, blending into the background or engaging in vague pursuits.  They show limited enthusiasm for most activities, preferring a solitary life, rarely initiating conversation.  They seem indifferent to social relationships and do not seek social contact.  They seem to have a low need for social involvement.  They require little affection and lack both warmth and emotional expression.  They manifest an emotionally bland appearance, with a flattened affect, combined with a lack of sensitivity to their own feelings and those of others.  They lack an outward

PSYCHOLOGICAL EVALUATION

FORM #: TR3B

Exhibit____  Page 619



P S Y C H I A T R I C    H O S P I T A L
5121 Raytown Road  ·  Kansas City, Missouri 64133  ·  (816) 356-5688

RENDE, ROB
Page 4

expression of aggression. They are often asexual, perhaps as a result of their relationship deficits. They are quite content to be passive, detached, and distant in their relationships and have few friends, preferring the life of a loner. The detachment is not a defense mechanism. They are comfortable this way and prefer it, at least at the conscious level. Underneath this detachment lies a rich fantasy life and excessive daydreaming. Intrapsychically, they are in a chronic dilemma because they cannot be in a relationship without fearing engulfment, nor can they be without a relationship without feeling intense aloneness. If Rob was in a relationship, problems are likely to arise, with spousal complaints of lack of involvement or intimacy. Others may see people like Rob as strange and "spacey." Relationship deficits are likely to be serious. Rob is likely to have low self-esteem, but more often, he may have difficulty expressing how he feels about himself. His thinking may be obscured at times, with cognitive slippage occasionally manifested in speech. His thoughts are vague and unfocused. Depersonalization and feelings of emptiness and identity diffusion are also part of his personality structure. People with this profile tend to drift through the marginal aspects of society. When social demands become inescapable, they are prone to anxiety and somatoform disorders and brief reactive psychoses.

Rob does not have all the characteristics that define a schizoid personality disorder, but the presence of schizoid traits is strongly indicated.

He also tends to relate in a self-sacrificing, martyr-like manner, allowing others to take advantage of him. People with this pattern seem to search for relationships in which they can lean on others for security and affection. Typically, they act in an unassuming manner, denigrating themselves into believing that they deserve what they get. Thus, this pattern is repeated in most relationships, and therefore, they are prone to be abused.

COGNITIVE FUNCTIONING: Rob's performance on the Shipley scale earned him an estimated IQ in the bright-average range of intelligence when compared to others in the general population. His abstract reasoning score was lower than his vocabulary, suggesting that he has had a recent decline in cognitive functioning, perhaps due to his anxiety. He has intellectual potentials in the superior range. His performance on the Bender-Gestalt is within normal limits and suggests good eye-hand coordination and no signs of organic brain dysfunction.

RESULTS OF PROJECTIVE TESTING:  His projective house drawing suggests that he is very withdrawn. He has a very low self-esteem and he has difficulty socializing and may not have much of a support system. His tree drawing suggests that he feels fragile and he cannot tolerate a great deal of stress coming from the environment or coming from internal sources. There are indications that he is quite depressed. He is fairly realistic but may, at times, use fantasy as a defense. He seems somewhat resistant to allowing feelings or other associations to emerge in response to the drawings. The drawings suggest that he is fairly well grounded but tends to be withdrawn from relationships.

PSYCHOLOGICAL EVALUATION

FORM #: TR3B



P S Y C H I A T R I C    H O S P I T A L
5121 Raytown Road  ·  Kansas City, Missouri 64133  ·  (816) 356-5688

RENDE, ROB
Page 5

His affect is likely to be flat. His Kinetic Family Drawing depicts he and his fiancee and his son who lives with him on an outing in which they are engaged in a treasure hunt. He indicates that he and his son enjoy this activity immensely. He seems to enjoy his relationship with his son and with his fiancee.

His responses to the Rorschach Inkblots suggest that for the most part he has good reality testing. He seems to be experiencing a great deal of subjective distress, even though he may not be able to express it very openly. In one blot, he perceived "someone screaming, with their mouth wide open and their eyes wide." He tends to deal with intense feelings by repressing them and by trying to focus on details in reality. He seems to be somewhat observant, but his defenses may be quite rigid. His reality testing seems to be good. He seems to be shutting down the imaginal side of his life in order to avoid the influx of traumatic imagery.

His responses to the Thematic Apperception Test suggest that he is quite apathetic. His motto seems to be "nothing satisfies." He does seem to have a strong desire to avoid being controlled by others. He admires people in authority but is afraid of the possible powers that they might have over him. He wants to be liked by authority figures but is pessimistic about this ever happening. He avoids anxiety related to interpersonal relationships by remaining detached and staying in the role of the observer. In all likelihood, this could be apparent in group therapy. He seemed very resistant to opening up psychologically. His stories tended to be very matter-of-fact and are not very well developed. He required quite a lot of encouragement. This suggests that he is defending against the imaginal side of his life in order to stay away from feelings that might overwhelm his ego. He does have a strong wish for a relationship, however, he is afraid of being rejected. In particular, he wants companionship when examining the damage that was done to him by early life trauma. It would be very difficult for him to do this alone. This may be why he stays away from dealing with psychological issues, because he feels that he could become immediately overwhelmed. However, it is difficult for him to feel that he can trust others not to reject him.

DIAGNOSTIC IMPRESSIONS:
AXIS I:      Major depression, severe and recurrent, with suicidal ideation.
             Rule out panic disorder.
             Dissociative identity disorder.
             Posttraumatic stress disorder.
AXIS II:     Avoidant personality disorder.

SUMMARY AND CONCLUSIONS: It is clear that ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Therefore, he stays quite withdrawn from others in spite of the fact that a relationship is really important to him. It is apparent that his relationships with his son and his fiancee are very supportive and very important to him. He seems to be able to give and receive in relationships, provided he has

PSYCHOLOGICAL EVALUATION

FORM #: TR3B

RR 1209



P S Y C H I A T R I C   H O S P I T A L
5121 Raytown Road  •  Kansas City, Missouri 64133  •  (816) 356-5688

RENDE, ROB
Page 6

some assurance that he is not going to be rejected. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In many ways, he seems quite stable. His reality testing is good, and he seems to be able to ground himself fairly well. However, deep down, his ability to withstand stress emerging from either outer events or the emergence of traumatic memories seems to be somewhat limited. As a result, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ because he is afraid that he will become overwhelmed by them. There is a sense in which he has not developed very much ego strength or self-confidence, and his fear that he might be overwhelmed by these experiences seems quite realistic. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ His hobby of genealogy probably is quite helpful with this. It allows him to use his intellect and also perhaps become aware of people in his family who had positive qualities that he has in common with them. His self-confidence may, to some degree, be weakened by the fact that he has difficulty walking due to arthritis. It may be difficult for him to feel confident in himself physically. However, he is quite bright. He may not be aware of this because his anxiety and depression seem to be interfering with his ability to use his intellect. With these two important areas of ego-strengthening removed from him, he may have difficulty feeling that he can deal with any challenge at all. His intellectual strengths are quite real, and the fact that he can form relationships with others despite anxiety is also a remarkable strength, considering his early life experience. He is someone who has some real possibility in terms of recovering from the trauma that has occurred in his life. However, his personality resources, at present, are limited, and he may have to deal with the trauma very gradually. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He does not seem to be in danger of becoming psychotic but he certainly can become acutely anxious and may have a panic episode. He very much needs to learn trauma stabilization techniques. He also may need to reflect on the strengths that he does have as a person and stay aware of these.

ASSETS:
1.    Is intelligence.
2.    Is able to form significant relationships with others.
3.    Has held responsible jobs in the past.
4.    Is motivated for treatment.

FRANCIS J. MANLEY, PH.D.
CLINICAL PSYCHOLOGIST

FJM:IMT11
D: 11/11/05
T: 11/13/05

PSYCHOLOGICAL EVALUATION

FORM #: TR3B

RR 1210

EXHIBIT 2

②
7-10-96

→ Kimmie did sexual things ē him
from the time he was 2 (she was
15 yrs.)

→ he hated Dad when he (Dad) left -- relieved
@ end.) by (step) ; tr (violence
(Dad was (mostly) verbally abusive
-- stomped mom's hands 2x's
-- broke every dish in house
-- he "kicked the shit out of
me" ē steel toed boots
(in for kicking another kid)
-- never ted by physician
(he had tumors removed from leg
that grew from scar from ones --
concern that they might be
(cancerous)

... stress overload from sister's death,
Creuer scare )

---→ 1st he revealed to "Mike"
-- slow regression -- he was there
2 weeks or so -- Mom realized
what happened & she'd yell
5 o'clock that he wasn't
being himself

Vorley
appearance
when Kimmie
died.

After
Kimmie's
death

---→ 1st P---- ) Det. came on Dec.
18th . he began cleaning house w--
stop

RR 0431

EXHIBIT 3

Exhibit___ Page_ 625



**MENTAL HEALTH UNIT**
OF
**DOUGLAS COUNTY HOSPITAL**
ALEXANDRIA, MN 56308

| | |
|---|---|
| NAME: | RINDE, ROBERT |
| AGE: | 33 |
| DATE: | JANUARY 15, 2003 |
| STAFF: | A. MEISNER, M.D. |

### INITIAL PSYCHIATRIC CONSULTATION

Patient seen for 65 minutes 90801. The patient is a 33 year old, divorced, white, male, living with a friend, unemployed, referred by Dr. Winger for urgent evaluation. Chief complaint: "I don't know."

### HISTORY OF PRESENT ILLNESS:

Mr. Rinde is a 33 year old, divorced, white, man, with a history of trauma, PTSD, and mood disorder, who presents for emergent evaluation per Dr. Winger. The patient saw her yesterday at the recommendation of a neurologist and voiced that he was having sleep problems. The patient reports that there may be two components to his sleep problems, one being depression and the other being PTSD and a desire to not sleep secondary to an increase in nightmares. The patient reports that his functioning really decreased about a month ago. He reports increased frequency of flashbacks and nightmares of past abuse. The patient reports that he has been feeling scared, he has been avoiding going out with both an anxiety component as well as decreased motivation (depression). He reports he is avoiding television for fear of witnessing any violence and increasing PTSD related to that. He denies any startle reflex but reports significant sleep problems, estrangement and irritability. He has an expectation that people will leave him and that if they get to know him they won't like him, though he does report he can be a very good chamaeleon. He reports he has been having PTSD off and on but was rather controlled until recently. He has had EMDR in the past. He reports that also one month ago he has had an increase in depressive symptoms. He reports low energy, motivation, appetite and poor sleep (though sleep may be related to the PTSD or both). The patient reports passive suicidal ideation, no impulse, intent or plan secondary to his children. He does report auditory hallucinations just once or twice the other day. He reports hearing a male voice coming from somewhere in his bedroom, that said "the room is quiet." The patient denies any type of reaction to this. He denies fearfulness, anxiety. He reports he is "curious." The patient reports he has had visual illusions, seeing some shadows and looking again and they'll be gone. He does feel they are animal shadows. He reports his mood is depressed. On review of systems, it was asked whether the patient has had episodes where for weeks at a time he felt a sudden burst in energy; decreased need for sleep, racing thoughts, increased speech, increased impulsivity including spending, as well as increased productivity. The patient reported affirmative. The patient denies he has had any consequences from these episodes including financial, relationship, physical, legal. He reports he has had many of these episodes. They have lasted for weeks at a time. He denies any drug or medication induction to these. The patient's female friend who accompanies him to this appointment reports she has not seen this and she has known him for approximately five years. The patient, however, reports that this does fit him quite well and during these times he would be cleaning his house from top to bottom multiple times, talking on the phone constantly as some other descriptors.

The patient reports he has seen psychiatrists in the past. He has been prescribed Prozac, Serzone, Zoloft, Paxil, and Depakote (for migraines). He has been hospitalized one time for 24 hours secondary to threats of suicide and plan for suicide by overdose. He was called by instant messaging via Internet by a crisis counselor who sent police secondary to the patient's relation to the counselor via computer about his suicidal plan via overdose. He was hospitalized in Olympia, Washington for one day. This was in October 1998. The patient also reports a couple other suicide attempts around age 13 where he cut his wrists several times, as well as overdosed. No one knew of these attempts. The patient denies trials of Celexa, Lexapro, Wellbutrin, Remeron, Lithium or Neurontin. The patient smokes one to two packs of cigarettes per day. He reports that as a teenager he had problems with alcohol, drinking in the morning but reports since he has been 18 he has one to two drinks per week. He has never been in CD treatment. He used marijuana last 3-4 years ago. Does not feel he ever had a problem with this. The patient is drinking 4 to 10 pots of coffee

REPORT OF CONSULTATION

RR 0676

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

RINDE, ROBERT
PAGE TWO

per day in the past week and in his need to try to not sleep. Previous to that he was drinking two cups per day. Patient denies he is in current psychotherapy. Reports he has been in therapy in the past and has been helpful.

**PAST MEDICAL HISTORY:**
The patient's PMD is Dr. Bosl. He reports history of hypertension and is currently off his anti hypertensive secondary to side effects. He also has had migraines. He has a surgery including a couple of benign fatty tumors on his leg and arm, as well as some intestinal surgery which he cannot recall what it was for but reports there is no problem secondary to this. He denies history of head injury, seizure, loss of consciousness, eating disorder. He does have chronic pain as far as migraines go. He has been evaluated by neurology which is the round about way he had this referral. He has some acute nutritional concerns but denies any chronicity to these. The patient is homosexual and reports that in years past he had HIV positive partner. He reports always having used safe sex and denies any concern regarding HIV, Hepatitis or Syphilis. He reports his libido is currently low. The patient reports he has had testing appropriate such that he does not need any current testing now. The patient also reports he has had an MRI of the brain recently with the neurology referral and is reportedly normal. He has also had an EEG x 1 which was reportedly normal. Before his move to Minnesota, he was asked to do a three day EEG - ?? Video but the patient moved prior to completing this.

The patient is on no medications. No herbal medications. Compliance issues - patient "doesn't care." Allergies to Codeine, Keflex, and the Penicillin family.

**FAMILY HISTORY:**
The patient has no full sisters. He had one full brother who was a still birth. He has three half-sisters. Maternal half sister Kim with Bipolar and history of hospitalizations. Maternal sister Kari recently diagnosed with Lupus. Paternal half sister, Tina, who is on something for depression and recently divorced. The patient's biologic father described as a severe alcoholic but no other psychiatric disorder, died of alcoholism at 56. The patient's biologic mother is on psychiatric medication for Bipolar and also has a lot of medical problems. The patient reports chronic suicide attempts when he was growing up. He does not think she was ever hospitalized. He does feel she has tried to overdose on Potassium given her poor renal function. The patient's maternal grandmother was hospitalized frequently and has had shock therapy. The patient has three adopted brothers. The patient is unaware of any other psychiatric, medical or CD history in the family.

**SOCIAL HISTORY:**
The patient grew up in Washington. He reports moving at least once a year secondary to his mother being described as a "nomad." Father moved along with the mother. The patient reports his parents have been divorced and remarried many, many times to each other. From ages 0 to 1976 he lived with Kim, his sister, and his biologic parents. In 1976 his mother adopted three boys so he lived with them also. Education is high school plus two years college studying DD. Current living situation with female friend and 10 year old son. The patient was married one time for eight years, has daughter 7 and son 8, who live with their mother in Washington. The patient's income source is nothing currently. His friend, Kate, who he lives with is funding him. He is not working. He does own a book store but it has been closed secondary to his inability to work. Kate is his main support system. He denies any legal problems. No military history. Grew up Mormon. Positive history of neglect, physical abuse by father and sexually abused by father and Kim, his sister, from ages 5 on. He reports he was also raped by someone, a scout master, in his church at age 13, as well as last September by a boyfriend, Chris. At this point the patient reports that probably the combination of the rape in September as well as that last January his mother told him she turned him in for abuse and that he would go to jail. The patient reports as it all came out, that the authorities did not believe her and she wanted to go to a nursing home without having to tell her son, so she made up these charges. The patient reports an element of betray as he was trying to push her to get exercise and improve her physical condition so she would not have to go to the nursing home and to his face she agreed that this was

REPORT OF CONSULTATION          CONTINUED

RR 0677

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

RINDE, ROBERT
PAGE THREE

her wish. With respect to patient's past working, he currently is not work as stated previously, then he worked for a temp agency filing claims for Workers' Comp for a couple of months, previous to that he worked for three months selling insurance, prior to that he worked for the State of Washington for about 10 years.

The patient is alert, oriented x 3. No fluctuations in consciousness. He appears his stated age, adequate hygiene, grooming, eye contact. Attitude somewhat sharp.

Psychomotor behavior decreased. Gait within normal limits. Speech spontaneous, normal amount, rate, fluency and tone. Was notable for always looking toward his friend to answer the questions, though I did not feel that though when pushing when to answering them, he was certainly able to answer them himself. Mood depressed. Affect congruent, as well as irritable. Thought process organized, though as before would always look for his friend to answer the question. Thought content for passive suicidal wish, no impulse, intent or plan. No homicidal ideation. Possible auditory hallucinations recently. Positive visual illusions, no other delusions. Patient is aware of current month, year, and day but was one off as far as the date. He was able to spell world backward. Impulse control poor. Insight poor. Judgment fair. Reliability as a historian fair. Strengths include supportive friend. Ownership in a business.

PROVISIONAL DIAGNOSIS:

AXIS I:     296.89 Bipolar II Disorder
            309.81 PTSD
AXIS II:    Deferred
AXIS III:   Hypertension, migraines
AXIS IV:    Severe, financial, employment, depression, trauma
AXIS V:     50; best in past year: 60

FUNCTIONAL ASSESSMENT:

The patient's symptoms have affected financial, employment, relationship and family.

ASSESSMENT:

Mr. Rinde is a 33 year old, divorced, while, man who presents with major depression with Bipolar II history as well as significant PTSD.

PLAN:

1.    Refer patient to psychotherapy. Patient reports needing to have a female therapist secondary to his past abuse. He has had therapy in the past, felt it was helpful. Patient has seen Dr. Maureen Winger for emergent evaluation and does feel comfortable with her. Referral was made.
2.    With respect to the patient's depressive symptoms, as well as history of Bipolar II hypomania on many occasions, will ask patient to get basic chemistry to evaluate renal function and then start Lithium. Patient and his friend were both educated as to the risk of Lithium as well as benefits including mood stabilization, toxicity, death, renal, thyroid, dehydration, tremor and many drug interactions. The patient will call with a new antihypertensive. He is on to monitor any interaction. He will call with any new medicines. The patient was also counseled and will monitor his hydration as this seems to have been a problem in the past.
3.    Return to clinic in two weeks for reevaluation.
4.    Emergency indications and access were discussed with the patient.
5.    When labs return, will call patient's meds if possible to Lithium if not contraindicated to Samuelson

REPORT OF CONSULTATION            CONTINUED

RR 0678

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

RINDE, ROBERT
PAGE FOUR

in Starbuck, 239-3875.

6. Will try to get a hold of his neurologic evaluation as well as MRI and organic work up.
7. Send communication to PMD.
8. Monitor nutrition acute changes
9. Treatment goal: mood stabilization and decrease in anxiety with respect to PTSD
10. Discharge criteria: patient has SPMI and will likely necessitate lifelong treatment with psychiatrist
11. Check blood pressure today as patient has gone off antihypertensive. Patient agrees to follow up tomorrow with PCP for this.

AMM:at          $BP$ $126/82$ T-Porwall          Allison M. Meisner, M.D.
D:    1/15/03                                                    1·21·03
T:    1/20/03                                                    TPIC

CC:    -0-

REPORT OF CONSULTATION                    CONTINUED

RR 0679

EXHIBIT 4

Thursday 5/29/03

Aversion therapy - around 1983
I was babysitting and we all were running around naked. The kids told their
mom. She got upset thinking there was more to it that that, and her
boyfriend came to my house and beat the shit out of me. My mom let him in,
he told her who he was and why he was there. She said to him "here he is,
have at him." An hour or so later, when he was done and left she beat me
again. The next day we went to a picnic at Samamish State Park and acted
like nothing had happened. I think it was summer and there was no school.
Their mom was the Bishop's daughter or something so she had the church get
involved. I went to see Bishop Johanesson and he asked what happened. I
told him exactly what went on and he said he did not believe me. I knew
something was going on but was not sure what and it did not feel right...felt
like shit but did not know why. He talked with my mom and I got sent to
therapy.

R. Kline in Seattle for aversion therapy which consisted of: Making you
think about sex and puke. Making you talk about sex and how bad and dirty it
was, how terrible you are, and associating the whole thing with puking in the
toilet with shit and every bad thing you could imagine and having rats crawl
all over, forcing yourself to throw up. He did this in weekly appointments
for a year or two, and in between appointments he made you talk yourself
through it at home and tape record it. Then bring the tape to the next
session so he could listen to it. He did this even though he was told
nothing sexual happened because he said he did not believe it. At some point
this therapist was sued because of his treatment of patients, but Rob is
unsure of the content of the lawsuits or the outcome. He does not know if he
lost his practice or not, but was unable to obtain any records of his from
that time. This therapist was a member of the church and was hired by the
church, so it is possible the church was aware of his practices and condoned
them. It may be possible that some of the churches records has more
infomation that we have at this time.

Rob's mom allowed all of this to go on and tells him she did not know what
was happening.. Yet, she told her friends all about him having been beaten by
the woman's boyfriend, and why, and that he had to go to therapy for it. He
heard her telling people. To his knowledge, he is the only one who had to go
to this kind of treatment. No one else in his family did, and he does not
think the girls he babysat did.

We talked about the other members of the family and where they fit, Jeremy
was the baby and he was quiet/shy most of the time. Very manipulative by way
of using his cuteness, etc to get what he wanted. Mark was just plain
unlikeable. He did not care about anyone else, was very uninhibited, just
did whatever he wanted. Joel was unresponsive to people. Did not like to be
touched, but eventually attached himself to Rob. Rob did not want any of
them there at all, but he took care of them and made sure they had food and
clothes and got to school. Kimi, who had been the favorite, was sort of
replaced by Jeremy who was the baby and cute. She took charge of him and
refered to him as her baby the way she did Rob when he was born. Rob says
that was probably true of her with him because he knows he used to call for
Kimi rather than his mom.

We talked about him getting beaten, injured, whatever, and never being taken
to a doctor. Even when it was a legitimate accident, because there may be
something else there for a doctor to see. Like the time he was hit by the
popcycle truck... his injuries were consitant with that accident but he also

RR 0534

Thursday 5_29_03.txt

had a black eye. If someone were to ask him how he got it he would have told them. He was honest if you asked the right question. He learned to answer only what was asked when he was growing up, therefor you will not find anything out about him unless you ask the right question in the right way. He took things literally, like when his mom said "if the kids at school ask how you got the black eye...tell them I hit you with a baseball bat" So...they did...and he did... then she proceeded to beat him because of what he said. She was joking but he took her literally and did what he was told, knowing that there were awful consequenses if you do not do what you are told and then the consequences happened anyway. He then did not know WHAT he was supposed to do. He is extremely honest and still people have not believed him about things that have gone on in his life.

Rob has been puking for the last 4 days, uncontrollably, whether he eats or not. He has been extremely down and wants to die. He says he does not have the strength to go on. That this is too hard to comprehend and he does not think anyone will believe him. He said no one has ever believed him in his life, that he was made to tell himself that he was a piece of shit and no good and deserved the treatment he got. He believes it. He knows that he was just a kid and did not know what he was doing was wrong, but he still blames himself for everything, thinking he should have known better, that he should have been able to handle everything. He cannot understand why he allowed and still allows his mother to matter in his life after she treated him the way she did or why he still feels like he should take care of her. Ever since we got here she has been saying he should not have moved here, so he questions whether he matters to her at all.

He says he is not strong enough to go on living if it is going to be like this. That he cannot see it ever getting better. That he cannot forsee a time when he has a minute he does not hurt and feel responsible. Time after time he has been hurt by someone and still let them into his life and taken care of them. He says he never should have had kids because with everthing that happened to him, he is afraid he will not be able to raise them the way they should be raised.

6/02/03

We talked about his mom beating him. He says there are many patches on the walls in Franks house from here slamming him and Kimi against the wall, hitting their heads. Mostly because they woke her up or were bickering with each other. She beat him terribly for very little reason. He said that evehn tho his dad was very abusive and alcoholic, he tried sometimes. He went to treatment and would come home and she would berate him, badger him, tell he why did he not just have a drink, that she liked him better when he was drinking... and one time, he went and bought a case of beer, brought it home, drank it, and then said to her "are you happy now?". Then she would go to her friends and complain that he started drinking again. She was extremely biting and manipulative and malicious when speaking to him. Rob says that later in life after he moved to California, he still drank, but he was happy-go-lucky and was not a mean drunk like his mom always says he was. On the other hand, his mother has always worked the system as well as people to get what she wants. She ignores the fact that Rob worked his tail off to get the downpayment for her house, and says that all he did was call the bishop and ask him to talk to her. She does not acknowledge that he actually worked for the money. She says that Rob got whatever he wanted always, but totally ignores the fact that if he got presents, he only had them a few days and then they got taken away from him, to be returned for the money. He

Page 2

RR 0535

Thursday 5_29_03.txt

hated getting gifts and still does not know how to accept them gracefully, yet he will shower them on other people.

Tonight he is trying to figure out how to deal with the things that keep coming out this weekend. He cannot have a quiet moment without thinking of something. He has tried staying busy to keep his mind off of it, but it is not working. He said that he has been pretending for so long that maybe this is all happening because he cannot pretend any longer. He said again he just wants to die, that he cannot see anything to live for if it is going to be like this and it looks to him like it is even going to get worse.

Just as a side note: I told Rob about my conversation with his mom about the money she said she was going to pay him back. She was talking about the taxes for the house and says that he never lent her any money for the sewer. She is planning on paying him back the tax money but knows nothing about the other. She also said to me that Joel had asked her for her portable air conditioner but that she told him she had to sell it with the house. Rob said bull shit since it is not attached to the house...we stopped by there to see if it was all emptied and Rob said maybe we should take the refrigerator he bought out of there. When we got home we talked about it and he called her and told her Joel needed the refer and air conditioner and we were going to go get it and take it to him... She agreed, and said he could have them and that she would let the real estate people know that they were not included with the house.

RR 0536

Exhibit___ Page 633

# EXHIBIT 5

RIVER OAKS HOSPITAL

ADMISSION SUMMARY

PATIENT:                    Robert Rinde (19887)
ADMITTING PHYSICIAN:        Thomas Hauth, M.D.
DATE OF ADMISSION:          4-13-05
DATE OF EVALUATION:         4-14-05

CHIEF COMPLAINT:           Post Traumatic Stress
                           Disorder,        Dissociative

Identity Disorder.

HISTORY OF THE PRESENT ILLNESS:    Patient is a 35-year-old male
                                   who       reports    increasing
dissociation.  He reports that people will tell him that he has
been angry or acting out by throwing things or driving recklessly
for which he has no recollection.  He now estimates that he has
spends approximately 50% of his day in a dissociative state.  He
was referred for inpatient treatment by his therapist.

Patient  has  a  history  of  depression  described  as  suicidal
thoughts with previous attempts of cutting himself, sitting on
the edge of a cliff, and a overdosing.  Patient reports
fluctuating sleep, fluctuating appetite, and increased energy.
His depression generally lasts for days or years at a day.  No
symptoms of elevated mood.  He experiences anxiety frequently in
the form of muscle tension and thoughts in his head.  He reports
no gambling.  He has a history of binge eating, no purging nor
restricting.  He denies any sexual behavior causing problems for
himself or for others.  He denies obsessions.  He reports som.
compulsive checking.  He gives examples going back to check the
lock three or four times before leaving and some excessive hand
washing, but no consequences from that.  Alcohol use starting at
age 21, last use three days ago.  He denies tolerance or
withdrawal.  Marijuana use from age 19 to 29, no daily use.  He
denies use of cocaine, benzodiazepines, opiates, PCP, LSD,
stimulants, or inhalants.

TRAUMA HISTORY:            Patient reports that he was kidnapped
                          by his father.  He reports, "There was
incest with my father and sister."  He also reports that he was
kidnapped and raped by his scout master and that he may have been
raped by a male within the last two years.  He does report re-
experiencing these events in the forms of nightmares, flashbacks,
and body memories; numbing in the form of dissociation, and has
symptoms of hypervigilance.

RR 1039

ROBERT RINDE (19887)
ADMISSION SUMMARY
PAGE 2

PAST PSYCHIATRIC HISTORY:    This would be his third inpatient psychiatric hospitalization.    He has been on Cymbalta for six months, Trazadone for three months, a combination of Valium and Klonopin for a year, and Risperdal just recently.  Prior medication includes Prozac, Paxil, Zoloft, Effexor, Wellbutrin, Lexapro, Lithium, Depakote, Tegretol, Neurontin, Zyprexa, and Seroquel.

FAMILY HISTORY:    Grandmother treated with extensive ECT treatments.

MEDICAL HISTORY:    He reports hypertension, irritable bowel syndrome, headaches, and rare asthma. He denies seizures and diabetes.  He has had surgeries for removal of _____ on his lower extremity and some sort of bladder surgery.  He has been tested for HIV and is HIV negative.

SOCIAL HISTORY:    Patient was born in Reno, Nevada and raised in Seattle, Washington.  He has limited college.  He reports no arrests, no violence.  He has a history of self-harm; last cut himself six months ago.

MENTAL STATUS EXAMINATION:    In general, the patient is a 35-year-old male.    He is appropriately groomed, cooperative with the interview.  There are no abnormal movements noted during the interview.  Communication, volume, rate, and tone of speech are appropriate.  He maintains good eye contact throughout the interview.  Mood is terrified.  Affect is congruent.  Thoughts are coherent.  He denies auditory and visual hallucinations.  There is no indication of grandiose or paranoid delusions.   He denies suicidal ideation and reports homicidal ideation.  Cognitive functioning is grossly intact.  Judgment is fair.  Insight is fair.

ADMIT DIAGNOSIS:

Axis 1 -  Major Depressive Disorder
          Post Traumatic Stress Disorder
          Dissociative Identity Disorder
          Rule Out Obsessive Compulsive Disorder
Axis 2 -  Deferred
Axis 3 -  Hypertension
          Irritable Bowel Syndrome
          Headaches
Axis 4 -  Trauma
Axis 5 -  30

RR 1040

Exhibit___ Page 636

ROBERT RINDE (19887)
ADMISSION SUMMARY
PAGE 3


ASSETS/STRENGTHS:

INITIAL TREATMENT PLAN:    Patient is admitted to the New Orleans
                          Institute and will participate in the
Trauma Resolution Program. He will continue on his current
medications.

ESTIMATED LENGTH OF STAY:    25 days.


dd: 4/14/05
dt: 4/15/05jwt

                          _____
                          THOMAS HAUTH, M.D.

RR 1041

Exhibit___ Page 637

EXHIBIT 6

Exhibit    Page 638

Rob Kiddé

9-9-97

→ divorce finalized this past week -- had mutually
agreed on a parenting plan; division of
property --> will have all 3 kids &
2ⁿᵈ; & +3 weekends each mo. + set
of holidays -- will meet half way

→ the divorce was very amicable in the end
-- he did well ē Brian's fair

→ situation ē his boys was handled;
the other child involved was dealt ē
appropriately -- no trigger up of old stuff

→ kids are managing pretty well -- all enjoyed
the week spent together while daughter was
in hospital

→ job hunting -- possible legislative job

→ met someone -- sexual encounter
s̄ any flashbacks! he's thrilled

→ some feelings of old stuff come up now
and then -- he's finding ①

→ the pivotal piece was dealing ē the
anger & the "blame the victim" stuff

→ way to deal ē any stuff that gets
"stuck"

→ relationship issues for future
Plan: Rob is done for now! — and happy
about it. Symptoms of PTSD are virtually
resolved. Will see again PRN if new things
arise.

RR 0337

EXHIBIT 7

Exhibit    Page 640



**MENTAL HEALTH UNIT**
OF
**DOUGLAS COUNTY HOSPITAL**
ALEXANDRIA, MN 56308

| | |
|---|---|
| NAME: | RINDE, ROBERT |
| Age: | 33 (DOB: 12/8/69) |
| DATE: | JANUARY 14, 2003 |
| STAFF: | M. WINGER, PHD,LP |

*COPY*

## NEUROPSYCHOLOGICAL EVALUATION

### REFERRAL INFORMATION:

The patient was referred for neuropsychological evaluation by Jeniece Aldinger, MD, neurologist. Dr. Aldinger saw the patient on 12/17/02 for headaches and dizziness. At that time, the patient and his roommate noted he has had trouble with memory. No specific examples of memory problems were provided to Dr. Aldinger. It was Dr. Aldinger's impression that the patient suffers from chronic mixed feature headaches likely related to underlying cervicalgia. It was her impression that the memory problems were most likely related to the patient's history of depression, though she also felt the headaches and insomnia might also prove to be a factor. Therefore, she requested neuropsychological testing to further evaluate the memory problems.

### CLINICAL INTERVIEW:

The patient is a 33 year old (DOB: 12/8/69), divorced, white, left-handed male with 14 years of formal education. He currently lives in Starbuck, MN, with his female roommate and 10 year old son. He has two other children ages 8 and 7, who live with their mother in Washington state. The patient relocated from Washington state about a year ago because his mother was ill. Apparently she has now recovered and is doing well. The patient owns a book store in Starbuck, MN, though this is currently closed for remodeling and will not re-open until May of this year.

Regarding chronology of symptoms, the patient was a rather poor historian. He was unable to pinpoint either the onset of the headaches or the onset of the memory problems. He is unclear whether the memory problems coincided with the onset of the headaches. He was unable to identify any stresses which may have been present when the headaches began. He describes his headaches as of a migraine variety, occurring about 6-8 times per month. Along with the headaches he has occasionally experienced numbness and tingling on his left side, as well as blurred vision and nausea. (In Dr. Aldinger's consultation, he also noted dizziness and disequilibrium.)

He rates the pain at a 7 on a 1 to 10 high scale. The length of headaches varies, with the longest having been about three days in duration. When he experiences the headaches, he becomes hypersensitive to light and sound and indicated he must go lie down in a dark room to manage the headaches. Maxalt has helped some, though it does not appear this has allowed him to function during the periods of time in which he does have a headache.

Regarding the memory problems, the patient indicated he used to be good at multi-tasking and now forgets most everything. When asked to describe his memory problems, the patient indicated that he "forgets a lot of things." For example, he forgot his birthday. When asked about specific types of memory problems, the patient endorsed all of the following: difficulty recalling names, remembering appointments or recalling conversations. He also indicated he frequently misplaces items, gets in the car and forgets where he is going, or forgets his own address. When asked about any difficulty with word finding, the patient indicated this occurs "all the time." In terms of following conversations, the patient indicated that if more than one person is involved "I check out....am just gone." He admitted that the memory problems do affect his work functioning, especially with the paper work involved, though denied any business difficulties or financial problems related to his work. It appears that his roommate, Kate, provides him frequent reminders and keeps him organized.

The patient is completely independent in self cares and activities of daily living. His memory problems have

REPORT OF EVALUATION                    RR 0700

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

COPY

RINDE, ROBERT
PAGE TWO

not limited his social contacts, though he indicated his headaches do limit his activities to some degree. In addition to the headaches, the patient suffers from irritable bowel syndrome. He is a smoker, smoking about two packs of cigarettes per day. When he met with Dr. Aldinger, he indicated he smoked only 10-15 cigarettes per day. At the time of this evaluation, the patient described having typically consumed four to ten pots of coffee per day. Again, at the time he met with Dr. Aldinger, he was reporting about four cups of coffee per day. He attributes the increase in nicotine and caffeine to his desire to avoid sleep because of flash backs and nightmares he experiences related to a past trauma history. The patient denied alcohol problems, indicating a family history of alcohol problems. He described his personal use currently as rare, though admitted that his alcohol use was problematic in the past. Nutrition appears of considerable concern at this time with the patient indicating he eats fewer than two meals per day, eats few fruits, vegetables or milk products, has recently lost weight, and is not always physically able to shop, cook or feed himself. Current medications include Propiazam 120 mg for blood pressure and Maxalt 10 mg for migraine headaches. The patient indicated he also suffers from extreme fatigue and interestingly noted he has never had a complete physical examination.

The patient has a significant psychiatric history. He describes himself as a survivor of sexual abuse and while it does not appear he has ever been on psychotropic medications, he did indicate he underwent psychotherapy five years ago while in Washington state. The therapists' approach was eye movement, desensitization and reprocessing (EMDR), which the patient felt was very successful. Unfortunately, he was revictimized about eight months ago, which has resulted in a recurrence of psychiatric symptoms. He has a desire to return to therapy and, in fact, contacted his former therapist for a recommendation and referral to a therapist in this area. He refuses to see a male and will only work with a female therapist.

SOCIAL HISTORY:

The patient is the second child in a sibship of five, with three brothers and one sister. He also has older step-siblings. The patient's parents are divorced. His mother is 58 years of age and lives in the Starbuck area. His father died a few years ago at the age of 59. The patient reported a family history of obesity and claimed that his mother weighed about 600 lbs at one time. He himself at one time weighed 400 lbs and lost a substantial amount of weight simply by exercising.

The patient attended school in Washington state. His family apparently moved around frequently and thus he spent little time at any one school. He indicated that he could have done much better in school than he did because he was very social and did not focus on academics as he should have. For unclear reasons he dropped out of school but eventually completed his GED. He worked for the state of Washington Department of Labor and Industries (Workers' Compensation Division) for ten years. He very much enjoyed that job, though resigned in order to take two years off to travel to "celebrate" the success of his psychotherapy and absence of psychiatric symptoms. It is unclear what type of work he did just prior to moving to the Starbuck area, where as mentioned he is now the owner of a book store.

The patient's sexual orientation is homosexual. He is not currently in a relationship, though does have good support from his female roommate. The patient has no military history. He listed his hobbies and activities as "travel." He indicated that finances are a concern to him, though would not elaborate on that concern. He described his religious/spiritual beliefs as other, noting "all of us together" are God." His religious commitment is rated as important to him.

BEHAVIORAL OBSERVATIONS:

The patient presented promptly for his appointment accompanied by his roommate. He was dressed in casual attire appropriate for the season. Grooming and hygiene were adequate. He appeared to be roughly his chronological age. He ambulated to and from the exam room with a normal gait and steady pace. No balance problems were noted. Affect throughout the interview and testing was labile with mood euthymic.

RR 0701

REPORT OF EVALUATION                                      CONTINUED

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL                    *COPY*

RINDE, ROBERT
PAGE THREE

As mentioned, the patient was a poor historian, having difficulty pinpointing the onset of symptoms and answering questions in a rather coy manner. He described his headaches and psychiatric symptoms in a matter of fact tone and thus affect was rather inconsistent with thought content. Speech was fluent, though rather circumstantial. Given the severity of psychiatric symptomology, the patient was asked to complete an MMPI-2 prior to the initiation of any cognitive testing. He was instructed to go out to get something to eat after having completed the MMPI, as he claimed he had nothing to eat for some time. The importance of eating prior to testing was stressed to him, though when he returned from his lunch break, he indicated he had not eaten and only had coffee to drink.

Despite the severity of psychiatric and physical symptoms endorsed, the patient felt quite comfortable proceeding with neuropsychological testing. He worked fairly diligently throughout the course of testing, declining breaks when offered. He put forth reasonable effort on all tasks. Level of alertness was consistent throughout the testing and there was no evidence that fatigue compromised performance. Motor activity was unremarkable with no evidence of tremor despite the patient's indication of substantial amounts of caffeine consumed and no nutritional intake for quite a period of time prior to the testing. Overall, it is this examiner's impression that the present results are an accurate reflection of the patient's current cognitive functioning.

TESTS ADMINISTERED:

Weschler Abbreviated Scale of Intelligence
New-Adult Reading Test-Revised
Controlled Oral Word Association
Wisconsin Card Sorting Test
Trailmaking Test
Digit Span
Spatial Span
Portions of the Weschler Memory Scale-Revised
Rey Auditory Verbal Learning Test
Boston Naming Test
Judgment of Line Orientation from RBANS
Rey Complex Figure
Finger Tapping Test
MMPI-2

TEST RESULTS:

Orientation: The patient was oriented to person, age and date of birth. He knew the year and month, though was unable to recall the specific date or day of the week. He was an hour and a half off on estimating the time. He was unable to recall the name of the clinic, though did correctly identify the city in which we were located.

Intellectual Functioning: Intellectually, the patient was functioning in the low average to average range with a slight, though non-significant superiority of non-verbal over verbal skills. Verbal skills fell within the low average range and non-verbal skills in the average range. An oral sight-reading test used to estimate pre-morbid intellectual functioning suggested the patient's estimated IQ should fall within about the average range, thus he is functioning at a significantly lower level than expected.

Higher Cognitive/Executive Functioning: Verbal abstraction was in the low average range and verbal fluency also well below average. Non-verbal problem solving and abstract concept formation were also slightly below average, with a perseverative quality noted in his problem solving approach.

RR 0702

REPORT OF EVALUATION                    CONTINUED

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

COPY

RINDE, ROBERT
PAGE FOUR

**Information Processing:** This fell within the average range for both simple processing and simultaneous processing of competing information.

**Attention Concentration** solidly within the average range on both auditory and visual attention tasks.

**Memory and Learning:** Immediate recall of an auditorily presented prose passage was low average and retention of that information across a 30 minute delay moderately impaired, with only a 53% retention rate. Immediate recall of visually presented geometric figures was low average and, similar to the auditory recall, deteriorated to the moderately impaired range after one-half hour. Retention was only 67%, which is well below expectation.

Word list learning was below expectation, with a rather erratic and inefficient learning style. Overall amount of information learned was below average and retention across a delay below expectation as well. Recognition of that material was also moderately impaired.

**Language:** Speech was fluent with no evidence of word finding pauses or paraphasic errors. Visual confrontation naming fell within the average range, though as previously mentioned, fluency was below expectation. Receptive language was not specifically assessed, though the patient had no difficulty understanding task instructions, suggesting intact comprehension.

**Visual Spatial Abilities:** Visual spatial perception was sufficient. However, visual spatial organization and planning was compromised with a disorganized approach resulting in a distorted end product. Immediate and delayed recall of the information was severely impaired and recognition also well below expectation.

**Motor Skills:** The patient showed the expected superiority of the dominant over the non-dominant hand on a finger tapping test. Both scores fell within the average range, with no lateralization noted.

**Emotional Functioning:** The patient completed the MMPI-2 and his profile suggested that the patient read, understood, and responded consistently to test items. His protocol was consistent with an individual who is experiencing extreme emotional distress, though there was some suggestion of over endorsement of pathology. The profile is consistent with significant, chronic psychopathology. Individuals with similar profiles typically are experiencing a psychotic thought process. These individuals are emotionally out of control and feel they are losing their mind. Impulsivity and poor judgment are likely. Somatic complaints are prominent and while there may be an associated medical problem, many of the vague symptoms are likely to be a reflection of emotional distress including depression, anxiety and related suicidal ideation. These individuals view the world as a hostile place. They feel misunderstood and are mistrustful of others. They likely have negative attitudes toward authority, as well as physicians and mental health professionals. They are pessimistic about the likelihood of improvement in their symptoms. Self perception is marked by a lack of self confidence and negative sense of self worth.

The extent of pathology is considerable, even if we take into consideration the likely over reporting of symptoms. The level of distress suggests urgent treatment is required.

SUMMARY AND IMPRESSION:

The patient was initially referred for assessment of cognitive functioning due to subjective complaints of memory problems. It was the neurologist's opinion that some of these cognitive problems could be related to his history of depression. However, she also wanted to rule out the possibility that his headaches and insomnia might be contributing to the cognitive problems. While some cognitive problems were reflected in the testing, the extent of his current emotional distress over shadows any potential contribution of the headaches or insomnia. As a result of the interview and the results of the MMPI-2, he was referred for an urgent psychiatric evaluation and urged to seek psychotherapy.

RR 0703

REPORT OF EVALUATION                    CONTINUED

## MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

COPY

RINDE, ROBERT
PAGE FIVE

At this point it is impossible to determine whether the cognitive problems present have any organic basis because of the severity of the emotional distress. When the patient's mental health concerns are treated and he is considered relatively stable, it would be useful to re-evaluate cognition only if memory problems persist.

Please feel free to contact me at Douglas County Hospital Mental Health Unit if further information regarding this evaluation and recommendations would be beneficial.

Maureen J. Winger, PhD,LP

MJW:aht
D:    1/20/03
T:    1/21/03

CC:    Jeniece Aldinger, M.D. DCH-ASU

RR 0704

REPORT OF EVALUATION                    CONTINUED

Exhibit___ Page 645

EXHIBIT 8

## Robi

**From:**      "Robi" <robrinde@mchsi.com>
**To:**        <starbucktimes@hcinet.net>
**Sent:**      Wednesday, June 11, 2003 6:36 PM
**Subject:**   To the editor

The fall of Serendipity Books and Antiques

To lay rumors to rest, yes, Serendipity Books has closed with no chance of reopening. Joyce Walquist will be having an auction to sell its contents and the building itself. Now the reason of this transformation is as follows. I am a survivor of childhood sexual abuse, this past October I was again abused sexually. I found myself unable to work and or be around other people, hence quickly money became an issue. which meant we were unable to continue with the business.

People who know me, know that I am homosexual and that I live with a woman. This woman is not transgendered, transexual or in any other way different then who she is, which is my closest friend. Unfortunately, some children in this community harass my son because of this. Harassment is a form of hate, as a community do we support hate? Why should an 11 year old child suffer because of tragic circumstances and/or who his loving parents are?

The truth in my own script, let the rumors rest.
Rob Rindé
Starbuck

6/12/2003

RR 0532

Exhibit _____ Page 647

EXHIBIT 9



**MENTAL HEALTH UNIT**
OF
**DOUGLAS COUNTY HOSPITAL**
ALEXANDRIA, MN 56308

NOTE: This report is strictly Confidential and is for the information only of the person to whom it is addressed. No responsibility can be accepted if it is made available to any other person, INCLUDING THE PATIENT.
MR151

| | |
|---|---|
| NAME: | RINDE, ROBERT |
| AGE: | 33 (DOB: 12/08/69) |
| DATE: | 03/26/03 & 03/31/03 |
| STAFF: | Nancy Kiger, PhD, LP |

### INTAKE/DIAGNOSTIC ASSESSMENT

**REFERRAL INFORMATION:**

Robert Rinde was initially referred to the Douglas County Hospital Mental Health Unit for neuropsychological testing and was seen by Maureen Winger, PhD, LP. Dr. Winger requested an urgent psychiatric consultation and Robert was seen by Allison Meisner, MD on January 15, 2003. Dr. Meisner's provisional DMS-IV Diagnosis was 296.89 Bipolar II Disorder and 309.81 PTSD. Robert was then seen by Joyce Forsgren, LICSW on 02/20/03. Ms. Forsgren planned to see him for individual therapy, however, the appointment did not go well and Robert walked out before the assessment could be completed. He was then rescheduled for this appointment.

**PRESENTING PROBLEM/CURRENT SITUATION:**

Robert is currently exhibiting significant symptoms. He is unable to leave the house except to attend psychiatric and therapy appointments. He has frequent nightmares. He panics when someone comes to the house and is unable to answer the phone. He describes "constant suicidal ideation" since September of 2002. Robert is unable to work, and he is relying on his friend, Kate, a housemate for financial support. He also has an 11 year old son, Travis, who is living with him in Starbuck, Minnesota. Robert's mother also lives in Starbuck and he moved here from Seattle/Tacoma, Washington when she was ill 1-1/2 years ago. Their relationship became very stressful and Robert rarely talks to her. Robert's mother is quite ill. She is currently residing in her own home and Kate provides some PCA services for her. Robert did note he had a relationship with another male which involved a rape. This occurred in the fall of 2002 and triggered memories of sexual abuse by his father, his sister and a scout master.

**FUNCTIONAL IMPAIRMENT:**

Robert is isolated. He is unable to work. He is hypervigilant and his symptoms of PTSD make it very difficult for him to do the necessary jobs associated with living in a home and caring for a child.

**FAMILY HISTORY:**

Complete family history is contained in Dr. Meisner's initial psychiatric consultation completed January 15, 2003.

**SOCIAL HISTORY:**

Robert's social history is also contained in Dr. Meisner's January 15, 2003 report.

**DEVELOPMENTAL/MEDICAL HISTORY:**

Please see the initial psychiatric consultation in this record.

**PSYCHIATRIC/PSYCHOLOGICAL/SUBSTANCE HISTORY:**

This history is also contained in Robert's initial psychiatric consultation.

REPORT OF EVALUATION                    RR 0706

MENTAL HEALTH UNIT OF DOUGLAS COUNTY HOSPITAL

RINDE, ROBERT
PAGE TWO

**MENTAL STATUS:**

Robert arrived at his appointment on time and accompanied by his friend, Kate. He was casually dressed in sweat pants, appropriately groomed and appeared his stated age. He was cooperative throughout the clinical interview, though he avoided eye contact. Speech was halting and he often looked to Kate to provide details. At times, he appeared very anxious. However, there was no evidence of a thought or perceptual disturbance. Suicidal ideation was endorsed, but he agreed to follow a safety plan and denied intent. Cognitive functioning appeared to be intact.

**STRENGTHS/VULNERABILITIES:**

Robert's strengths include the fact that he has been able to hold a job in the past. He has a very close relationship to his friend, Kate, who appears to be very devoted to him. He is very positive about his relationship with his son. Vulnerabilities include a history of trauma. In addition, his relationship with his mother has caused him a great deal of stress.

**DSM-IV DIAGNOSIS:**

AXIS I:      309.81 Posttraumatic Stress Disorder; 296.90 Mood Disorder, NOS.
AXIS II:     R/O 301.9 Personality Disorder, NOS.
AXIS III:    Hypertension, migraines.
AXIS IV:     Severe, financial problems, unemployment, trauma, conflictual relationship with mother.
AXIS V:      GAF: 50.

**TREATMENT PLAN:**

Ongoing individual therapy on a regular basis is likely to be beneficial to Robert. It will be important to take time in building rapport with him as he has already had a difficult experience. Care will need to be coordinated with his treating psychiatrist. Given the severity of his symptoms, he may need to be seen quite frequently during the initial phases of therapy. Consultation will be received from Chris Erbes, PhD, LP. This has been discussed with Robert.

Nancy C. Kiger, PhD, LP

NK:jmt
D:     04/01/03
T:     04/04/03